**U.S. Department of Labor**    Office of Labor-Management Standards
Washington, D.C. 20210



October 28, 2021

Ray Tellis, Regional Administrator
Federal Transit Administration, Region IX
201 Mission Street, Suite 2210
San Francisco, California 94105

Re:    Reconsideration of June 14, 2019 Determination Responding to Objections to
Employee Protection Terms for Pending FTA Grant Applications
Alameda-Contra Costa Transit District, CA-2017-017-01 and CA-2019-011;
Golden Gate Bridge, Highway and Transportation District, CA-2019-041;
Los Angeles County Metropolitan Transportation Authority, CA-2018-012-01 and CA-2018-093-01;
Riverside Transit Agency, CA-2019-048;
San Francisco Bay Area Rapid Transit District, CA-2019-029;
San Joaquin Regional Transit District, CA-2019-034;
San Mateo County Transit District, CA-2017-104-01;
Santa Clara Valley Transportation Authority, CA-2018-081-01 and CA-2019-047

Dear Mr. Tellis:

Before state and local transportation agencies can receive certain federal mass transit funding
assistance, Section 13(c) of the Urban Mass Transportation Act of 1964 ("UMTA") requires that
the U.S. Secretary of Labor certify that "fair and equitable" arrangements are in place to protect
the interests of affected employees. 49 U.S.C. § 5333. Those arrangements "shall include
provisions that may be necessary for" "the preservation of rights, privileges, and benefits
(including continuation of pension rights and benefits) under existing collective bargaining
agreements or otherwise" and "the continuation of collective bargaining rights." *Id.* §
5333(b)(2)(A), (B) (commonly referred to as Section 13(c)(1) and (c)(2)).

In 2013, the Department[1] determined that the enactment of the California Public Employees'
Pension Reform Act of 2013 ("PEPRA"), Cal. Gov't § 7522 *et seq.*, precluded Section 13(c)
certification of grants to two California transit agencies. The transit agencies had received federal
transit funding for decades and committed to abide by Section 13(c)'s requirements.
Nevertheless, the transit agencies unilaterally reduced their employees' pension benefits in order
to comply with the substantial restrictions imposed by PEPRA on public employers in California.

---

[1] The Secretary of Labor delegated his authority under Section 13(c) to the Office of Labor-Management Standards
(OLMS). *See* Secretary's Order 8-2009, § 5.A(4), 74 Fed. Reg. 58835 (Nov. 13, 2009). For simplicity, this
reconsideration uses the term "the Department" generally to refer to those at the U.S. Department of Labor given
authority for Section 13(c) certification.

1

The Department reasoned that PEPRA substantially diminished the affected unions' ability to bargain over future pension benefits in violation of Section 13(c)(2)'s requirement to continue collective bargaining rights and reduced benefits provided under the agreements for employees in contravention of Section 13(c)(1)'s preservation of existing benefits requirement. California and the transit agencies successfully challenged the Department's position in the U.S. District Court for the Eastern District of California and ultimately obtained an injunction that precluded the Department from relying on PEPRA to withhold certification of the grant funds intended to benefit those two transit agencies.

On June 14, 2019, the Department issued a determination ("2019 Determination") reevaluating its prior determinations and acquiescing to the district court's conclusions that PEPRA's impact on transit employees did not preclude Section 13(c) certification. In light of litigation brought by transit employees' unions regarding the 2019 Determination, the Department, after further deliberation, believes that the 2019 Determination does not reflect the best approach to certification under Section 13(c). Upon reconsideration, the Department has decided that it does not agree with the substance of the 2019 Determination, which represents a deviation in the Department's long-standing interpretation and application of Section 13(c).

The Department hereby nullifies that 2019 deviation and returns to its original superior position. The Department finds that PEPRA effectively precludes certification under Section 13(c) for those transit agencies subject to its reforms. The reasons for the Department's return to its longstanding position are set forth at length below. The Department, however, is not rescinding or otherwise taking retrospective action as to the particular grant certifications addressed in the 2019 Determination. The Department's certifications pursuant to its 2019 Determination included no conditions indicating that funds could be de-obligated or that transit agencies might incur other obligations in the event of a change in the Department's application of Section 13(c). Therefore, the Department does not believe it would be fair and equitable, in light of all the circumstances, to issue a decision that could de-obligate the funds that have been obligated as a result of these particular grant certifications. The Department's conclusion to this effect accounts for any reliance interests that the State of California and its transit agencies may have in the 2019 Determination; the State's interests in the funds already committed are protected, and the State is now apprised of the approach that the Department will take with respect to Section 13(c) for grant applications prospectively.[2]

## Background and Procedural History

### The California Public Employees' Pension Reform Act (PEPRA)

California enacted PEPRA in 2012 to reform the state's public employee pension system. PEPRA affects the vast majority of California transit system employees because most participate in affected public retirement systems, such as the California Public Employees' Retirement System ("CalPERS"), a retirement system established under the County Employees Retirement

---

[2] While the Department will change its approach going forward, it will of course continue to comply with the injunction entered by the Court in the prior case. *See California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018) (granting injunctive relief but limiting scope of injunction to the two transit agencies at issue in that case).

Law of 1937 ("1937 Act System"), or an independent public retirement system plan. *See* Cal. Gov't § 7522.02(a)(1); AR[3] 64-001325 n.1.[4] PEPRA's most significant revisions are for those hired on or after January 1, 2013 ("new employees"), but certain provisions also affect those hired before that date ("classic employees").

PEPRA makes significant reductions to the maximum pension benefits that can be offered by public agencies participating in affected California retirement systems. Among other changes, PEPRA lays the groundwork for increased cost-sharing of defined benefit pensions. PEPRA requires that employees hired on or after January 1, 2013 pay at least 50% of the normal costs of any defined benefit pension plan and prohibits employers from paying any of the statutory employee contribution. Cal. Gov't § 7522.30(c). PEPRA extends that goal to all employees, declaring that "[t]he standard shall be that employees pay at least 50 percent of normal costs." *Id.* § 7522.30(a); *see also id.* § 20516.5(a). As of January 1, 2018, PEPRA also allows employers that contract with CalPERS to require all employees pay 50 percent of the normal costs, although for employees represented by labor unions, the employer can unilaterally impose this requirement only after bargaining to impasse. *Id.* § 20516.5(b) & (c).

PEPRA also makes changes to pension formulas and how benefits are calculated. PEPRA establishes minimum retirement ages and length-of-service requirements, and sets the maximum percentage of compensation to which a retiree will be entitled. *Id.* §§ 7522.20, 7522.25. PEPRA defines the final compensation that will be used to calculate pension benefits, providing for a three-year period for compensable income calculations, excluding certain income such as bonus payments and overtime pay, and capping the total amount of eligible income. *Id.* §§ 7522.10, 7522.32, 7522.34, 7522.42. It phased out the ability of public employees to purchase nonqualified service time (service credit for non-working time) or "airtime." *Id.* § 7522.46. It requires that enhancements to a public employee's retirement formula or benefit can only apply prospectively. *Id.* § 7522.44(a)-(b). PEPRA limits the ability of public employee retirees to work and simultaneously collect a pension. *Id.* § 7522.56.

PEPRA also places limits on the types of plans that public agencies can offer. It bars a public employer from offering a defined benefit pension plan to new employees that would cost more or be riskier to the employer than statutory benefit formulas. *Id.* § 7522.15. PEPRA bars a public employer that did not offer a supplemental defined benefit plan before January 1, 2013, from doing so after that date or from including any new employee in an existing supplemental defined benefit plan. *Id.* § 7522.18(a), (c).

---

[3] AR refers to the Administrative Record compiled for the challenge to the Department's 2019 Determination. *See* Certified List of the Contents of the Administrative Record, ECF# 15, filed in *ATU v. U.S. Dep't of Labor*, No. 2:20-CV-00953-KJM-DB, 2021 WL 2003104 (E.D. Cal. May 19, 2021).

[4] Transit agencies in California may choose between various options for retirement systems for their employees. Many transit agencies in California choose to contract with CalPERS or the 1937 Act systems, and by doing so, they are subject to the limitations mandated by PEPRA for those systems. Other transit agencies participate in pension trusts governed by the Employee Retirement Income Security Act of 1974 or have established their own locally administered retirement system. *See* AR 64-001325 n.1. Some transit systems in California use private contractors for the operation of all service and vehicle maintenance and so are not affected by PEPRA's restrictions on public employers and employees.

**Prior Related Administrative and Court Proceedings**

2013 and 2015 Determinations and Related Litigation

Related prior administrative proceedings began in 2012 when two public transit agencies, the Sacramento Regional Transit District ("SacRTD") and the California Department of Transportation ("Caltrans") on behalf of Monterey-Salinas Public Transit System Joint Powers Agency d/b/a Monterey-Salinas Transit ("MST"), submitted grants for Section 13(c) certification. *See California v. U.S. Dep't of Labor ("Cal. II")*, 2016 WL 4441221, at *4 (E.D. Cal. 2016). The Amalgamated Transit Union (ATU), whose locals represented affected transit workers, filed objections to certification due to PEPRA's effects on transit workers collective bargaining rights. The Department denied certification of SacRTD's grant application on September 4, 2013 and of MST's application on September 30, 2013, finding, *inter alia*, that PEPRA prevented "continuation of collective bargaining rights" under Section 13(c)(2) and thus precluded certification. *See* AR 5-000126; AR 6-000144; AR 14-000196 ("2013 Determinations").

California and the transit agencies sought review of the 2013 Determinations in the U.S. District Court for the Eastern District of California. In a 2014 decision, the court held that the 2013 Determinations were arbitrary and capricious. *California v. U.S. Dep't of Labor ("Cal. I")*, 76 F. Supp. 3d 1125 (E.D. Cal. 2014). Among the reasons the court provided was that the Department erred in "reflexively" relying on *Amalgamated Transit Union, AFL-CIO v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), in light of the factual differences between that case and the circumstances presented by PEPRA, which involved "a state's system-wide changes in some aspects of public employment." 76 F. Supp. 3d at 1143. Additionally, the court found that the Department's conclusion that PEPRA prevented collective bargaining over pensions was erroneously premised on an assumption that a pension must necessarily be a defined benefit rather than a defined contribution plan. *Id.* The court further stated that the Department was arbitrary and capricious in, *inter alia*, "fail[ing] to consider the realities of public sector bargaining," and in determining that not yet hired employees had rights under collective bargaining agreements. *Id.* at 1144-45. The court remanded the matter to the Department for further proceedings consistent with its decision. *Id.* at 1148.

On August 13, 2015, the Department reaffirmed its denial of the Section 13(c) certifications, providing additional explanation to address the issues raised by the court. *See* AR 94-001645; AR 99-001677 ("2015 Determinations"). California and the transit agencies returned to court to challenge the new determinations, and the court once again ruled that they were arbitrary and capricious. *California v. U.S. Dep't of Labor ("Cal. III")*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018); *Cal. II*, 2016 WL 4441221. The court found that the statutory text and legislative history of Section 13(c) were ambiguous as to whether Section 13(c)(2)'s provision requiring "the continuation of collective bargaining rights" protected those rights from a diminishing or lessening that fell short of elimination. *Cal. II*, 2016 WL 4441221, at *9-12, 15-17. The court noted, however, that the history of the statute suggested that the provision was "motivated primarily by larger-scale restrictions on collective bargaining rights" not present in this case. *Id.* at *17.

The court also determined that the Department erred in relying on case law establishing that even minimal unilateral changes by an employer could violate the statute because Congress' intent was not to apply all National Labor Relations Act (NLRA) law to states through the UMTA. *Id.* at \*19-20. The court determined that PEPRA was a permissible state law "backdrop" for collective bargaining because it did not substantially interfere with federal labor policy. *Id.* at \*21-26. In making this determination, the court analyzed whether a private analog of PEPRA would be subject to preemption under the NLRA. *Id.* The court created a test with the following five factors to evaluate this preemption issue: (1) Does the state law concern state interests deeply rooted in local feeling and responsibility and are those interests a merely peripheral concern of federal policy?; (2) Is the state law one of general applicability?; (3) Does the law protect workers' interests, for example, by establishing minimum labor standards?; (4) Does the state law essentially dictate the substantive result of collective bargaining?; (5) Does the law otherwise clash with the federal goal of encouraging the employer and the representative of the employees to establish, through collective negotiation, their own charter for the ordering of industrial relations? The court's application of this test resulted in one factor favoring the Department (the fifth), one factor favoring the transit agencies (the fourth), and the remaining three factors being neutral or uncertain. Within the context of this test and also as an independent basis, the court found the Department erred in failing to explain why the transit authority's ability to negotiate for other types of benefits did not make up for any change made by PEPRA. *Id.* at \*25, 27-28.

The court also ruled that the Department had been arbitrary or capricious in concluding that there were not adequate arrangements in place to preserve the pension rights of classic employees given the less significant changes to these employees' benefits. *See Cal. III*, 306 F. Supp. 3d 1180. The court enjoined the Department from relying on PEPRA to deny California's application of funding for MST or SacRTD under Section 13(c)(1) or (2). *Id.* at 1190. The Department appealed the court's decisions, but, on November 5, 2018, moved voluntarily to dismiss the appeal. *See* AR 162-002563. On December 19, 2018, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal. *See id.*

June 14, 2019 Determination and Related Litigation

On November 16, 2018, the Department re-referred the SacRTD and MST grant applications to ATU and the recipients. Between January and May 2019, the Department also referred eleven other grant applications by California transit agencies. *See* AR 163-002569 (2019 Determination). ATU objected to the proposed certifications of the SacRTD and MST grants on the basis that it would be premature and improper to certify the grant to comply with the district court's decision given that an appeal was still pending.[5] *See id.* at 1-2. ATU objected to the other proposed certifications due to PEPRA's effect on transit employees' collective bargaining rights. *See id.* at 2.

On June 14, 2019, the Department issued the 2019 Determination responding to ATU's objections to certification of multiple California grants due to PEPRA's effect on transit employees' collective bargaining rights. The 2019 Determination explained that the Department had "reexamined" its earlier position, and "[i]n light of the [California] district court's

---

[5] At that time, ATU's motion to intervene was still pending.

decisions," had "concluded that PEPRA does not present a bar to certification under section 13(c)." *Id.* at 2. The 2019 Determination first explained that it had reexamined the scope of its certification authority under Section 13(c) and determined that the provision grants the Secretary "broad discretion" to determine the adequacy of protective arrangements under Section 13(c). *Id.* at 4-5.

The Department further acknowledged that while the statute requires the Secretary to assess whether each of the enumerated statutory objectives has been satisfied, "the Secretary still retains broad discretion in evaluating fairness and equity vis-à-vis each of the five objectives." *Id.* at 5. Turning specifically to the provisions for the preservation of benefits and continuation of collective bargaining rights, the Department found that they could be read "strictly to mean no changes can be made to employees' rights, or more leniently to mean that rights must only be substantially continued or preserved." *Id.* at 5-6. The 2019 Determination noted that the purpose and context of the statute suggest, however, that the more lenient interpretation is appropriate. *Id.* at 6-7. The Department explained that Section 13(c) was designed to give the Secretary the flexibility to consider states' unique circumstances and not rigidly incorporate the strictures of the NLRA that preclude an employer from making even minimal unilateral changes to terms and conditions of employment. *Id.*

The 2019 Determination applied this interpretation to the grants at issue, finding that PEPRA did not substantially affect transit employees' benefits under existing collective bargaining agreements or impermissibly impair collective bargaining rights in violation of Section 13(c). *Id.* at 7-9. The Department explained that PEPRA only impacts bargaining over one substantive term of employment, pensions, and does not foreclose bargaining altogether but leaves employees free to negotiate around its restrictions. *Id.* at 7-8. It further explained that PEPRA was not aimed at the collective bargaining process but at alleviating the state of California's "serious financial problem of pension funding." *Id.* at 8. In light of PEPRA's unique purpose and limited effect, the Department concluded that it did not preclude certification of the grants at issue. *Id.*

On August 22, 2019, ATU and some of its affiliated California local unions filed suit against the Department in the U.S. District Court for the District of Columbia, challenging the Department's certification of grants to the California transit agencies in the 2019 Determination. California filed a motion to intervene along with a proposed motion to transfer venue to the U.S. District Court for the Eastern District of California, which were granted by the U.S. District Court for the District of Columbia on December 19, 2019 and April 29, 2020, respectively. *See ATU v. U.S. Dep't of Labor*, No. 2:20-CV-00953-KJM-DB, 2021 WL 2003104 (E.D. Cal. May 19, 2021). ATU moved for summary judgment, and the Department and California separately filed oppositions and cross-motions for summary judgment.

Prior to the filing of the Department's reply, there was a change in administration that resulted in new leadership assuming responsibility for the Department. The Department sought and received stays from the court so that new leadership would have time to become familiar with the issues in this case and decide whether to reconsider the Department's position regarding PEPRA. The Department now issues this reconsideration of its 2019 Determination.

**Analysis**

**Understanding Collective Bargaining**

PEPRA substantially interferes with the scope of permissible collective bargaining by transit workers and transit agencies such that Section 13(c)(2)'s requirement regarding "the continuation of collective bargaining rights" is not met. PEPRA places limits on the maximum pension benefits obtainable by transit workers, making defined benefit plan terms less favorable and shifting investment risk from employer to employee. As noted above, PEPRA established a minimum contribution amount for new employees, set the formula for time-in-service requirements, capped pensionable compensation, excluded certain compensation from pensionable compensation, and placed limitations on supplemental defined benefit plans. After PEPRA, unions and the transit agencies can no longer bargain freely about the calculation of defined benefit pensions, the service requirements for qualification, the compensation to be used for calculating pension amounts, the percentage of costs to be paid by new employees, or the addition of a new defined benefit plan. In essence, PEPRA largely removed the subject of defined benefit pensions from collective bargaining.

In doing so, PEPRA significantly interferes with transit employees' ability to bargain over pension rights, which is a mandatory subject of collective bargaining. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 159 (1971) ("Under the National Labor Relations Act, as amended, mandatory subjects of collective bargaining include pension and insurance benefits for active employees."); *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 (D.C. Cir. 2008) (explaining that the Supreme Court has "made clear that retirement benefits for current employees are mandatory bargaining subjects"). While PEPRA does not restrict collective bargaining procedures themselves, it predetermines significant aspects about the outcome of any such procedures with respect to defined benefit pensions. The state law places new limits on the potential solutions that transit agencies and transit workers can reach to the question of appropriate wages and benefits. In the Department's assessment, this constitutes a significant interference with transit workers' collective bargaining rights such that they are not "continued" within the meaning of Section 13(c) and the Department cannot certify that fair and equitable arrangements are in place to protect transit workers affected by assistance in California.

California and its transit agencies have received federal transit funding for decades and committed to abide by Section 13(c)'s requirement that changes to transit employees' wages and benefits be brought about by collective bargaining rather than state fiat. PEPRA violated this agreement, mandating that transit agencies make changes to workers' benefits and resulting in collective bargaining agreements that are consistent with the new limits. California and the transit agencies have not remedied the violation and continue to allow PEPRA to impede transit workers' collective bargaining rights with its significant limits on obtainable defined benefit pension plans. In limiting potential solutions that employers and employees can reach regarding the question of deferred compensation, PEPRA continues to interfere with the collective

bargaining process regardless of the specific terms of workers' collective bargaining agreements now in existence.[6]

The Department remains convinced of the accuracy of this assessment of PEPRA's impact after reviewing the 2019 Determination and the district court decisions finding the 2013 and 2015 Determinations to be in violation of the Administrative Procedure Act. For the reasons explained below, the Department disagrees with the exercise of discretion under Section 13(c) reflected in the 2019 Determination, notwithstanding the arguments made in those decisions that Section 13(c) certification is appropriate despite PEPRA. First, the Department does not agree that PEPRA's changes are so insignificant and unsubstantial that they do not impermissibly interfere with the continuation of collective bargaining rights for purposes of Section 13(c). Second, the Department does not believe that any of the complexities inherent in the interrelationship of public sector bargaining, state law, and federal labor law provide a justification for overlooking PEPRA's impact on transit workers' collective bargaining rights.

**PEPRA's Impact on Collective Bargaining Rights**

The 2019 Determination and district court decisions portray PEPRA's impact as insignificant and minimal by focusing on the ways in which collective bargaining rights were continued. The Department does not agree that PEPRA's substantial impact on pension benefits can be minimized by simply focusing on aspects of transit workers' collective bargaining rights that were untouched by the law.

First, the Department is not convinced that PEPRA's impacts are minor because they affect defined benefit plans but not defined contribution plans. *See* 2019 Determination at 7; *Cal. I*, 76 F. Supp. 3d at 1143. In order for a state or transit agency to significantly interfere with collective bargaining over pensions, it is not necessary that it affect bargaining about all types of pension plans. PEPRA's restrictions on defined benefit plans are sufficient alone, especially given the advantages such plans offer employees, including putting investment risk on the employer. *See* 2015 Determinations at 19-20.[7]

---

[6] PEPRA significantly interferes with collective bargaining rights for employees of affected public retirement systems, despite gradations in its effect. PEPRA's practical impact on transit employees depends on the particulars of each employee's situation, including the benefits enjoyed by the employee at PEPRA's enactment, the public retirement system that the transit agency participates in and the pension plan(s) it offers employees, and potentially the existence and contents of a collective bargaining agreement separately negotiated by a union to which the employee belongs.

[7] A defined benefit plan provides for a fixed periodic payment at retirement, which can be funded by contributions from the employer and employee. In a defined benefit plan, the employer is obligated to make up any shortfall in payouts to employees and so "typically bears the entire investment risk." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *Hurlic v. Southern California Gas Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008). In contrast, defined contribution plans typically operate by having an employee contribute a fixed amount to their individual account, sometimes with employer contributions. At retirement, the employee is entitled to benefits based on the gains, losses, and expenses that investment of the contributions have incurred. *See Hughes Aircraft*, 525 U.S. at 439; *Hurlic*, 539 F.3d at 1029. Defined contribution plans shift the investment risk to the employee, and often require the employee to make decisions about contribution amounts, types of investment, and how to convert the funds to retirement income. *See, e.g.*, U.S. Government Accountability Office, Retirement Income, Ensuring Income Throughout Retirement Requires Difficult Choices, GAO-11-400 (June 7, 2011), *available at* http://www.gao.gov/products/GAO-11-400.

Second, the Department now finds untenable the 2019 Determination's conclusion that PEPRA's impact is diminished because it is not aimed at collective bargaining procedures themselves. *See* 2019 Determination at 8. Continuation of collective bargaining rights logically requires that an employer abide by the procedures in place and not be able to dictate terms and conditions of employment by fiat. An employer's unilateral change to terms and conditions of employment is a violation of the collective bargaining process and procedures. *See USC Univ. Hosp. & Nat'l Union of Healthcare Workers*, 358 NLRB 1205, 1213 (2012) ("It is, of course, long, well established Board and court authority that an employer violates Section 8(a)(5) and (1) of the [NLRA] if it makes a unilateral change in the wages, hours, working conditions, or other terms and conditions of employment of its employees without first giving a union representing a unit of employees notice and an opportunity to bargain." (*citing NLRB v. Katz*, 369 U.S. 736, 743 (1962))). As the D.C. Circuit observed in *Donovan*, "[c]ollective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects." 767 F.2d at 951. In enacting PEPRA, the state unilaterally dictated certain substantive results of the collective bargaining process by preventing employees from obtaining certain favorable terms for defined benefit pension plans.[8] PEPRA's unilateral changes to obtainable pension benefits is inconsistent with the continuation of collective bargaining rights, just as changes to aspects of collective bargaining procedures may be as well.

Third, the Department finds unsupported the 2019 Determination's conclusion that PEPRA's effects are mitigated by the fact that employees and employers are free to bargain around PEPRA's effects and within its restrictions. *See* 2019 Determination at 8; *Cal. II*, 2016 WL 4441221, at *25, 28. In theory, employees may be able to coax an employer to offer certain benefits to mitigate the effect of PEPRA's restrictions. But this will always be true in any situation where the state or employer takes away rights or benefits but does not completely eliminate collective bargaining. The logical result of this type of reasoning is that the employer will always be able to shape by state fiat the types of benefits obtainable in favor of employers and chip away at collective bargaining rights. For collective bargaining rights to continue, state employers cannot have authority to unilaterally diminish significant terms and conditions of employment of transit workers. As the D.C. Circuit in *Donovan* recognized, "the substantive provisions of collective bargaining agreements may change, but section 13(c) requires that the changes be brought about through collective bargaining, not by state fiat." 767 F.2d at 953.

Moreover, in practice, PEPRA places a hand on the scale in favor of the employer in a manner that is inconsistent with the process of collective bargaining. Under the rules of collective bargaining, an employer would need to negotiate with employees if it wished to place new restrictions on obtainable pension benefits and would likely need to offer some compensatory benefits to employees in exchange. In contrast, by enacting PEPRA, the state unilaterally

---

[8] As explained in the 2015 Determinations, pension plans are one of the terms and conditions of employment over which an employer must bargain collectively. Pensions were understood to be a mandatory subject of collective bargaining at the time of Section 13(c)'s passage. *See* 2015 Determinations at 11-12. Indeed, Section 13(c) itself specifically notes pensions rights among those protected. *See* 49 U.S.C. § 5333(b)(2)(A) (requiring "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise").

9

removed certain outcomes from the process that were considered unfavorable to public employers in the state. PEPRA creates a result in favor of the employer without the prerequisite negotiations, which typically is what encourages employers to offer compensatory benefits to induce an agreement from employees. As such, the Department is not persuaded that PEPRA's effects can so easily be mitigated. It is not reasonable to base an assessment of whether collective bargaining rights have continued on speculation that some employees *may* have been able to obtain some compensatory benefits in exchange for restrictions mandated by state law. In the Department's judgment, PEPRA's restrictions constitute a significant interference with collective bargaining rights, regardless of the results of subsequent negotiations regarding pensions and other benefits.

Fourth, the Department does not view PEPRA's restrictions as less impactful because the most significant changes apply to recently hired employees. *See Cal. I*, 76 F. Supp. 3d at 1144-45. It is well established that new employees are entitled to the rights granted under collective bargaining agreements. *See* 2013 Determinations at 12-13; *see also J.I. Case Co. v. NLRB*, 321 U.S. 332, 334-36 (1944); *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1106-07 (2d Cir. 1991). Employers may not unilaterally change wages and benefits of new employees. *See, e.g.*, *Mississippi Power Co.*, 332 NLRB 530, 532 n.10 (2000), *enfd. in relevant part*, 284 F.3d 605 (5th Cir. 2002); *Triple A Fire Prot., Inc.*, 315 NLRB 409, 422 (1994). The Ninth Circuit has specifically held that an employer violates federal labor law when it refuses to collectively bargain over new employees or refuses to apply the terms of existing agreements to the new employees. *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 931 (9th Cir. 1980). Given this basic principle of collective bargaining, it is appropriate to consider PEPRA's provisions affecting new employees when assessing the impact of the law on the continuation of collective bargaining rights. Additionally, Section 13(c)'s protections could soon become meaningless if the Department were to ignore employers' actions affecting the rights and benefits of recently hired or new employees, and there is "nothing in the text of the provision to suggest that the essential process entailed in 'the continuation of collective bargaining rights' should come to mean less as time goes by." *Donovan*, 767 F.2d at 957 (Ginsburg, J., concurring). As such, the Department is not persuaded by the district court decisions' and the 2019 Determination's assessment of PEPRA's effect on collective bargaining rights as trivial or unsubstantial.

**Interrelationship of Public Sector Bargaining, State Law, and Federal Law**

As explained below, upon further reflection, the Department finds the arguments in the 2019 Determination and district court decisions related to the dynamics involved in applying principles of federal labor law to state or local government to be unpersuasive. The Department looks to federal labor law in assessing these arguments about the intended relationship between Section 13(c) and state laws in order to understand the general scope of the duty to bargain collectively. As the D.C. Circuit recognized in *Donovan*, the Department now finds that the legislative history to the Urban Mass Transportation Act "reveals Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy." 767 F.2d at 948. Nevertheless, the Department uses NLRA precedent as guidance below and is not suggesting its rigid application to Section 13(c). *See* 2019 Determination at 6; *Cal. II*, 2016 WL 4441221, at *19.

Public Sector Realities

First, the Department does not find that the "realities of public sector bargaining" require the Department to excuse PEPRA's impact. *See Cal. II*, 2016 WL 4441221, at \*21. The Department is familiar with the "realities of public sector bargaining" and that the process entails additional actors, considerations, and complications. Transit agencies need to consider "taxes, legislative policies, constitutional requirements, civil service principles, municipal codes, and other concerns in addition to the ordinary concerns of private employment, like budgets or competitors' practices." *See id*. Here, transit agencies were placed in an additional federal-state bind because California enacted a law that interfered with collective bargaining relationships that its transit agencies had agreed to preserve and continue as a condition of continued receipt of federal transit assistance.

As the 2019 Determination stated, Section 13(c) gives the Secretary of Labor a degree of flexibility and ability to adapt state and local circumstances to collective bargaining. *See* 2019 Determination at 6. But the Department does not view this flexibility as meaning that it is obligated to ignore or excuse all state or local government's unilateral changes to transit workers' rights because of "the many rocks and hard places between which [transit agencies] must navigate." *See Cal. II*, 2016 WL 4441221, at \*21. Rather, Section 13(c) contemplates that the Department be allowed to conclude that a law impermissibly interferes with Section 13(c)'s protections, and "seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)." *See Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 25 n.8 (1982); *see also Donovan*, 767 F.2d at 947 ("Section 13(c) does not prescribe mandatory labor standards for the states, but rather dictates the terms of federal mass transit assistance. States are free to forego such assistance and thus to adopt any collective bargaining scheme they desire . . . . But the statute does not allow states to eliminate collective bargaining rights and still enjoy federal aid."). In the Department's estimation, PEPRA's effects are significantly negative and cannot be disregarded simply because of the additional difficulties that public sector bargaining often entails.

Accommodation to Local Circumstances

Second, the Department does not conclude that PEPRA's impact should be overlooked as part of accommodating collective bargaining principles to California's and local agencies' unique circumstances. PEPRA was enacted to respond to the state's budgetary concerns. *See Cal. I*, 76 F. Supp. 3d at 1138 ("In 2012, California's Governor signed the PEPRA into law 'to reform California's public employee pension systems and to bring the staggering cost of funding such systems under fiscal control.'" (quoting California's First Amended Complaint)). The 2019 Determination granted undue latitude to California, drawing support from NLRA law that "'allows private employers to follow the dictates of economic necessity, so long as they bargain over the effects of management's decisions.'" 2019 Determination at 8 (quoting *Cal. II*, 2016 WL 4441221, at \*25). But "effects bargaining" under the NLRA refers to decisions employers may make unilaterally because they are solely within the province of management, and does not apply to mandatory subjects of bargaining, like retirement benefits for current employees. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 674-77 (1981).

Moreover, NLRA case law does not generally excuse unilateral actions regarding a mandatory subject of collective bargaining simply because "such action was compelled by economic need or that it may have served what may appear to us to be a desirable economic objective." *Oak Cliff-Golman Baking Co.*, 207 NLRB 1063, 1064 (1973), *enfd.*, 505 F.2d 1302 (5th Cir. 1974); *see also Air Convey Industries*, 292 NLRB 25, 26 (1988) (finding employer's financial inability to make the required benefit fund payments and that it has ceased operations to be no defense to a violation of the NLRA's requirement to abide by provisions of a collective bargaining agreement); *NLRB v. Manley Truck Line, Inc.*, 779 F.2d 1327, 1330-32 (7th Cir. 1985) (upholding NLRB's rejection of employer's argument for an economic necessity exception to the NLRA's prohibition against unilateral modifications of an existing collective bargaining agreement); *Milwaukee Terminal Servs.*, 282 NLRB 637, 639 (1987) (rejecting economic necessity defense to employer's unilateral changes made after expiration of an existing contract). NLRA precedent does recognize an exception to bargaining requirements where there are extraordinary unforeseen economic exigencies having a major economic effect that require the employer to take immediate action. *See* NLRB, GC 20-04: Case Summaries Pertaining to the Duty to Bargain in Emergency Situations (Mar. 27, 2020), *available at* https://www.nlrb.gov/guidance/memos-research/general-counsel-memos.

With this background in mind, the Department finds there is insufficient justification to merit exercising any flexibility accorded to the Department to accommodate the unique circumstances of states and localities to collective bargaining procedures. The 2019 Determination did not set forth evidence establishing that California's budget constraints constituted compelling economic circumstances that would justify excusing the requirement to collectively bargain with transit workers about significant aspects of defined benefit plans. There is insufficient evidence to support its conclusion that the budgetary concerns behind PEPRA's enactment were such that they merited special consideration when determining whether collective bargaining rights have been continued within the meaning of Section 13(c). As such, unique state and local circumstances here do not justify overlooking the limitations that PEPRA imposes on the collective bargaining relationship between transit agencies and workers.

State Law Backdrops

Lastly, the Department does not conclude that PEPRA should more properly be considered a permissible state law backdrop for collective bargaining rather than an intrusion on collective bargaining rights. *See Cal. II*, 2016 WL 4441221, at *21-26; *Cal. I*, 76 F. Supp. 3d at 1143. Section 13(c) does not preempt PEPRA, and an NLRA-preemption analysis is unnecessary. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8, 27 (explaining legislative history that clarifies that "Section 13(c) would not supersede state law," and reflects "congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)"). To the extent preemption cases can be useful in determining whether a state law violates Section 13(c), they support the conclusion that PEPRA improperly intrudes on collective bargaining rights, as thoroughly discussed in the 2015 Determinations. *See* 2015 Determinations at 13-16.

As the 2015 Determinations explain, PEPRA does not resemble the kind of law that survives the NLRA preemption analysis under the doctrine set forth in *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140 (1976). PEPRA cannot properly be characterized as a state law setting minimum labor standards or mandating certain benefits that does not intrude into the processes of collective bargaining. *See Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 727, 751-58 (1985) (upholding a state law requiring insurance policies to provide mental health coverage where the law had only the most indirect effect on employees' self-organization and collective bargaining); *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21-22 (1987) (finding not preempted a state law requiring employers to provide a one-time severance payment to employees affected by a plant closing). PEPRA establishes ceilings and prohibits negotiation over aspects of defined benefit pensions; it does not set minimum standards. With its substantive mandates, PEPRA "virtually dictate[s] the results" of defined benefit pension provisions of collective bargaining agreements. *See Chamber of Commerce v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995) (finding preempted a county ordinance that imposed a detailed wage and benefit scheme for construction projects within the county).

PEPRA differs from the state laws noted above in another manner: it is not a general law seeking to regulate all state citizens, private and public. Rather, PEPRA involves the state "acting as an employer," an area where the state "has a much narrower latitude to enact laws that trench upon the terms of a collective bargaining agreement negotiated under the regime of federal labor laws." *See Hull v. Dutton*, 935 F.2d 1194, 1198 (11th Cir. 1991). Ignoring PEPRA's intrusion on collective bargaining and treating it as only a backdrop would "give the State tremendous liberty to abrogate collective bargaining contracts with its own employees under the guise of enacting a 'minimum labor standard.'" *Id.* at 1199. States could eviscerate Section 13(c)'s protections merely by passing laws defining benefits available to public employees. Section 13(c) was clearly enacted to prevent such a result. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8 (noting "congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)"); *Donovan*, 767 F.2d at 948 (explaining it was "Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy").

The Department is not persuaded by the district court's contrary conclusion that PEPRA presents "no substantial inconsistency with federal labor policy." *Cal. II*, 2016 WL 4441221, at *21-26. The Department does not base its decision-making on the five factor test the court constructed and used to reach this conclusion. None of the Department's recent in-depth examinations of the statutory language and legislative history of Section 13(c) yielded the conclusion that Congress intended a preemption analysis to govern the Secretary's conclusions about what arrangements are fair and equitable. *See* 2019 Determination, 2015 Determinations, 2013 Determinations. Moreover, most of the factors, as applied by the district court, seem ill-suited to making any necessary nuanced distinctions between state laws affecting transit employee rights to varying degrees. Only the last factor (whether the law clashes with the goal of encouraging collective negotiation) seems directly aligned with Section 13(c)'s purpose, and this was the only factor the court found weighed in favor of finding PEPRA impermissibly intruded on collective bargaining. *See id.* at 25. The other four factors (the first, second, third, and fourth) seem unhelpful when

evaluating the significance of state laws affecting transit workers' rights as they will likely not weigh in favor of finding a violation of Section 13(c) no matter the impact of the state law.

The district court found the first factor (whether the state law concerns deeply-rooted state interests) could not resolve in favor of the Department's position because PEPRA reflected "an overarching concern with a broad and traditional state interest: the budget." *Id.* at \*24. A state's budget will likely be implicated whenever a state enacts cost-saving measures cutting employee benefits. Taken to its logical conclusion, this factor provides no protection against a state law that dramatically cuts benefits bargained for by transit workers.

The court found that the second factor (whether the state law is generally applicable) could not weigh in favor of the Department's position because California enacted PEPRA rather than the transit agencies, with whom the transit workers directly bargained. *Id.* at \*25. Thus, this factor would never weigh in favor of finding a state law significant so long as public transit workers fall under the authority of a sub-agency of the state. Taken to the logical conclusion, it would mean Section 13(c) provides no protection against generally applicable state law unless there is a direct relationship between the state and the transit worker. This interpretation would be contrary to Section 13(c)'s purpose to protect transit workers against state laws that interfere with collective bargaining rights. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8; *Donovan*, 767 F.2d at 948.

The court found that PEPRA was neutral as to the third factor (whether the state law is directed toward the protection of workers' interests) even though "PEPRA's changes increase the share of pension costs borne by employees and are intended to alleviate California's financial burdens as employer." *Cal. II*, 2016 WL 4441221, at \*25. Still, the district court found that the third factor did not support the Department's position because "[i]t is not clear . . . that a state law conflicts with federal policy simply because its substantive result may tend to favor employers" and since transit agencies and employees could still engage in negotiations to offset PEPRA's effects. *Id.* This factor, at least as applied by the district court, does not seem useful in measuring intrusion on employees' collective bargaining rights if it returns an inconclusive result as to a law clearly and admittedly directed at improving the employer's interests at the cost of workers' interests.

Lastly, the court found that the fourth factor (whether the state law essentially dictates the substantive result of collective bargaining) was not met because transit workers could bargain around and within the restrictions of PEPRA. *Id.* at \*25. Laws like PEPRA capping allowable benefits do dictate a substantive result: they dictate an agreement with benefits lower than the cap. As applied by the district court, the effect of these caps cannot be taken into account. Presumably, this factor could only weigh in favor of recognizing a significant intrusion if the state removed entire subject(s) of collective bargaining from the table or prohibited any further collective bargaining. This factor, like the first and second, therefore is not capable of making nuanced distinctions between state laws impacting transit workers' rights. As such, the Department does not find the district court's preemption analysis to provide a workable standard for evaluating state law's interference with collective bargaining relationships protected by federal law. Nor, as explained above, does the Department believe that the realities of public sector bargaining or California's unique circumstances provide a justification for PEPRA's interference with collective bargaining rights.

14

**Conclusion**

In enacting PEPRA, California placed new and significant limits on the scope of permissible pension benefits for its public transit workers, affecting the collective bargaining relationships that its transit agencies had agreed to preserve and continue as a condition of continued receipt of federal transit assistance. For many years following the enactment of PEPRA, the Department took the position that PEPRA constituted an impermissible interference with the collective bargaining rights protected by Section 13(c). The Department changed positions in 2019, relying on district court opinions enjoining the Department from denying certification and reasoning that Section 13(c) granted the Department the discretion to certify despite PEPRA's effects.

As explained above, the Department believes that its original position was better reasoned and supported. PEPRA's impact on transit workers' collective bargaining rights is material and significant even if it does not eliminate collective bargaining over pension benefits altogether or alter collective bargaining procedures. The Department does not find it appropriate to overlook PEPRA's impact as an accommodation to the realities of public sector bargaining, as part of the complexities of adapting principles of federal labor policy to state law or local circumstances, or by characterizing the law as simply a state "backdrop." The Department arrives at its assessment of PEPRA as an impermissible interference with collective bargaining rights even following a permissive view of the Department's discretion under Section 13(c). As such, the Department determines, on a prospective basis, that it is not appropriate for it to certify that there are fair and equitable arrangements in place to protect the employees of California transit agencies, and it accordingly overrules the legal positions expressed in its 2019 Determination.

Sincerely,

ANDREW AUERBACH

Digitally signed by ANDREW
AUERBACH
Date: 2021.10.28 13:49:59
-04'00'

Andrew D. Auerbach
Deputy Director

cc:      See Certifications

15