**ROB BONTA (SBN 202668)**
**Attorney General of California**
**PAUL STEIN (SBN 184956)**
**Supervising Deputy Attorney General**
**ANNA FERRARI (SBN 261579)**
**Deputy Attorney General**
**455 Golden Gate Avenue, Suite 11000**
**San Francisco, CA 94102-7004**
**Tel: 415.510.3779 / Fax: 415.703.5480**
**Email: Anna.Ferrari@doj.ca.gov**

**THOMPSON COBURN LLP**
**WARREN L. DEAN, JR. (*pro hac vice*)**
**1909 K Street, N.W., Suite 600**
**Washington, DC 20006**
**Tel: 202.585.6900 / Fax: 202.585.6969**
**Email: WDean@thompsoncoburn.com**

**LUKAS SOSNICKI (SBN 295895)**
**10100 Santa Monica Blvd., Suite 500**
**Los Angeles, CA 90067**
**Tel: 310.282.2500 / Fax: 310.282.2501**
**Email: LSosnicki@thompsoncoburn.com**

Attorneys for Defendant-Intervenor
STATE OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| AMALGAMATED TRANSIT UNION, INTERNATIONAL, et al., | Case No. 2:20-cv-00953-KJM-DB |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION TO STAY AGENCY IMPLEMENTATION PENDING JUDICIAL REVIEW** |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR, et al., | Date:   December 17, 2021 |
| | Time:   10:00 a.m. |
| Defendants. | Judge:  Honorable Kimberly J. Mueller |
| | Place:    Courtroom 3 |
| THE STATE OF CALIFORNIA, | [Related Case No. 2:13-CV-02069-KJM-DB] |
| Defendant-Intervenor. | |

10281360

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE**, that Defendant-Intervenor State of California (the "State") will and hereby does respectfully move this Court for a stay, pursuant to 5 U.S.C. § 705—and, to the extent necessary, a preliminary injunction under this Court's traditional equitable authority—to postpone the effective date of the Department of Labor's (the "Department") Reconsideration of June 14, 2019 Determination Responding to Objections to Employee Protection Terms for Pending FTA Grant Applications ("October 28, 2021 Reconsideration") until such a time as the merits of this action have been resolved, including, specifically, its purported impact to "nullif[y]" the Department's Response to Objections to Employee Protective Terms for Pending FTA Grant Applications ("June 14, 2019 Determination").

The Department's October 28, 2021 Reconsideration "nullified" the June 14, 2019 Determination, concluding that California's Public Employees' Pension Reform Act ("PEPRA") precludes certification of federal grants to California's transit agencies under Section 13(c) of the Urban Mass Transportation Act of 1964 ("UMTA"). The State respectfully requests that the Court's order preserve the status quo, and the rights of the parties, by requiring the Department to continue processing grants for certification to California transit agencies as required by UMTA and its implementing regulations, and precluding the Department from relying on PEPRA as a basis to deny certification, consistent with this Court's prior orders in the related *State of California v. U.S. Department of Transportation* litigation.

The Motion will be heard on December 17, 2021, beginning at 10:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Kimberly J. Mueller in Courtroom 3 of the above-named court.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Court's files in this action, the arguments of counsel, the Declarations of Edith Chang, Deputy Executive Officer at the California Air Resources Board; Chad Edison, Chief Deputy Secretary Rail and Transit at the California State Transportation Agency; Carolyn Gonot, General Manager and Chief Executive Officer of the Santa Clara Valley Transportation Authority; Darrell E. Johnson, Chief Executive Officer of the Orange County Transportation Authority; Denis J.

Mulligan, General Manager of the Golden Gate Bridge, Highway, and Transportation District; Robert M. Powers, General Manager of the San Francisco Bay Area Rapid Transit District; Elizabeth Jean Ward-Waller, Deputy Director of Planning and Modal Programs at the California Department of Transportation; and Stephanie N. Wiggins, Chief Executive Officer of Los Angeles County Metropolitan Transportation Authority; and any other matter that the Court may properly consider.

As detailed in the Joint Report of the Parties, ECF No. 68 at ¶¶ 6-7 (the "Status Report"), the Parties have attempted in good faith to resolve the disputed issues discussed herein. Despite such efforts, the Parties have been unable to reach agreement and Court intervention is required.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 3

    A.  Prior Litigation and the 2019 Determination ......................................... 3

    B.  The October 28, 2021 Reconsideration ................................................... 5

    C.  The Department's Refusal to Agree to a Voluntary Stay ......................... 6

III.  LEGAL STANDARD ........................................................................................... 7

IV.  ARGUMENT ........................................................................................................ 8

    A.  The State Is Likely to Succeed on the Merits of Its Claims. ................... 8

    B.  The State and California's Transit Agencies Subject to PEPRA Will Suffer Irreparable Harm If the Department Blocks Certification of Transit Grants. .......... 16

        1.  The State Will Be Irreparably Harmed. ...................................... 17

        2.  California's Transit Agencies Will Be Irreparably Harmed. ....... 19

        3.  The Department's Actions Jeopardize Significant Transportation Projects Throughout the State. ....................................................... 21

    C.  The Balance of Equities and the Public Interest Favor California ......... 23

V.  CONCLUSION .................................................................................................... 25

NOTICE OF MOTION AND MOTION TO STAY AGENCY IMPLEMENTATION PENDING JUDICIAL REVIEW

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592 (1982) ........................ 18

*Amalgamated Transit Union, AFL-CIO v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985).................... 9

*Burlington N. and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771 (D.C. Cir. 2005)............................................................................................................................ 13

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018)............................................................ 16, 17, 23

*California v. U.S. Dep't of Labor*, 155 F. Supp. 3d 1089 (E.D. Cal. 2016)......................... 3, 9, 10

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ...................................... 7, 16

*City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019) .......................................................................................... 8, 17, 18

*City & Cty. of San Francisco v. U.S. Citizenship and Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020) ................................................................................................... 11, 24

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) .......... 8, 16, 17, 23

*Fed'l Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................ 10

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009)................................................................ 15

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020).............................................................. 3, 8

*Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039 (9th Cir. 2015)..................................................... 17

*J.O.P. v. United States Dep't of Homeland Sec.*, 409 F. Supp. 3d 367 (D. Md. 2019)............. 14, 23

*Lilliputian Sys., Inc. v. Pipeline and Hazardous Materials Safety Admin.*, 741 F.3d 1309 (D.C. Cir. 2014)............................................................................................. 13

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980).......................................................................................................... 23

*Moralez v. Vilsack,* No. 1:16-CV-0282-AWI-BAM, 2016 WL 7404756 (E.D. Cal. Dec. 21, 2016), *aff'd sub nom. Moralez v. Perdue*, 770 F. App'x 348 (9th Cir. 2019)........................................................................................................................ 15

*Nat'l Assoc. for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018)....................................................................................................... 13

*New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019) ..................... 17

*Nken v. Holder*, 556 U.S. 418 (2009).................................................................................... 23

*Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ................. 10, 11

*Rai v. Biden*, Case No. 21-cv-863-TSC, 2021 WL 4439074 (D.D.C. Sept. 27, 2021) ................... 8

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................................. 25

*State of California v. United States Dep't of Labor*, No. 2:13-cv-02069, 2016 WL
4441221 (E.D. Cal. Aug. 22, 2016) ................................................................... 1, 3, 6

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891 (2020)............ 13, 14

*Washington v. DeVos*, 466 F. Supp. 3d 1151 (E.D. Wash. 2020) ................................................ 23

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994) .................................... 12

**Statutes and Constitutional Provisions**

Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ..........................................................*passim*

American Relief Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021)................................... 15, 16, 20

California Sustainable Communities and Climate Protection Act of 2008, S.B. 375,
2007-08 Session (2008)........................................................................................... 18

Coronavirus Aid, Relief and Economic Security Act, Pub. L. No. 116-136, 134
Stat. 281 (2020))......................................................................................................*passim*

Coronavirus Response and Relief Supplemental Appropriations Act, Pub. L. No.
116-260, 134 Stat. 1182 (2020)...........................................................................*passim*

Federal Employees' Retirement System Act of 1986, Pub. L. No. 99-335, 100 Stat.
514 (1986) ................................................................................................................ 11

National Labor Relations Act, 29 U.S.C. § 151 *et seq.*.......................................................... 9, 11

Public Employees' Pension Reform Act, Calif. Gov't Code § 7522, *et seq.* .......................*passim*

Urban Mass Transportation Act of 1964, 49 U.S.C. § 5301, *et seq.* ........................................ 2, 3

**Rules**

Local Rule 123 ............................................................................................................................ 3

**Other Authorities**

29 C.F.R. § 215 ....................................................................................................................... 6, 12

60 Fed. Reg. 62,964-01 .............................................................................................................. 12

# I.     __INTRODUCTION__

On October 28, 2021, the Office of Labor-Management Standards of the Department of Labor (the "Department") abruptly acted to suspend, without any notice or opportunity for comment, federal transit funding on which the State of California ("State") has relied for decades. The Department did so based on a deeply flawed interpretation of a nearly 60-year-old statute and its application to a statewide public pension law that has now been in effect for nearly nine years—an application this Court has repeatedly rejected. Among other harms, the Department's arbitrary actions will deprive the State of emergency funds specifically intended by Congress to sustain transit systems and services during the national crisis caused by a devastating pandemic. As it addresses this national crisis, the State is now forced to seek an order from this Court immediately restoring, pending this Court's review, the flow of federal funding, including emergency funding to prevent immediate and irreparable harm to the State, its residents, its economy, its environment, its transit systems and passengers, and its transit workers caused by the Department's ill-considered actions.

In abruptly concluding that California's 2013 pension reform law disqualifies the State's transit agencies from receiving federal grant funding, the Department has reverted to a policy that this Court has already rejected as arbitrary and capricious, contrary to Congressional intent, and out of touch with the realities of public sector bargaining. More pressing, the Department has already begun implementing its deeply flawed decision, and has taken action to suspend the processing of grant applications from California transit agencies. In 2013, the then-Secretary of the Department expressly acknowledged "the devastating impact that a loss of federal transit dollars would have on transit services, commuters, jobs, and economic development in California." *State of California v. United States Dep't of Labor*, No. 2:13-cv-02069 (E.D. Cal.) ("*State of Cal.*"), ECF No. 122-1 at 2. At that time, the Department was threatening to withhold $1.6 billion in fiscal year 2013. *Id.* at 3. Now, California is being cut off from over $12 billion in transit funds.

Absent a stay of the Department's decision, California and its transit agencies, which are already struggling because of the COVID-19 pandemic, will suffer significant, irreparable harm pending final resolution of this case. The billions of federal dollars at stake include billions of dollars in emergency funding appropriated by Congress for the specific purpose of ensuring that transit

agencies in California (and elsewhere) can survive the financial fallout caused by the COVID-19 pandemic. Even assuming the State's mass transit systems could partially mitigate the loss of federal funding to some degree by finding other funding sources, they would still be forced to significantly curtail critical services and make other deep cuts, including laying off transit workers and delaying significant infrastructure projects. The harms to transit riders (particularly the disabled, essential workers, and other vulnerable populations who depend on public transit), transit workers, the economy, and the environment will be nothing short of devastating. *See, e.g.,* Ex. A, November 19, 2021 Letter from Transportation Agencies to the Hon. Pete Buttigieg, at p. 2.

Beyond these physical and economic impacts, the decision directly targets California's sovereign interest in enacting and maintaining the Public Employees' Pension Reform Act ("PEPRA") as a means of ensuring the integrity and fiscal solvency of public pension systems throughout the state, including the largest such system in the country.

The purpose of the "new" determination cutting off federal transit funding to California is clear: the Department and the Amalgamated Transit Union ("ATU") seek to pressure the State to either abandon PEPRA or carve out transit agency workers from its terms. But the "new" determination cites no new facts or law (or indeed any reason) that this Court has not already squarely rejected multiple times. Further, the Department does not explain why it is necessary or appropriate to revisit this settled issue in the midst of a global pandemic when the State's transit agencies desperately need federal funding.

As explained below, California is highly likely to prevail on the merits of its claims that the Department's October 28, 2021 Reconsideration violates the Administrative Procedure Act ("APA"). California has also demonstrated, through declarations and other evidence, that both it and its transit agencies will suffer serious irreparable harm absent judicial intervention. Accordingly, pursuant to Section 705 of the APA, or this Court's equitable authority, this Court should stay the effective date of the October 28, 2021 Reconsideration until final judgment has been entered in this case. Until that time, the Court should issue an order directing the Department to continue processing Section 13(c) certification requests as required by the Urban Mass Transportation Act of 1964 ("UMTA") and its implementing regulations, and precluding the Department from denying

1    certifications on the basis of PEPRA, consistent with the Court's prior orders in the related *State of*
2    *California* litigation. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 205 (D.D.C. 2020) (issuing an
3    order under § 705 preliminarily staying a No-Visa Policy, requiring defendants to "expeditiously
4    process and adjudicate" diversity visa applications, and ordering defendants not to "interpret or
5    apply" certain disputed presidential proclamations in a way that foreclosed the processing of
6    diversity visa applications). Such relief is essential to preserve the status quo and, more specifically,
7    to prevent the Department from relying on the October 28, 2021 Reconsideration to either freeze or
8    slow the processing of billions in federal transit grants or deny certifications to California transit
9    agencies under Section 13(c) of the UMTA and thereby block federal transit funding statewide.

10   **II.    BACKGROUND**

11        **A.    Prior Litigation and the 2019 Determination**

12        Litigation over whether PEPRA precludes the Department from certifying grants for public
13   transit under Section 13(c) of UMTA has been pending before this Court for nine years. The issue
14   has been litigated both in the instant case and a prior, related case, *State of California*,[1] and has
15   resulted in several decisions on the merits, all in favor of the State, and in a permanent injunction
16   against the Department.

17        In 2013, and then again in 2015, the Department refused to certify transit grants based on a
18   conclusion that PEPRA violates UMTA, which requires that federal transit grant recipients ensure
19   the "continuation of collective bargaining rights," and the "preservation of rights, privileges and
20   benefits (including continuation of pension rights and benefits) under existing collective bargaining
21   agreements." Each time, this Court held that the Department's refusal to certify transit grants on the
22   basis of PEPRA was arbitrary and capricious. *See State of Cal.*, 76 F. Supp. 3d 1125, 1144 (E.D.
23   Cal. 2014) (hereinafter, "2014 Decision"); *State of Cal.*, No. 2:13-CV-02069-KJM-DB, 2016 WL
24   4441221 (E.D. Cal. Aug. 22, 2016) (hereinafter, "August 2016 Decision").[2] In 2018, due to the
25
26   ─────────────────────
27   [1] The Court found these two cases are related within the meaning of Local Rule 123(a) and assigned them to the same judge on June 2, 2020. *State of Cal.*, ECF No. 168.
28   [2] Also in 2016, this Court granted the State's motion to enforce, in part, based on the Department's failure to issue a remand decision consistent with its prior order. *California v. U.S. Dep't of Labor*, 155 F. Supp. 3d 1089, 1096-97 (E.D. Cal. 2016) (hereinafter, "January 2016 Decision").

1   Department's refusal to abide by these decisions, this Court entered a permanent injunction

2   preventing the Department "from relying on PEPRA, as currently enacted, to deny the State's

3   application for funding under . . . [§ 13(c)]" with respect to two entities then before the Court,

4   Sacramento Regional Transit District ("SacRT") and Monterey-Salinas Transit ("MST"). *State of*

5   *Cal.*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018).

6       In June 2019, when another, larger round of grant applications by eight different California

7   transit agencies came before the Department, it adhered to this Court's prior decisions and issued a

8   determination concluding that: (1) PEPRA "addresses only one substantive term of employment

9   (pensions)"; (2) PEPRA does not "preclude bargaining over pensions altogether, but rather caps

10  defined benefit plans and their eligibility criteria prospectively while allowing bargaining over

11  defined contribution plans"; (3) "PEPRA imposes few, if any, restrictions on other subjects of

12  collective bargaining"; and (4) PEPRA "does not interfere with the collective bargaining process."

13  *See* Ex. B, Response to Objections to Employee Protection Terms for Pending FTA Grant

14  Applications at 7-8 (June 14, 2019) ("June 14, 2019 Determination"). Accordingly, the Department

15  denied the PEPRA-based objections to certification filed by ATU, and certified the grants at issue

16  as compliant with Section 13(c). *Id.*

17      ATU challenged the June 14, 2019 Determination by filing a complaint in the district court

18  for the District of Columbia. The State of California intervened as a defendant in the action, and

19  successfully moved to have it transferred to this Court and related to the prior case. After the parties

20  completed briefing on cross-motions for summary judgment, the Department made a series of

21  requests to hold the case in abeyance so it could potentially issue a new determination regarding

22  PEPRA's effect on the grants at issue—one apparently based solely on the change in administrations

23  in Washington. Shortly before the rescheduled hearing on the cross-motions, the Department

24  announced that it would be issuing a new determination reversing its position on PEPRA. This Court

25  treated the notice as a request for a voluntary remand, which it granted.

26

27

28

### B.   The October 28, 2021 Reconsideration

The October 28, 2021 Reconsideration[3] purports to "nullif[y] that 2019 deviation" and "return[] to [the Department's] original superior position." *See* Ex. C, Reconsideration of June 14, 2019 Determination Responding to Objections to Employee Protection Terms for Pending FTA Grant Applications at 2 (Oct. 28, 2021) ("October 28, 2021 Reconsideration"). The October 28, 2021 Reconsideration concludes that "PEPRA effectively precludes certification under Section 13(c) for those transit agencies subject to its reforms." *Id.* This Court twice struck down the Department's supposedly "superior position" as a misinterpretation of statutory text and legislative history, arbitrary and capricious, and lacking the reasoned decisionmaking required under the APA.[4]

The October 28, 2021 Reconsideration (at p. 2) purports to "apprise[]" the State "of the approach that the Department will take with respect to Section 13(c) for grant applications prospectively," suggesting it will be applied as general rule to all agencies subject to PEPRA, as distinct from a certification decision on a particular grant application by a transit agency. And, on the very same day the Department issued the October 28 Reconsideration, and before even filing it with this Court, the Department appears to have begun implementing its new policy to block the certification of transit grants. On October 28, 2021, the State understands the FTA Regional IX Office informed at least one major transit agency (in connection with applications that were not at issue in the June 14, 2019 Determination, and therefore subject to reconsideration) that it had been instructed not to send any California grants to the Department for certification until further notice. The notification came in response to an inquiry about American Rescue Plan ("ARP") Act funding,

---

[3] While the Department refers to its October 28, 2021 action as a "Reconsideration"—and the State adopts that characterization for ease of reference here—that term does not fairly describe the October 28, 2021 action. It does not alter the certification status of the grants at issue in the June 14, 2019 Determination. Instead, the October 28, 2021 action is a new and purportedly binding statement of prospective applicability, in other words, an *ultra-vires* rulemaking. *See* infra p. 12; *see also* 5 U.S.C. § 551(4) ("'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

[4] The Department twice appealed this Court's holding that the refusal to certify transit grants on the basis of PEPRA was arbitrary and capricious. It voluntarily dismissed both appeals and thereby avoided appellate scrutiny of its actions. The Department ultimately issued the June 14, 2019 Determination in compliance with this Court's orders.

1    which Congress provided to states specifically to help mass transit agencies survive the pandemic's

2    drain on transit ridership and revenues, and prevent layoffs of transit workers.

3        The Department provided no notice to the State before unilaterally acting to effectively

4    suspend funds to transit agencies and the State. The Department also offered no explanation why it

5    opted to suspend funds from all State transit agencies subject to PEPRA pending judicial review (in

6    contrast to its approach in the *State of California* litigation, when there was no pandemic, when the

7    Department continued to process and certify grants apart from the SacRT and MST grants at issue

8    in that litigation). Further, the Department provided no opportunity for the affected transit agencies

9    to comment. By acting unilaterally and without notice and opportunity to comment, the Department

10   violated its own published procedures on Section 13(c) certification. 29 C.F.R. Part 215.

11       The Department's unilateral moves also appear to be at odds with its prior representations

12   to this Court. On two occasions, the Department informed the Court that its new interpretation of

13   Section 13(c) would apply "prospectively." *See* Withdrawal Cross-Defs' Cross-Mot. Summ.

14   Judgment, ECF No. 55; Status Rpt., ECF No. 61. The State received no indication that the

15   Department's "prospective" change of course would dispense with its own established procedures,

16   including the opportunity for applicants to comment.

17           **C.    The Department's Refusal to Agree to a Voluntary Stay**

18       The October 28, 2021 Reconsideration will, if left in place, deprive California transit

19   agencies of billions of dollars that cannot be replaced from other sources. Federal grant funds are

20   critical to mass transit in California, and to the State and local budgets in California. More than

21   eighty California transit agencies, either directly or through another entity, such as the California

22   Department of Transportation ("Caltrans"), depend on federal funding to support their capital

23   projects and operational needs. The Department's announced intent to deny certification of federal

24   transportation grants based on PEPRA, and FTA's resulting inability to provide those grants, will

25   force California transit systems to severely curtail services. By hobbling California's mass transit

26   systems, the "new" policy on PEPRA will severely impact the State's economic and environmental

27   health as well.

28       In light of the State's concerns regarding the Department's authority to issue the October 28,

10281360                                    6

2021 Reconsideration, defects in the legal analysis underpinning the Department's conclusions with respect to PEPRA, and the significant irreparable harm that the State and its transit agencies and residents will incur if the new determination is left in place, on November 1, 2021, the State asked the Department to implement a voluntary stay of the October 28, 2021 Reconsideration pursuant to 5 U.S.C. § 705. Despite having previously agreed (in the related litigation) to continue processing applications and releasing disputed funds, and despite the current heightened need for a stay to ensure the continued vitality of California's transit agencies during a global pandemic, the Department declined to implement the requested stay. It promised only to "not deny" grant applications from California agencies until December 21. *See* Status Report at ¶ 6, ECF No. 68.

On November 12, 2021, the State filed a Motion for Leave to file a Cross-Complaint against the Department. The proposed Cross-Complaint alleges three APA claims against the Department arising from the October 28, 2021 Reconsideration. *See* Cross-Complaint, ECF No. 70-1. As explained in more detail below, the State is likely to prevail on the merits of these claims.

The State and its transit agencies subject to PEPRA will also suffer significant and irreparable harm if the Department enforces the October 28, 2021 Reconsideration before this Court has issued a final ruling on the State's claims. Accordingly, pursuant to 5 U.S.C. § 705 or the Court's equitable authority, this Court should stay the effective date of the October 28, 2021 Reconsideration and require the Department to process Section 13(c) certification requests without relying on PEPRA as a basis for their denial, and preserve the status quo and the rights of the State and its transit agencies pending judicial resolution of the State's proposed cross-complaint.

## III.   **LEGAL STANDARD**

The APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Section 705 operates broadly to allow the agency to postpone enactment of a rule for a host of reasons, or for a Court to suspend enforcement or enjoin its application." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 971 (D. Md. 2020) (citation omitted). "The factors governing issuance of a preliminary injunction also govern issuance of a

§ 705 stay." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). To obtain a preliminary injunction or a stay under § 705, the moving party must establish that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Id.* (citation omitted). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019) ("*San Francisco I*") (citation omitted).

Section 705 "authorizes courts to stay agency action pending judicial review, not just to enjoin their application to the injured parties before the court." *Rai v. Biden*, Case No. 21-cv-863-TSC, 2021 WL 4439074 at *15 (D.D.C. Sept. 27, 2021) (citation omitted). A stay under § 705 "includes 'the power to compel agency inaction when necessary to preserve the status quo or rights pending conclusion of the action.'" *Id.* While the effect of a stay is to halt certain agency action during the pendency of a lawsuit, the Court may also order defendant agencies to *continue to act* just as they would have under the pre-stay status quo. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 205 (D.D.C. 2020) (applying Section 705 and traditional equitable powers to require agency defendants to "expeditiously process and adjudicate" diversity visa applications under existing standards while the case progressed).

## IV.   <u>ARGUMENT</u>

### A.   <u>The State Is Likely to Succeed on the Merits of Its Claims.</u>

The State has requested leave of the Court to assert three APA claims against the Department arising from the October 28, 2021 Reconsideration. Prop. Cross-Compl. at ¶¶ 69-95, ECF No. 70-1. The State is likely to prevail on each of them. Indeed, the State has already twice prevailed on the key points of law underlying the claims. The October 28, 2021 Reconsideration is a change in policy, but by its own terms reverts to a position this Court has already rejected. And while the Court will need to adjudicate the Department's new October 28, 2021 Reconsideration, nothing suggests a different outcome this time.

*First*, the October 28, 2021 Reconsideration is not based on any new law or new facts. It presents nothing this Court has not already carefully considered and rejected. Instead, as the Department itself concedes, it reverts to arguments the Department unsuccessfully advanced in the prior litigation. *Compare* Ex. D, 2013 MST Determination, *State of Cal.*, ECF No. 9-2 at 148-149, 153-154 *with* Oct. 28, 2021 Reconsideration at 2-3, 7-9 (arguing PEPRA's changes to defined benefit pensions essentially removes pensions from the collective bargaining process); *compare* 2013 MST Determination at 10-16 *with* Oct. 28, 2021 Reconsideration at 10-14 (arguing that legislative history and *Amalgamated Transit Union, AFL-CIO v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), support the Department's refusal to certify based on PEPRA); *compare* Ex. E, 2015 SacRT Determination, *State of Cal.*, ECF No. 87-3 at 11-21 *with* Oct. 28, 2021 Reconsideration at 8-14 (relying on National Labor Relations Act ("NLRA") precedent to support the Department's refusal to certify based on PEPRA). The Court's 2014 and August 2016 Decisions thoroughly analyzed each of these issues already, and held the Department failed to show PEPRA is inconsistent with UMTA's requirements for "the continuation of collective bargaining rights" or the "preservation of collective bargaining rights." 2014 Decision at 1141-45; August 2016 Decision at *13-28 (rejecting reliance on NLRA precedent; "It cannot be that bargaining is discontinued simply because the results of the bargaining process were 'different.' As the DOL recognizes, Section 13(c)(2) protects collective bargaining rights, not bargaining results."). This Court further held that, unlike the state statute at issue in *Donovan*, PEPRA does not remove pension rights from the scope of bargaining and does not "substantially conflict[] with federal labor policy" such that it would violate 13(c)(2). August 2016 Decision at *21-26, 31. While the Department may continue to disagree with the Court's analysis, nothing has changed to give the Court any reason to reach a different conclusion this time.

Notably, this is not the first time the Department has chosen to ignore judicial findings with which it disagrees. In the January 2016 Decision, this Court had to remind the Department that its disagreement did not provide a basis for its blatant disregard for the Court's rulings:

> On remand, the DOL found this court's order to be 'in error,' and found the collective bargaining agreement indeed applies to new employees. . . . That conclusion is inconsistent with this court's order. The DOL may not disregard this

1  court's orders simply because it disagrees with them or finds they are premised on
2  a misinterpretation of law or fact. The appellate bodies designed to fulfill that role
   are the Ninth Circuit Court of Appeals and the United States Supreme Court.

3  January 2016 Decision at 1098.[5] Yet again, the Department's actions show that same disregard.

4  *Second*, the October 28, 2021 Reconsideration fails to meaningfully explain the

5  inconsistencies between it and the Department's June 14, 2019 Determination, including the

6  Department's sudden and drastic change of position on issues that have now been thoroughly

7  litigated for nine years. While an agency is permitted to change its policies, the rescission of a prior

8  ruling requires "a reasoned analysis for the change beyond that which may be required when an

9  agency does not act in the first instance." *Fed'l Commc'ns Comm'n v. Fox Television Stations, Inc.*,

10  556 U.S. 502, 514 (2009). An agency policy change complies with the APA if the agency:

11  (1) displays awareness that it is changing position, (2) shows that the new policy is
    permissible under the statute, (3) believes the new policy is better, and (4) provides
12  good reasons for the new policy, which if the new policy rests upon factual findings
    that contradict those which underlay its prior policy, must include a reasoned
13  explanation for disregarding facts and circumstances that underlay or were
    engendered by the prior policy.
14

15  *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *Fox*,

16  556 U.S. at 515-16). Here, while the Department acknowledges its position has changed (*i.e.*, it

17  reverted to a prior, "superior" position), the October 28, 2021 Reconsideration fails to show the

18  policy is permissible under Section 13(c) and fails to sufficiently explain what "good reasons"

19  caused the Department to change its mind.

20  While purporting to rely on various vague and unsubstantiated conclusions—for example,

21  that the Department is "not convinced that PEPRA's impacts are minor" and finds this Court's

22  reasoning to be "unpersuasive" (*see* October 28, 2021 Reconsideration at 8, 10)—the Department

23  apparently concedes the main reason for its change of position is a change in administrations:

24  Prior to the filing of the Department's reply [in cross-motions for summary
    judgment], there was a change in administration that resulted in new leadership
25  assuming responsibility for the Department. The Department sought and received
    stays from the court so that new leadership would have time to become familiar
26  with the issues in this case and decide whether to reconsider the Department's

27  ─────────────────────
28  [5] The Court also had to remind the Department that the Court, and not the Department, would decide
    which level of deference it would give the Department's decisions. August 2016 Decision at *12-
    13.

position regarding PEPRA. The Department now issues this reconsideration of its
2019 Determination.

*Id.* at 6. However, an agency's decisionmaking process cannot be based solely on a change of

personnel or politics. Even though "[e]lections have policy consequences," an agency decision to

reverse a policy after an election still requires a "reasoned explanation" for the change. *Village of*

*Kake*, 795 F.3d at 968. "[A]n agency about-face with no 'reasoned explanation . . . for disregarding'

the findings underlying the prior policy" does not satisfy APA standards. *City & Cty. of San*

*Francisco v. U.S. Citizenship and Immigr. Servs.*, 981 F.3d 742, 761 (9th Cir. 2020) (citing *Fox*,

556 U.S. at 516) ("*San Francisco II*"). The Department offers no such explanation. It does not make

new findings of fact or describe any material change in circumstances since the June 14, 2019

Determination. It does not cite to any new or changed law.[6] It does not consider the impact of

abruptly denying federal transit funding during a time of unprecedented disruption for transit

agencies. And, again, it continues to rely on legal arguments this Court has already rejected—

including that PEPRA is inconsistent with federal labor policy because, under the NLRA, pensions

are a mandatory subject of collective bargaining. This Court has already recognized that Congress

exempted state and local government employers from the NLRA. August 2016 Decision at *18-20.

This Court also specifically held the Department erred by relying on NLRA case law to support its

determinations. *Id.* The Department's repetition of rejected arguments does not provide "good

reasons" for the policy change.[7]

      *Third*, the Department violated the APA in the manner it chose to announce its changed

policy and then immediately seek to enforce it against all transit agencies subject to PEPRA.  The

Department did not permit California's transit agencies subject to PEPRA to engage in the

---

[6] The "Analysis" section of the October 28, 2021 Reconsideration cites to NLRA cases dated 1971, 2008, 2012, 1962, 1944, 1991, 2000, 2002, 1994, and 1980. *Id.* at 7-10. None of these decisions represents a changed circumstance or new information upon which the Department may argue its October 28, 2021 Reconsideration rests.

[7] Like the Department's prior position, the October 28, 2021 Reconsideration also fails to explain how PEPRA conflicts with federal labor policy where its reforms are broadly similar to the Federal Employees' Retirement System Act of 1986, Pub. L. 99-335, 100 Stat. 514 (1986), which established the Federal Employees' Retirement System ("FERS") for federal employees hired after December 31, 1983. Among other things, FERS modified the parameters for calculating pension benefits and contributions to be less generous, created a defined contribution program, and implemented a later retirement age than prior law. *Id.* at 6, 9, 13.

administrative process required by the Department's binding published procedures. Under those procedures, California and its transit agencies were entitled to participate in the administrative process that culminated in the October 28, 2021 Reconsideration. The Department's denial of any opportunity for participation constitutes an independent reason to invalidate the October 28, 2021 Reconsideration. *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994) (invalidating a regulation after finding that the Department of Housing and Urban Development violated its own notice and comment procedures when determining whether Washington's state eviction procedures violated due process). This deprivation of the right to participate is particularly concerning given the Department's apparent intent to apply the October 28, 2021 Reconsideration not just to a specific dispute over particular grant applications, but as a general rule barring certification of grants to *an*y transit agency subject to PEPRA.[8]

The Department has no rule-making authority under Section 13(c), and its *ultra-vires* Reconsideration is invalid on that ground alone. 60 Fed. Reg. 62,964-01 (Dec. 7, 1995) ("There is no statutory authority to issue regulations under section 5333(b)"). If the Department intends to establish a broadly-applicable and binding interpretation of Section 13(c) outside of any particular determination, it must return to Congress for that purpose.

Further, the Reconsideration was issued without any notice and comment process whatsoever, in violation of the Department's own binding procedural standards for Section 13(c) certification of FTA grants, at 29 C.F.R. Part 215; 60 Fed. Reg. 62,964-01 (Dec. 7, 1995) ("The guidelines . . . are intended to be binding in administering this employee protection program."). Those procedures establish two alternative pathways to address an objection by a union or transit agency under 13(c): (1) if the Department finds the objection not sufficient, it will certify the grants at issue; or (2) if the Department finds the objection sufficient, it will initiate a process requiring the parties to negotiate for 30 days and, failing agreement, providing for the submittal of briefs by the

---

[8] On this point, ATU is in apparent agreement that the Department's October 28, 2021 Reconsideration presents a rule applicable to all transit agencies in California, and that Section 13(c) should "impos[e] a mandatory duty on the [Department] to deny certification where, as here, a state statute abridges any of the employees' collective bargaining rights (including their right to bargain over defined benefit pensions) to any degree." Motion to Intervene at 4, ECF 71-1.

1   parties, followed by a determination by the Department on the issues in dispute. 29 C.F.R.

2   § 215.3(d). The Department's June 14, 2019 Determination was issued in response to objections

3   submitted by ATU under these procedures. The Department found the ATU's objections to be

4   insufficient. By reversing its June 14, 2019 Determination, the Department is effectively indicating

5   that it now finds ATU's objections sufficient. This finding should have triggered a process under its

6   guidelines that involved participation and written submissions from the affected transit agencies and

7   ATU—a process which should have been conducted and completed *before* the Department

8   unilaterally issued its October 28, 2021 Reconsideration. Instead, it bypassed its published

9   procedures and arbitrarily created a different procedure, one neither published nor followed in prior

10  cases, wherein the Department did not solicit or consider arguments from the affected transit

11  agencies.

12      The October 28, 2021 Reconsideration also violates the APA in how it proposes to address

13  the permanent injunction that remains in place as to MST and SacRT. The Department feigns

14  compliance with the Court's permanent injunction simply by declaring the October 28, 2021

15  Reconsideration does not apply to these two entities. October 28, 2021 Reconsideration at 2 n.2. But

16  the Department is not entitled to treat similarly situated parties differently without providing a

17  "reasoned explanation and substantial evidence in the record." *See Lilliputian Sys., Inc. v. Pipeline*

18  *and Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014); *see also*, *Burlington*

19  *N. and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an

20  agency applies different standards to similarly situated entities . . . its action is arbitrary and

21  capricious and cannot be upheld."). The October 28, 2021 Reconsideration offers no explanation

22  why the Department may treat other California transit agencies differently with respect to PEPRA

23  than MST and SacRT. And the Department does not explain how it intends to comply with this

24  Court's prior injunction with respect to MST and SacRT under its own procedures following the

25  October 28, 2021 Reconsideration.

26      Nor does the October 28, 2021 Reconsideration adequately explain how the Department

27  considered any reliance interests arising from the June 14, 2019 Determination. *See U.S. Dep't of*

28  *Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1912-1915 (2020) (failure to consider

1  reliance interests in agency policy violated the APA); *Nat'l Assoc. for the Advancement of Colored*

2  *People v. Trump*, 298 F. Supp. 3d 209, 239-40 (D.D.C. 2018) (same). Where an agency is "not

3  writing on a blank slate," it is required to assess reliance interests and weigh them against competing

4  policy concerns." *Regents*, 140 S.Ct. at 1915. "If an agency ignores such reliance interests it may

5  have 'entirely failed to consider an important aspect of the problem,' rendering the agency's action

6  arbitrary and capricious." *J.O.P. v. United States Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 378

7  (D. Md. 2019). Here, the Department appears to contend there are no reliance interests at issue at

8  all because the October 28, 2021 Reconsideration applies prospectively. October 28, 2021

9  Reconsideration at 2. This assertion does not satisfy the Department's requirements to "assess"

10  reliance interests and "weigh them against competing policy concerns." *Regents*, 140 S.Ct. at 1915.

11  The October 28, 2021 Reconsideration says nothing about how other California transit agencies may

12  have relied on the June 14, 2019 Determination with respect to the federal funding that these

13  agencies need to survive. *See* infra Section IV.B.

14       The transit agencies' reliance interest is particularly strong given the Department's refusal

15  to voluntarily stay the effective date of the October 28, 2021 Reconsideration. At prior stages in the

16  related litigation, the Department agreed to continue processing applications and disbursing funds

17  while the parties litigated the Department's actions. The Department has offered no explanation why

18  it would reverse the policy it followed in the related litigation and move to abruptly and unilaterally

19  suspend all funding prior to judicial resolution of this controversy. If anything, the Court's repeated

20  rejection of the Department's position and the exigencies of the COVID-19 pandemic provide even

21  greater justification for preserving the status quo and the flow of federal funding to the State.

22       *Fourth,* the Department's actions defy specific Congressional directives and intent to

23  alleviate the impacts of the unprecedented COVID-19 pandemic. In response to the pandemic,

24  Congress passed three emergency measures designed to provide emergency funds to the nation's

25  transit systems to prevent, prepare for, and respond to the pandemic: The Coronavirus Aid, Relief

26  and Economic Security (CARES) Act (Pub. L. No. 116-136, 134 Stat. 281 (enacted March 27,

27  2020)); the Coronavirus Response and Relief Supplemental Appropriations Act (CRRSAA) (Pub.

28  L. No. 116-260, 134 Stat. 1182 (enacted December 27, 2020)) and the American Relief Plan (ARP)

1   Act (Pub. L. No. 117-2, 135 Stat. 4 (enacted March 11, 2021)).[9] Those funds were largely made

2   available under pre-existing formulas that provided and continue to provide substantial funding to

3   California's transit agencies. The funds were made available for several purposes, ranging from

4   paying for the operating expenses of the transit systems to paying for the expense of putting transit

5   workers on leave due to reductions in service or because of a presumptive or confirmed case of

6   COVID-19. These emergency funds are critical to transit agencies. At the time Congress passed

7   these emergency measures, the Department's June 14, 2019 Determination provided, consistent with

8   this Court's rulings, that Section 13(c) would not bar California transit agencies from receiving those

9   funds. While Congress recognized that applications for these emergency grants would be sent to the

10  Department for certification, Congress necessarily understood that PEPRA would not bar

11  California's transit agencies from receiving those funds. *See Moralez v. Vilsack,* No. 1:16-CV-0282-

12  AWI-BAM, 2016 WL 7404756, at \*10 (E.D. Cal. Dec. 21, 2016), *aff'd sub nom. Moralez v. Perdue*,

13  770 F. App'x 348 (9th Cir. 2019) (finding "Congress is presumed to be aware of existing

14  administrative regulations when it legislates on that subject-matter" and holding that Congress relied

15  upon existing administrative language to inform the intent and content of legislation (quotations

16  omitted)); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009). The Department

17  cannot now suspend those emergency funds on the basis of a purported "reconsideration" of its June

18  14, 2019 Determination. Congress has acted on the understanding that California would receive

19  funding, and the Department lacks authority to subvert Congressional intent.

20          For all of the foregoing reasons, and all of the reasons the State intends to present in the

21  forthcoming summary judgment briefing, the State will prevail on its cross-claims under the APA.

22

23

---

24  [9] In all three of these emergency measures, the transit funds appropriated were targeted towards
    operating expenses of transit agencies. Title XII of the CARES Act appropriated $25 billion in
25  grants to transit agencies aimed at offsetting specific COVID-19-related operating expenses
    including the costs of maintaining service, the purchase of personal protective equipment (PPE),
26  and the provision of paid administrative leave for operations personnel due to reductions in service.
    *See* 134 STAT. 599-600. Division M of CRRSAA, appropriated an additional $14 billion to allow
27  transit agencies to continue providing services and employing workers during and after the COVID-
    19 pandemic. *See* 134 STAT. 1945-48. Section 3401 of the ARP Act appropriated another $30.5
28  billion for similar purposes. *See* 135 STAT. 72.

**B.**    **The State and California's Transit Agencies Subject to PEPRA Will Suffer Irreparable Harm If the Department Blocks Certification of Transit Grants.**

If this Court does not stay the Department's actions to implement its October 28, 2021 Reconsideration, and does not restore a path to obtain critical emergency funding, the State and transit agencies subject to PEPRA will suffer irreparable harm. By its very nature, suspending emergency funding appropriated by Congress strips the State's transit agencies of the resources they need to immediately respond to an unprecedented public health and economic crisis. In their plain text, the CARES Act, CRRSAA, and the ARP Act all evince a congressional belief that the emergency funding—including the funding to transit agencies—is needed immediately to prevent catastrophic economic and social disruption. *See* CARES Act, Pub. L. No. 116-136, Div. B, 134 Stat. 281, 599-600 (regarding funding of transit infrastructure grants: "[T]he amount made available under this heading in this Act . . . is designated by the Congress as being for an *emergency requirement* . . . ." (emphasis added)); CRRSAA, Pub. L. No. 116-260, Div. M, 134 Stat. 1182, 1947-48 (similarly designating transit funds as emergency requirements); ARP Act, Pub. L. No. 117-2, § 3401(a)(2), 135 Stat. 4, 72 (2021) ("[F]unds provided under this section . . . shall be available for the operating expenses of transit agencies to prevent, prepare for, and respond to the coronavirus *public health emergency*." (emphasis added)). The sudden, arbitrary, and capricious suspension of emergency funding at issue here creates an emergency by itself. The State's mass transit services are a vital component of its transportation functions. Any disruption to those services—or even any threatened disruption to those services—directly harms the State and California's transit agencies.

To establish a threat of irreparable harm, a party must demonstrate that "they will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Casa de Maryland*, 486 F. Supp. 3d at 967. The "harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* When agency actions cause monetary damages to a state, that injury is irreparable because the state cannot sue to recover those damages. *See District of Columbia*, 444 F. Supp. 3d at 34 ("[E]conomic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims."); *California v. Azar*, 911

1   F.3d 558, 581 (9th Cir. 2018) (economic harm to states from APA violation is "irreparable here

2   because the states will not be able to recover monetary damages . . ."); *see also Idaho v. Coeur*

3   *d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (tribal sovereign immunity created

4   unrecoverable damages and supported irreparable harm).

5        "The analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *Azar*,

6   911 F.3d at 581; *see also District of Columbia*, 444 F. Supp. 3d at 36-38 (finding additional

7   administrative costs in the "hundreds of thousands of dollars" sufficient for irreparable harm to the

8   States; "state plaintiffs have shown that their anticipated injuries are significant."). Where the "direct

9   and inevitable consequence of the impending implementation of [a] Rule" requires a state to pay to

10  offset a loss of federal funds, the state shows irreparable injury. *New York v. U.S. Dep't of Homeland*

11  *Sec.*, 408 F. Supp. 3d 334, 350 (S.D.N.Y. 2019) (states' anticipated increases to healthcare and

12  programmatic costs caused by federal government's narrowing of eligibility criteria for benefits

13  program established irreparable harm). "Governmental administrative costs caused by changes in

14  federal policy are cognizable injuries." *San Francisco I*, 408 F. Supp. 3d at 1123. For the scope of

15  irreparable harm, the "proper reference point would be the budget for the relevant state agency or

16  program, as states cannot simply move money from one agency or program to another." *District of*

17  *Columbia*, 444 F. Supp. 3d at 38-39 (cleaned up). Prompt litigation following the issuance of an

18  agency decision weighs in favor of a finding of irreparable harm. *Azar*, 911 F.3d at 581.

19        1.      The State Will Be Irreparably Harmed.

20        The Department's actions to deny funding—including critical emergency funding—will

21  cause significant irreparable harm to the State in numerous ways. *First*, the State's economy will be

22  damaged if federal funding to transit agencies is curtailed. The damage will result from increased

23  traffic congestion, additional travel time, increased fuel consumption, reduced productivity, impact

24  on foot-traffic dependent businesses, and delays in movement of commercial cargo, manufactured

25  goods, and perishable agricultural products, all during an unprecedented global supply chain crisis.

26  Ex. F, Decl. of Robert M. Powers in Support of Motion to Stay at ¶¶ 6, 12, 13 ("BART Decl."); Ex.

27  G, Decl. of Stephanie N. Wiggins in Support of Motion to Stay at ¶ 3 ("Metro Decl."); Ex. H, Decl.

28  of Darrell E. Johnson in Support of Motion to Stay at ¶¶ 8, 19-23 ("OCTA Decl."); Ex. I, Decl. of

1   Carolyn Gonot in Support of Motion to Stay at ¶ 18 ("VTA Decl."); Ex. J, Decl. of Denis J. Mulligan

2   in Support of Motion to Stay at ¶¶ 7, 27 ("Golden Gate Decl."); Ex. K, Decl. of Chad Edison in

3   Support of Motion to Dismiss at ¶¶ 7-8 ("CalSTA Decl."). Such economic harm cannot be reversed

4   once incurred.

5       *Second*, the State relies on the continued vitality of its public transportation system—and the

6   federal funds necessary to support it—in almost every aspect of budgeting and planning the State's

7   operations. The Department's changed policy, and the resulting curtailment of federal funding, will

8   require the State either to reallocate state funds to replace the withheld federal funds to the extent

9   possible, or to go without adequate funding, with the inevitable harmful consequences. "[O]bvious

10  adverse budgetary consequences" for states constitute irreparable harm. *San Francisco I*, 408 F.

11  Supp. 3d at 1122-25.

12      *Third*, the State relies on functioning public transportation systems throughout the State to

13  comply with its obligations under various environmental statutes. For example, California must

14  comply with clean air commitments under the California Sustainable Communities and Climate

15  Protection Act of 2008. Sustainable Communities and Climate Protection Act of 2008, S.B. 375,

16  2007-2008 Session (2008); Ex. L, Decl. of Edith Chang in Support of Motion to Stay at ¶¶ 9, 14, 18

17  ("CARB Decl."). The transportation sector is one of the main contributors to California's emissions

18  of greenhouse gas and conventional air pollutants, and a robust public transit system is an important

19  element to accomplishing California's transportation and land use goals. The State cannot comply

20  with its requirements under the Sustainable Communities and Climate Protection Act if its transit

21  agencies must sharply curtail services due to the Department's arbitrary and capricious policy on

22  PEPRA. *See* CARB Decl. at ¶¶ 14, 18.

23      As these three points demonstrate, threatened and direct harm to the transit agencies of the

24  State of California causes immediate harm to the State itself.

25      *Finally*, in addition to physical and economic harms flowing from damage to the State's

26  transportation agencies, the State has a sovereign interest in enacting and enforcing PEPRA that

27  would be irreparably harmed if the Department's actions are not stayed. *See Alfred L. Snapp & Son,*

28  *Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 601 (1982) (finding that "the power to create and

enforce a legal code" is a sovereign interest). The State has an interest in guaranteeing that local and regional transit entities throughout the State are subject to consistent standards regarding the impact of PEPRA upon Section 13(c) certifications. And the State seeks to administer PEPRA to apply consistently across California public employees, regardless of their industry or vocation. The State's sovereignty will be directly challenged and harmed if the State is forced to comply with the Department's changed position that misinterprets PEPRA, treats similarly-situated transit agencies differently, and treats transit agency employees differently than other public employees, contrary to the Legislature's intent. This is a separate and significant harm.

### 2.   California's Transit Agencies Will Be Irreparably Harmed.

California's transit agencies subject to PEPRA will likewise suffer broad-based, substantial, and irreparable harm if funding is withheld. Transit agencies use formula and discretionary FTA funding to support their basic and critical operations, and to pay for transit capital projects. Transit agencies use these federal funds to (among other things):

- Pay wages and benefits of union and non-union employees. BART Decl. at ¶¶ 9, 12; VTA Decl. at ¶ 12; OCTA Decl. at ¶¶ 12, 16-17; Golden Gate Decl. at ¶¶ 12-15;

- Purchase, operate, and maintain rail cars, buses, and other infrastructure to maintain and improve safety and reliability. BART Decl. at ¶¶ 17-21; VTA Decl. at ¶¶ 7, 9, 12-16; Metro Decl. at ¶ 5, 7; OCTA Decl. at ¶¶ 6-7, 10, 17-18; Ex. M, Decl. of Elizabeth Jeanie Ward-Waller in Support of Motion to Stay at ¶¶ 5, 10-11 ("Caltrans Decl."); Golden Gate Decl. at ¶¶ 7, 20-22;

- Provide critically needed public transit services for the elderly, transit dependent, low-income, rural, minority, and disabled riders—services that are essential to allow access to jobs, schools, and medical services. BART Decl. at ¶¶ 11-14; VTA Decl. at ¶ 14; OCTA Decl. at ¶¶ 8, 15, 22; Caltrans Decl. at ¶¶ 5-6, 8-11; Golden Gate Decl. at ¶¶ 8, 20-22; and,

- Fund the design and construction of transportation infrastructure projects that are vital to the economic health of California cities, and that are a key part of the effort to enhance mobility and address climate change. BART Decl. at ¶¶ 6, 13, 15-17, 20-24; VTA Decl. at ¶¶ 17-18; Metro Decl. at ¶¶ 4-5, 7-9; OCTA Decl. at ¶¶ 6-7, 18-25; Caltrans Decl. at ¶¶ 6, 8-11; CalSTA Decl. at ¶¶ 7-8.

All aspects of transit agencies' critical operations are placed at risk by the Department's actions.

Transit agencies have become especially dependent on federal funding as a result of the COVID-19 pandemic. Transportation operations of all kinds, but particularly those involving the transportation of persons, have been severely affected by the pandemic. As explained *supra*, that is why Congress passed emergency measures in the form of the CARES Act of 2020, the CRRSAA,

and the ARP Act. More than a dozen applications by transit agencies for this emergency funding will be directly threatened by the Department's actions. *See* Golden Gate Decl., ¶¶ 19, 24, 26; BART Decl., ¶¶ 21, 23(L) & (N), 24(A); VTA Decl., ¶¶ 15-16. These emergency funds have been, and will continue to be, indispensable in allowing transit agencies to survive the effects of the pandemic. VTA Decl. ¶¶ 15-16; OCTA Decl. at ¶ 9-13; Caltrans Decl. at ¶¶ 5, 8-11; Golden Gate Decl. at ¶¶ 20-27; BART Decl., ¶¶ 9, 21, 23(L) & (N), 24(A). And while many of California's transit agencies' applications for emergency funding are planned for submission later in this fiscal year, several applications were pending when the Department announced its changed policy on October 28. *See, e.g.*, BART Decl. at ¶ 25.

For example, the following applications, which have effectively been suspended, pose a more immediate risk of layoffs or suspension of services in the state:

<u>Golden Gate Bridge, Highway, and Transportation District ("Golden Gate")</u>. Facing a pandemic-induced financial crisis, on September 11, 2020, Golden Gate's Board of Directors approved issuing federal Worker Adjustment and Retraining Notification (WARN) Act notices, notifying affected employees and union representatives of a potential upcoming "mass layoff." Golden Gate Decl. at ¶ 13. On November 13, 2020 the Board approved the elimination of 205 positions. *Id.* at ¶ 14. As some positions were already vacant, 187 employees were notified of their upcoming layoff, effective January 4, 2021. *Id.* CRRSAA provided funds to stave off these impending layoffs, and federal CARES Act and CRRSAA funding provided about half of the revenue that the District used to pay its bus and ferry operating expenses for the 2020/21 fiscal year. *Id.* at ¶¶ 15-16. On October 27, 2021, the Metropolitan Transportation Commission (MTC), a regional transportation planning agency for San Francisco Bay Area counties, allocated $43.9 million of additional ARP funds (second tranche of ARP funding) to Golden Gate. *Id.* at ¶ 19. Golden Gate anticipates using approximately $24 million of this amount to fund bus and ferry operations in the current fiscal year. *Id.* This grant has not been certified by the Department, and it has not been awarded to Golden Gate by the FTA. The District again faces the specter of significant layoffs if the funds are not certified. *Id.*

<u>California Department of Transportation (Caltrans)</u>: Caltrans is a state agency that awards

transit funding, including federal transit dollars, to state, regional and local grantees through competitive processes. In September 2021, Caltrans applied for $75 million in CRRSAA stimulus funding that was made available to rural transit operators in California, through the FTA 5311 program, to counter funding losses they have experienced due to the COVID-19 pandemic. Caltrans Decl. at ¶ 5. This funding is desperately needed to keep transit operating in California's rural counties. *Id.* If the Department's actions hold up certification, and the grants are not awarded, transit agencies across California's rural counties would have to find alternative operational resources or see transit services and/or projects cease. *Id.* at ¶¶ 5, 10.

Finally, in addition to the immediate negative impact on transit agencies' operations that the Department's actions have caused, the Department is causing irreparable long-term harm to the agencies' creditworthiness and future ability to borrow critical funds. Metro Decl. at ¶ 11; BART Decl. at ¶ 18.

> 3.  The Department's Actions Jeopardize Significant Transportation Projects Throughout the State.

The uncertainty created by a potential loss of federal funding is also a direct threat to numerous significant transportation projects pending throughout the State. These include:

BART: The Department's determination puts at risk nearly half a billion dollars in State investments in BART's Transbay Corridor Core Capacity Program (TCCCP), a significant project intended not only to improve service and increase system ridership in the Bay Area, but also to improve regional air quality and lower greenhouse gas emissions. In 2020, FTA and BART executed a $1.169 billion Capital Investment Grant (FTA CIG) Full Funding Grant Agreement (FFGA) to fund BART's Transbay Corridor Core Capacity Project, which will enable BART to increase Transbay service levels by up to 30% by replacing BART's 50-year old train control system with a modern communications-based train control system and procuring 252 additional rail cars, as well as by making investments in train storage and expanded power capacity. The funding to be provided under the FTA CIG FFGA is allocated over several years through annual grants to BART from the FTA. BART plans to apply for a $143.3 million FTA CIG grant for this project, which would be subject to Section 13(c) certification. The TCCCP project cannot be completed as planned without

continued federal funding. BART's ability to deliver the service-level increases forecasted by the project will be seriously jeopardized without this grant, thereby undermining the value of the over $1 billion of federal funds that have already been awarded to the TCCCP project. *See* Bart Decl. at ¶ 16; CalSTA Decl. at ¶ 9.

Uncertainty regarding the availability of federal assistance will likely result in inadequate funding to cover cashflow for a pending $1 billion rail-car procurement project. *Id.* at ¶ 20. The contract for the Rail Car Procurement Phase 1 project was awarded in 2012, and production of the rail cars is well underway with 286 Fleet of the Future rail cars in revenue service. *Id.* at ¶¶ 19-20. The funds for this project are to be reimbursed by current and future formula funds subject to Section 13(c) certification. *Id.* at ¶ 19. A funding shortfall could result in a breach of the procurement contract and costly litigation, with potentially dire financial consequences to BART. If federal funding were cut off entirely, BART would need to solicit a new rail car procurement contract in a construction market where limited heavy-rail car manufacturers exist, and labor and materials costs have risen sharply. *Id.* at ¶ 20.

<u>Los Angeles County Metropolitan Transportation Authority (Metro)</u>: Uncertainty regarding federal funding would significantly impact Metro's Westside Purple Line Extension project. Metro Decl. at ¶ 4, 9. The project will provide a high-capacity, high-speed, safe, and dependable alternative for commuters to travel between downtown and westside Los Angeles, two of the Los Angeles region's largest job centers and home to many significant destinations, including the University of California Los Angeles and the Federal Veterans Administration Hospital. *Id.* at ¶ 4. This project also expands rail service to high-demand areas, helping ensure that Los Angeles is adequately prepared to host National Special Security Events like the 2028 Olympics Games, the 2026 FIFA World Cup, and the 2022 NFL Super Bowl. *Id.* If federal assistance is denied, delayed, or otherwise interrupted, Metro will have to cancel the project or redirect other funding sources to complete the work. *Id.* at ¶ 9. Redirection of other funds would require modification or cancellation of other critical work and impede or completely stop Metro's progress in improving congestion and the movement of people and goods throughout Los Angeles. *Id.*

<u>Orange County Transportation Authority (OCTA)</u>. OCTA is currently relying on federal

1  funding to build the OC Streetcar project, Orange County's first modern electric streetcar, serving
2  one of the nation's most densely populated areas through Santa Ana and Garden Grove. OCTA
3  Decl. at ¶ 6. The project would be jeopardized if federal funding stopped.

4       The impact of the Department's actions will also become more significant and more harmful
5  and unmanageable over time. This dispute has already been pending for almost nine years—and the
6  Department's recent change of position threatens to reset the process entirely. While transit agencies
7  are resourceful. the immediate harm is unavoidable, and will only get worse, if the Department's
8  conduct is not stayed and if future unlawful denials of certification are not enjoined.

9       **C.**       **The Balance of Equities and the Public Interest Favor California**

10      The last two factors—the balance of the equities and the public interest—both favor the State
11  of California. Because the Government is a party, these two factors merge. *See J.O.P.*, 409 F. Supp.
12  3d at 418. "The public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581. "The
13  public interest inquiry primarily addresses impact on non-parties rather than parties." *Washington*
14  *v. DeVos*, 466 F. Supp. 3d 1151, 1170 (E.D. Wash. 2020). For the Court to grant a stay or injunction,
15  the public interests in favor of granting the relief must outweigh other public interests that cut in
16  favor of not issuing relief. *See id.*

17      Of particular relevance here, where the federal agency's only hardship is maintaining the
18  status quo, and disbursing federal dollars that the agency does not wish to disburse or believes may
19  violate Congressional intent, that hardship "pales in comparison" to systemic injuries to states
20  caused by an agency's refusal to disburse those federal dollars. *District of Columbia*, 444 F. Supp.
21  3d at 45 (finding federal disbursement of money for supplemental nutrition assistance minimal in
22  comparison to injury states would suffer without such money). That is precisely the case here. The
23  State's request for a stay seeks to maintain the status quo, while the Department intends to suddenly
24  and drastically change it. *Id.* at 15; *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football*
25  *League*, 634 F.2d 1197, 1200 (9th Cir. 1980) (preliminary injunction "preserve[s] the status quo
26  ante litem pending a determination of the action on the merits."); *see also Nken v. Holder*, 556 U.S.
27  418, 429 (2009) (a stay is a "temporary setting aside of the source of the Government's authority . .
28  . by returning to the status quo").

The Department's actions will have, as the Department put it in 2013, a "devastating impact . . . on transit services, commuters, jobs, and economic development in California." *State of Cal.*, ECF No. 122-1 at 2. And the cuts to public transit services, reductions in investment and maintenance of transit infrastructure, and layoffs here are exact harms that Congress intended to avert when appropriating the recent emergency funding. *See*, *e.g.*, Caltrans Decl. at ¶¶ 5-6, 8; BART Decl. at ¶¶ 9, 12-14, 22-24; VTA Decl. at ¶¶ 9-14; OCTA Decl. at ¶¶ 16-18; Metro Decl. at ¶¶ 7-9. The pandemic has already devastated these agencies' revenue (as recognized by Congress in the CARES Act, CRRSAA, and ARP). Cutting off federal funding threatens transit agencies' ability to provide critical services to the public, and in particular to low-income and disabled persons who rely on public transit to navigate to jobs, school, doctor's appointments, grocery shopping, and other errands and necessities of daily life. *See*, *e.g.*, BART Decl. at ¶¶ 11-14; OCTA Decl. at ¶¶ 6-8, 12-15; VTA Decl. at ¶¶ 10, 14; Caltrans Decl. at ¶¶ 7-8. It is difficult to imagine a more direct public harm, especially as record high gas prices in California compound the cost of alternative transportation methods.

In declining to issue an agency stay under 5 U.S.C. § 705, the Department, for its part, has offered no explanation of what harm it expects to incur. The Department has asserted an interest in having its October 28, 2021 Reconsideration implemented and enforced. But a stay of that implementation until this Court rules on the merits amounts to "no more than a temporary extension of the law previously in effect." *San Francisco II*, 981 F.3d at 762 (granting stay and preliminary injunction against agency about-face on the definition of "public charge" for immigration). Again, staying the Department from actions to cut off funding is no more than maintaining the status quo; even after an initial interruption, federal funding continued flowing to transit agencies subject to PEPRA during the prior litigation before this Court.[10] Since the Department's June 14, 2019 Determination, that funding has also been expressly based on the Department's certifications. The

---

[10] In 2013, facing the cut off of $1.6 billion in funding to California, the state Legislature enacted a temporary exemption from PEPRA for transit workers, which expired automatically once this Court invalidated the Department's 2013 determination the following year. Significantly, even with no PEPRA exemption in effect from the end of 2014 and forward, the Department never took the draconian step it has now of cutting off all federal transit funding to California transit agencies while the 13(c) issue was litigated.

NOTICE OF MOTION AND MOTION TO STAY AGENCY IMPLEMENTATION PENDING JUDICIAL REVIEW

relief sought by the State will ensure nothing changes until this Court is able to review the October 28, 2021 Reconsideration and rule on the merits. It will permit the disbursement of funds based on pending grant applications—funds that transit agencies are already relying on. It will also permit the certification of significant additional ARP grants for money specifically appropriated by Congress to relieve the difficulties that transit agencies are experiencing from the COVID-19 pandemic and to keep workforces employed. None of the results of a stay under the APA will harm the Department.

The Department's inability to show harm is particularly clear given the history of this case. The State seeks only a stay pending this Court's confirmation of prior orders finding the Department's actions are arbitrary and capricious and an order maintaining the status quo. This Court has already ruled twice that PEPRA is not a bar to certification under 13(c). The Department cannot possibly show any harm where the State seeks only to vindicate its and its transit agencies' right to enforce and rely upon rulings that this Court has already made. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required . . ."). For this separate reason, there can be no doubt that the public interest and balance of equities favor the State.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the State of California respectfully requests that the Court enter an order pursuant to 5 U.S.C. § 705 and the Court's traditional equitable authority staying the effective date of the October 28, 2021 Reconsideration until the Court rules on the merits of the State's proposed cross-complaint, and ordering the Department to continue processing Section 13(c) certification requests as required by UMTA, consistent with the Court's prior orders in the related *State of California* litigation.

1   DATED: November 19, 2021                 ROB BONTA
                                            Attorney General of California
2
                                            PAUL STEIN
3                                           Supervising Deputy Attorney General

4

5                                           By:   /s/ Anna Ferrari (as authorized on 11/19/21)
6                                                 ANNA FERRARI
                                                  Deputy Attorney General
7
                                                  Attorneys for Defendant-Intervenor
8                                                 STATE OF CALIFORNIA

9   DATED: November 19, 2021                 THOMPSON COBURN LLP
10

11

12                                          By:   /s/ Lukas Sosnicki
                                                  WARREN L. DEAN, JR. (admitted pro hac vice)
13                                                LUKAS SOSNICKI

14                                                Attorneys for Defendant-Intervenor
                                                  STATE OF CALIFORNIA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

10281360                                  26

## CERTIFICATE OF SERVICE

I hereby certify that on 19th of November, 2021, I caused the foregoing Motion to Enforce and Reconsider or Modify Scope of Injunction to be served electronically by the Court's CM/ECF System on all counsel of record, including:

**Andrew D. Roth , PHV**
Bredhoff & Kaiser PLLC
805 15th Street, NW
Suite 1000
Washington, DC 20005
202-842-2600
Fax: 202-842-1888
Email: aroth@bredhoff.com

**Joel McElvain**
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel.: (202) 616-8298
Fax: (202) 616-8202
Email: joel.l.mcelvain@usdoj.gov

*Attorney for DOL*

**Benjamin Kerl Lunch**
Neyhart Anderson Freitas Flynn and Grosboll
44 Montgomery Street
Suite 2080
San Francisco, CA 94104
415-677-9440
Fax: 415-677-9445
Email: blunch@neyhartlaw.com

*Attorneys for ATU*