1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  Amalgamated Transit Union, International,        No. 2:20-cv-00953-KJM-DB
    et al.,
12                                                   ORDER
                          Plaintiffs,
13

14          v.

15  United States Department of Labor, et al.,

16                          Defendants,

17  And Cross-Claims.

18

19          The U.S. Department of Labor recently determined it will not certify transportation grants

20  to California transit agencies, given the Department's current position that California's Public

21  Employees' Pension Reform Act prevents a "continuation of collective bargaining rights," as

22  required by the Urban Mass Transportation Act.  The Department's decision, if it stands, will take

23  effect starting on December 27 of this year, when several California grant applications seeking

24  billions of dollars in funding will be ready for a certification decision.  More denials of

25  certification will follow, affecting many more billions in grants.  The State of California seeks to

26  stay or enjoin the operation of the Department's recent determination to not certify the State's

27  transportation grants.  California has raised at least serious merits questions in its challenge to the

28  Department's determination.  And the State and its transportation agencies undeniably will suffer

                                              1

1  irreparable harm if the court does not enjoin the Department as requested.  California's motion is
2  **granted, as explained below.**

3  **I.     BACKGROUND**

4         In the first half of the Twentieth Century, mass transit systems were run by private
5  companies more commonly than they are today.  *See Jackson Transit Auth. v. Amalgamated*
6  *Transit Union*, 457 U.S. 15, 17 (1982).  As zoning and development practices changed, and as
7  more people began driving, many transit companies found themselves in precarious financial
8  situations.  *See id.*  In the 1960s, Congress began offering federal money to local governments to
9  acquire failing private transit companies so that the government entities could continue offering
10  mass transit as a service.  *See id.*  At the same time, Congress was concerned transit workers
11  could lose collective bargaining rights.  "If, for example, state law forbade collective bargaining
12  by state and local government employees, the workers might lose their collective-bargaining
13  rights when a private company was acquired by a local government."  *Id.*

14         Congress's solution was a provision commonly known as section 13(c) of the Urban Mass
15  Transportation Act of 1964 (UMTA), now codified at 49 U.S.C. § 5333(b).  Under that section,
16  "[a]s a condition of financial assistance" from the federal government, "the interests of employees
17  affected by the assistance shall be protected under arrangements the Secretary of Labor concludes
18  are fair and equitable."  49 U.S.C. § 5333(b)(1).  Section 13(c) lists several "provisions" that
19  these "arrangements" must include.  *See id.* § 5333(b)(2).  One of these provisions is "the
20  continuation of collective bargaining rights."  *Id.* § 5333(b)(2)(B).  This requirement is usually
21  cited as section 13(c)(2) of the UMTA.

22         Today, when a state or local government applies for federal transit funding, the
23  application and any arrangements under section 13(c) are referred to the Department of Labor and
24  its Office of Labor-Management Standards.  *See* 29 C.F.R. § 215.2; Secretary's Order No. 8-
25  2009, § 5.A(4), 74 Fed. Reg. 58835, 58835–36 (Nov. 13, 2009).  If a labor organization
26  represents the applicant's employees, the Department refers the application to that organization,
27  which can object.  *See id.* § 215.3(d)(1).  If the Department finds the objections "sufficient," a
28  term defined in the regulations, it may send the parties to negotiations.  *See id.* § 215.3(d)(2)–(3),

1  (6).  If negotiations are unsuccessful, the parties forward their competing proposals to the

2  Department, which decides whether to certify the application.  *See id.* § 215.3(d)(6)–(7).

3      About nine years ago, a Sacramento-area transit agency applied for federal funds to defray

4  the costs of extending its light rail system.  *See California v. U.S. Dep't of Lab.*, 76 F. Supp. 3d

5  1125, 1131 (E.D. Cal. 2014).  Many of the agency's employees were represented by a local

6  division of the Amalgamated Transit Union (ATU), and the union objected to the transit agency's

7  application.  *See id.* at 1131, 1138.  The union argued a recently enacted state statute, the

8  California Public Employees' Pension Reform Act or "PEPRA," prevented a "continuation of

9  collective bargaining rights" under section 13(c)(2).  *See id.*  For example, the law required all

10  employees hired after January 1, 2013 to pay for at least half of any defined-benefit pension

11  plans.  *See* Cal. Gov't Code § 7522.30(a).  In the past, the Sacramento transit agency had not

12  required its employees to help fund its pension plan.  *See* 76 F. Supp. 3d at 1129–30.  After

13  unsuccessful negotiations, in 2013, the Department of Labor agreed with the union's position and

14  denied certification.  *See id.* at 1131–32.  Three similar applications by another local California

15  transit agency, Monterey Salinas Transit, met a similar fate the same year.  *See id.* at 1133–34.

16      The two transit agencies challenged the Department's decisions under the Administrative

17  Procedure Act (APA) in this court in 2013.  *See generally* Compl., *California v. U.S. Dep't of*

18  *Lab.*, No. 13-2069 (E.D. Cal. Oct. 4, 2013), ECF No. 1.  The agencies contended the Department

19  had acted arbitrarily and without authority in violation of the Administrative Procedure Act,

20  among other claims.  *See generally id.*  While the case was pending, California made a temporary

21  exception to its pension reform law for employees "whose interests are protected" under section

22  /////

23  /////

24  /////

25  /////

26  /////

1   13(c).  *See* Cal. Gov't Code § 7522.02(a)(3);[1] *see also* 2013 Cal. Legis. Serv. Ch. 527 (A.B.

2   1222) (West).

3        This court granted summary judgment in the agencies' favor in 2014.  *See generally*

4   *California*, 76 F. Supp. 3d 1125.  The court found the Department had relied primarily on a legal

5   analysis, and that analysis was faulty.  *See id.* at 1141–44.  For example, the Department had

6   relied heavily on a 1985 circuit court opinion, but it had not considered many differences between

7   the state law in that case and the California law in question.  *See id.* at 1142–43 (discussing

8   *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985)).  Nor did the

9   Department's legal reasoning take account of longstanding Supreme Court authority that

10  describes pension regulations as a permissible "backdrop" to collective bargaining under federal

11  labor law.  *Id.* at 1143 (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987)).

12  The Department had also impliedly and incorrectly assumed that California's reforms foreclosed

13  bargaining over pensions.  *See id.*  Although the state's reforms did place limits on the types of

14  defined benefit plans a public employer could put up for negotiation, the state had not forbidden

15  bargaining over defined contribution plans, *see id.*, another common type of pension plan that

16  "dominate[s] the retirement plan scene today," *id.* at 1129 n.2 (quoting *LaRue v. DeWolff, Boberg*

17  *& Assocs., Inc.*, 552 U.S. 248, 255 (2008)).

18       The court remanded the two transit agencies' applications to the Department for further

19  proceedings "consistent with" the court's order.  *See id.* at 1148.  The Department initially filed

20  an appeal, but dismissed that appeal voluntarily.  *See* Order, *California v. U.S. Dep't of Lab.*, No.

21  15-15385 (9th Cir. Aug. 12, 2015), Dkt. No. 19.  In 2015, the Department issued two new

---

[1] This section provides that the state's pension reforms would "not apply to a public employee whose interests are protected under Section 5333(b) of Title 49 of the United States Code until a federal district court rules that the United States Secretary of Labor, or his or her designee, erred in determining that the application of this article precludes certification under that section, or until January 1, 2016, whichever is sooner."  Cal. Gov't Code § 7522.02(a)(3)(A). The exception would also become permanent in the event of an adverse judgment: "If a federal district court upholds the determination of the United States Secretary of Labor, or his or her designee, that application of this article precludes him or her from providing a certification under Section 5333(b) of Title 49 of the United States Code, this article shall not apply to a public employee specified in subparagraph (A)."  *Id.* § 7522.02(a)(3)(B).

1   decisions on remand, in which it again rejected the applications.  *See State of California v. United*

2   *States Dep't of Lab.*, 155 F. Supp. 3d 1089, 1097–98 (E.D. Cal. 2016) (summarizing the new

3   decisions).  The two transit agencies returned to this court to challenge those decisions.  *See id.* at

4   1098–99.

5         In 2016, this court again granted summary judgment to the transit agencies.  *See generally*

6   *California v. U.S. Dep't of Lab.*, No. 13-2069, 2016 WL 4441221 (E.D. Cal. Aug. 22, 2016).

7   Although the Department had supported its decisions on remand with lengthy explanations, those

8   explanations were often self-contradictory and arbitrarily one-sided.  *See, e.g.*, *id.* at *13–17.  In

9   addition, as it had done before, the Department had relied primarily on a legal analysis rather than

10  subject matter expertise or insights drawn from practice.  *See, e.g.*, *id.* at *21, *28.  A few

11  ancillary disputes remained unresolved, so the court permitted supplemental briefing and did not

12  immediately consider what remedy was appropriate.  *See id.* at *35.  The court ultimately entered

13  judgment in favor of the two transit agencies and closed the case in 2018.  *See generally*

14  *California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180 (E.D. Cal. 2018).  The court enjoined the

15  Department of Labor from relying on the California pension reforms to deny applications for

16  federal funding by the two plaintiff transit agencies.  *See id.* at 1190.  The court did not extend

17  that injunction to other transit agencies.  *See id.*  The case was not a class action, and the court's

18  reasoning was specific to the two plaintiff transit agencies.  *See id.*  The Department again

19  pursued an appeal, which it again dismissed voluntarily.  *See* Order, *California v. U.S. Dep't of*

20  *Labor*, No. 18-15509 (9th Cir. Dec. 19, 2018), Dkt. No. 33.

21        In the months and years that followed, several other California transit agencies submitted

22  applications for federal funding, and the Department of Labor certified those applications over the

23  ATU's objection.  *See* Letter from Arthur Rosenfeld to Robert Molofsky (June 14, 2019), Mot.

24  Ex. B, ECF No. 73-2.  The Department explained that it had "independently reexamined the

25  scope of its authority under section 13(c) and the best way to provide fair and equitable employee

26  protective arrangements."  *Id.* at 4.  It concluded that section 13(c) was intended to give the

27  Secretary of Labor "discretion" and "flexibility" and that in California's case, the disputed

28  pension reforms did not "substantially affect transit employees' benefits under existing collective

5

bargaining agreements." *Id.* at 7. The Department cited, for example, California's argument that nothing in the state's pension reforms "prohibit[ed] the negotiation of an actuarially equivalent retirement benefit to that which may have been allowable through a defined benefit pension" before the reforms. *Id.* The Department acknowledged its decision was a departure from its decisions not to certify the two transit agency grants in 2013 and 2015. *Id.* at 8–9. It explained that it had reconsidered its position after reviewing this court's orders and other case law. *See id.*

ATU challenged the Department's 2019 decision to certify the grants by filing an action in the United States District Court for the District of Columbia. *See generally* Compl., ECF No. 1. California moved to intervene and to transfer the case to this district, and the court granted both motions. *See* Min. Order (Dec. 19, 2019); Mem. Opinion & Order, ECF No. 20. The action was then reassigned to the undersigned. *See* Related Case Order, ECF No. 28. The parties filed and began briefing cross-motions for summary judgment.

While those motions were pending, and before the Department's reply brief came due, the Department informed the court it was considering whether to revisit its 2019 decision, and it asked the court to stay the ATU's case. *See* Mot. Stay, ECF No. 44. The court did not stay the action but held the pending cross-motions for summary judgment in abeyance. Order, ECF No. 51. The Department eventually withdrew both its motion for summary judgment and its 2019 decision. *See* Withdrawal, ECF No. 55; Notice, ECF No. 65. It issued a new determination recently, on October 28, 2021. *See* Letter from Andrew Auerbach to Ray Tellis (Oct. 28, 2021), Mot. Ex. C, ECF No. 73-3. The 2021 determination "nullifies" the 2019 determination, which the Department dismisses as a "deviation." *Id.* at 2. The Department returned to the position it adopted in 2013 and 2015, which it found to be "superior" despite having defended that position unsuccessfully for several years. *Id.* As before, the Department relies primarily on an analysis of case law and statutory provisions. It criticizes this court's orders and its own 2019 determination for wrongly portraying California's pension reforms as "insignificant and minimal." *See id.* at 8. According to the letter, the Department is "not persuaded" by the legal reasoning in this court's decisions and in the Department's 2019 determination, which it described as "unsupported" and "untenable." *See id.* at 8–12. It rejected this court's analysis of federal labor law as "unhelpful"

6

1    and "ill-suited to making any necessary nuanced distinctions between state laws affecting transit

2    employee rights to varying degrees." *See id.* at 13–14.

3           Despite that criticism, the Department clarified in the margin that it will "of course"

4    comply with the permanent injunction this court imposed in 2018. *Id.* at 2 n.2. It also clarified

5    that its determination will apply only to future grant applications. It was not "rescinding or

6    otherwise taking retrospective action as to the particular grant applications addressed in the 2019

7    Determination." *Id.* at 2. It intended this limitation to account "for any reliance interests that the

8    State of California and its transit agencies may have in the 2019 Determination." *Id.*

9           In response to the Department of Labor's decision to reconsider its 2019 determination,

10   California requested and obtained leave to file a cross-claim under the APA in this action. *See*

11   Order, ECF No. 76. The state now moves for an order staying the Department's 2021

12   determination. *See generally* Mot., ECF No. 73. The state argues this new determination

13   conflicts with this court's reasoning in the previous litigation and is blind to the irreparable harm

14   it will cause very soon now.

15          The state supports its motion with declarations from the directors and managers of several

16   local transit agencies. For example, the general manager of the San Francisco Bay Area Rapid

17   Transit District, more commonly known as BART, explains that in the past few years, his agency

18   has been relying on federal grants to fund projects and operations. *See* Powers Decl. ¶¶ 2, 9, Mot.

19   Ex. F, ECF No. 73-6. Without federal funds, BART will be forced to make "extremely deep

20   service cuts" in 2022 and the years that follow. *Id.* ¶ 11. BART would likely close 20 of its 50

21   stations and cut back heavily on the number of routes and trains it runs. *See id.* These cuts would

22   have the greatest negative effects on people in outlying towns and cities, where incomes are often

23   lower, and where people rely most heavily on public transit to commute to work in the Bay Area.

24   *See id.* ¶¶ 11, 14. Fewer riders will lead to fewer fares and lower revenues. *See id.* ¶ 11. Lower

25   revenues would likely lead to further service cuts in a repeating downward cycle. *See id.* Many

26   of BART's employees would likely lose their jobs. *See id.* ¶ 12.

27          BART also relies on federal funds to maintain railcars, replace aging equipment, improve

28   its train control system and power infrastructure, renovate passenger stations, and complete

1   similar projects.  *See id.* ¶ 15.  In 2020, while the Department of Labor was still certifying grants,

2   BART agreed to a billion-dollar project to increase service, modernize its fleet, improve

3   communications, and make other improvements.  *See id.* ¶ 16.  This project is funded in part by

4   federal grants awarded in stages.  *See id.*  Some funding already has been awarded, but the

5   Department of Labor's 2021 decision has put more than a hundred million dollars of future funds

6   in jeopardy.  *See id.*  Without these funds, the project cannot be completed as planned.  *See id.*

7   Another BART railcar procurement project that began in 2012 is also in jeopardy of losing almost

8   $1 billion in federally subsidized loans, which could lead in turn to delays, higher costs, and

9   litigation over BART's contractual obligations.  *See id.* ¶¶ 19–21.  A third billion-dollar grant

10   project that BART already has negotiated and begun to implement would likely face similar

11   problems.  *See id.* ¶ 22.  Federally funded maintenance and efforts are also in jeopardy.  *See id.*

12   ¶ 17.  Delays or uncertainties about federal funding probably will also have a negative effect on

13   BART's credit rating, which would increase its borrowing costs.  *See id.* ¶ 18.  During the time

14   the Department of Labor was certifying grants, BART applied for and obtained more than $2.3

15   billion in federal funds.  *Id.* ¶ 23.  In the coming months, BART has planned to submit six grant

16   applications worth hundreds of millions of dollars to the Department of Labor for certification.

17   *See id.* ¶ 24.

18          The Chief Executive Officer of the Los Angeles Metropolitan Transit Agency (MTA)

19   submitted a similar declaration.  *See generally* Wiggins Decl., Mot. Ex. G, ECF No. 73-7.

20   Federal funds are a "significant and critically important resource" for the MTA.  *Id.* ¶ 4.  For

21   example, MTA is using federal funds to finance a subway extension in preparation for the 2022

22   NFL Superbowl, the 2026 FIFA World Cup and the 2028 Olympic Games.  *Id.*  It has already

23   planned and started this extension, *see id.* ¶¶ 4, 9, and it expects to submit applications for more

24   than $250 million to fund the project expansion in the coming year, *id.* ¶ 5.  If federal funds are

25   no longer available, that project and others may be abandoned.  *Id.*  Work will likely stop if

26   federal funds are delayed for more than a few months.  *Id.* ¶ 10.  Borrowing costs will likely

27   increase.  *See id.* ¶ 11.

28   /////

1        The administrators of several other transit agencies also submitted similar declarations,

2    and they expect similar consequences if federal funds are delayed or unavailable.  *See generally*

3    Johnson Decl., Mot. Ex. H, ECF No. 73-8 (Orange County Transportation Authority); Gonot

4    Decl., Mot. Ex. I, ECF No. 73-9 (Santa Clara Valley Transportation Authority); Mulligan Decl.,

5    Mot. Ex. J, ECF No. 73-10 (Golden Gate Bridge, Highway, and Transportation District).

6    Officials from the California State Transportation Agency and the California Department of

7    Transportation agree about the likely consequences of the Department of Labor's 2021 decision.

8    *See generally* Edison Decl., Mot. Ex. K, ECF No. 73-11; Ward-Waller Decl., Mot. Ex. M, ECF

9    No. 73-13.

10        If the Department of Labor's decision stands, California and its transit agencies expect to

11    experience the negative effects of that decision very soon.  Their borrowing costs may increase

12    soon after the Department discloses an adverse decision, if they have not increased already as a

13    result of the uncertainty the announcement regarding the decision itself has created.  *See, e.g.*,

14    Powers Decl. ¶ 20; Wiggins Decl. ¶ 11.  It is undisputed that the regulatory objection periods for

15    several applications seeking more than $2 billion will close in the next few weeks, including as

16    soon as December 27, and these applications could then be denied.  *See* Auerbach Decl. ¶¶ 6–8 &

17    Ex. A, ECF No. 82-1.  At least one agency has already warned its employees that mass layoffs are

18    on the horizon.  *See* Mulligan Decl. ¶ 13 (describing letter provided to employees under Worker

19    Adjustment and Retraining Notification (WARN) Act of 1988, Pub. L. No. 100-379, 102 Stat.

20    890 (codified at 29 U.S.C. §§ 2101–2109)).  That agency has relied on federal funding to stave

21    off those layoffs before now.  *See id.* ¶¶ 14–17.

22        The state and its transit agencies are likely not alone in having relied on the Department of

23    Labor's previous decision to certify federal grants.  In 2020 and early 2021, Congress passed

24    three acts in response to the ongoing novel coronavirus pandemic: the Coronavirus Aid, Relief

25    and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), the

26    Coronavirus Response and Relief Supplemental Appropriations Act, Pub. L. No. 116-260, 134

27    Stat. 1182 (December 27, 2020), and the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat.

28    4 (March 11, 2021)).  Each act includes funding for state and local transit agencies, including in

1    California.  *See* Mot. Stay at 15 n.9 (citing 134 Stat. 599–600, 134 Stat. 1945–48, and 135 Stat.

2    72).  California transit agencies have relied on this funding to weather the pandemic.  *See, e.g.*,

3    Mulligan Decl. ¶¶ 17, 19, 24; Powers Decl. ¶ 23.

4           Both the ATU and the Department oppose the state's request to stay the effects of the

5    Department's 2021 decision.  *See generally* ATU Opp'n, ECF No. 77; DOL Opp'n, ECF No. 78.

6    California submitted a combined reply, *see generally* Reply, ECF No. 79, and the court held a

7    hearing by videoconference on December 17, 2021.  Andrew Roth and Benjamin Lunch appeared

8    for the ATU.  Joel McElvain appeared for the Department of Labor.  Warren Dean and Anna

9    Ferrari appeared for California.

10   **II.     LEGAL STANDARD**

11          California requests "a stay, pursuant to 5 U.S.C. § 705—and, to the extent necessary, a

12   preliminary injunction under this court's traditional equitable authority—to postpone the effective

13   date" of the Department's 2021 determination.  *See* Notice of Motion at 2, ECF No. 73.  Under

14   § 705, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable

15   injury, [a] reviewing court . . . may issue all necessary and appropriate process to postpone the

16   effective date of an agency action or to preserve status or rights pending conclusion of the review

17   proceedings."  5 U.S.C. § 705.  The ATU contends California cannot obtain relief under § 705

18   because the Department's 2021 determination has no "effective date" to "postpone."  ATU Opp'n

19   at 4–5.  The court need not decide whether the ATU is correct in this respect.  District courts

20   within this circuit have held that the factors a court considers when deciding whether to issue a

21   stay under § 705 "substantially overlap with the *Winter* factors for a preliminary injunction."

22   *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020) (citing *Winter v.

23   Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), and quoting *City and County of San Francisco v.

24   U.S. Customs & Immigration Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019)).  The Ninth

25   Circuit has also applied the same test to preliminary injunctions and motions to stay an

26   administrative action pending appeal.  *See, e.g., Humane Soc. of U.S. v. Gutierrez*, 558 F.3d 896

27   (9th Cir. 2009) (order).

28   /////

To obtain a preliminary injunction, a plaintiff must prove, "by a clear showing," (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *City & Cty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 788–89 (9th Cir. 2019) (emphasis omitted) (first quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); then quoting *Winter*, 555 U.S. at 20). "Alternatively, 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 789 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). When the party opposing an injunction is the government, as is true in this case, the balance of equities and public interests "merge." *E.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020) (per curiam).

## III.   DISCUSSION

The court begins with what is undisputed: California and its transit agencies will likely suffer great harm if the Department of Labor does not certify their applications for federal funds under section 13(c). California cannot mitigate these harms by pursuing damages from the United States, so they are irreparable. *See* 5 U.S.C. § 702; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). The Department of Labor agrees "substantial funding is at stake here." DOL Opp'n at 19. It does not dispute the State's claim of irreparable harm. Nor does the ATU.

The Department of Labor and ATU also do not contest the State's claims that its transit agencies will feel the effects of the Department's 2021 letter very soon, before this action can be resolved finally on its merits. They argue only that the State can avoid the adverse consequences of the Department's decisions by making an exception to its pension reform laws, *see, e.g.*, ATU Opp'n at 3 & n.1; DOL Opp'n at 19, and that the State can choose to forego federal funding if it prefers not to make an exception, *see* ATU Opp'n at 19; DOL Opp'n at 19. As ATU's counsel conceded at hearing, only the California Legislature can pass exceptions to California laws, and the state has shown clearly that such legislative action is all but impossible within the timelines in

11

1    question.  As noted above, the objection periods for billions of dollars of grants will close within

2    a few days, on December 27, 2021—between Christmas and New Year's Day.  The California

3    Legislature is not currently in session and will not reconvene until January 3, 2022.  *See* Office of

4    the Secretary of the Senate & Office of the Assembly Chief Clerk, 2022 Tentative Legislative

5    Calendar (Oct. 21, 2021).[2]  The court thus finds that the State has clearly shown it will suffer

6    irreparable harm if the court denies its motion.

7         The State's harms heavily outweigh opposing interests.  The Department of Labor and the

8    ATU emphasize one countervailing interest: the Department of Labor would not be permitted to

9    interpret section 13(c) as it currently prefers.  *See* ATU Opp'n at 19–20; DOL Opp'n at 19.  The

10   other interests they press are derivative of this merit-based claim.  *See, e.g.*, ATU Opp'n at 19

11   (arguing preliminary injunction "would run counter to the federal policy in favor of collective

12   bargaining that Congress sought to further in making 'the continuation of collective bargaining

13   rights'" a condition to funding under section 13(c) of the UMTA); *id.* at 20 (arguing public has

14   interest in government's "compliance with federal law requirements for the expenditure of federal

15   funds"); DOL Opp'n at 19 (arguing Department and public have interest in ensuring "local transit

16   agencies provide for the continuation of collective bargaining rights before they are found to be

17   eligible to receive federal transit funding").

18        For purposes of this order, the court assumes without deciding that the Department of

19   Labor has a legitimate interest in exercising its discretion to fulfill its duties under section 13(c)

20   of the UMTA.  If the Department ultimately prevails, a preliminary injunction would in the

21   meantime have been a roadblock to exercising that discretion.  But nothing in the record suggests

22   the Department would be blocked for long by the injunction alone.  The parties request neither a

23   trial nor discovery.  As suggested at hearing, the court will set an expedited schedule for summary

24   judgment at the conclusion of this order.  Moreover, the Department's actions over the last few

25   years confirm its interests weigh lightly in the balance.  It certified grants to California transit

---

    [2] https://www.senate.ca.gov/legdeadlines (accessed Dec. 17, 2021).  The court takes
judicial notice of this information.  *See* Fed. R. Evid. 201(b)(2); *King v. Cty. of Los Angeles*, 885
F.3d 548, 555 (9th Cir. 2018) (taking "judicial notice of the undisputed and publicly available
information displayed on government websites").

1    agencies for more than two years before it reconsidered in October 2021; as recently as December

2    2020, the Department was actively defending its decision to do so.  *See* Mot. Summ. J., ECF No.

3    38.  It spent several months deciding whether to reconsider.  A delay of a few more months will

4    impose no significant hardship on the Department of Labor.

5         Another interest receives relatively little attention in the parties' briefing, although ATU's

6    counsel alluded to it at hearing; it is an interest that should definitely be recognized.  If the

7    Department of Labor's current interpretation of section 13(c) is correct, then the employees of

8    California transit agencies would be wrongfully deprived of the rights Congress intended for them

9    to possess and exercise during any period of injunctive relief.  The rights and interests of these

10   employees should arguably be at the forefront of this litigation.  After all, the UMTA refers to

11   "the interests of employees affected by" federal assistance, 49 U.S.C. § 5333(b)(1), not the

12   Secretary of Labor's interests in enforcing sound policies, and not the interests of whatever

13   organizations represent those employees.  At the same time, however, denying the State's request

14   for a preliminary injunction would also lead to hardships for transit employees.  As the record

15   documents, layoffs are likely if federal funding is delayed or uncertain.  *See, e.g.*, Mulligan Decl.

16   ¶¶ 13–17; Powers Decl. ¶ 12; Gonot Decl. ¶ 12.  Additionally, the Santa Clara Valley

17   Transportation Authority has sought federal funds, now at risk, to help retrain employees who

18   cannot return to their posts after a mass shooting on the agency's property earlier this year.  *See*

19   Gonot Decl. ¶ 15.  It also is paying for counseling and financial support to the families of

20   employees who died in the attack.  *See id.*  Without an injunction, these funds may be lost, or the

21   agency may need to divert funds from other sources for critical tasks, such as repairs.  *See id.*

22   ¶¶ 15–16.  Transit employees' interests fall on both sides of the balance.

23        In sum, California has clearly shown its citizens and local transit agencies will suffer

24   significant irreparable harm if the court denies its motion.  These harms heavily outweigh the

25   interests that weigh against a preliminary injunction.  California's likelihood of success on the

26   merits is the only remaining question.  Because the balance of harms tips sharply in favor of an

27   injunction, the state will prevail if it raises even "serious questions going to the merits."  *All. for*

28   *the Wild Rockies*, 632 F.3d at 1135.  The court finds the State has done so, as explained below.

1    This court expended considerable time and judicial effort addressing a nearly identical

2    dispute in the previous litigation about California's pension reforms, and ultimately decided the

3    transit agencies in that litigation prevailed.  This court's previous decisions are not binding here.

4    *See City of Fresno v. United States*, 709 F. Supp. 2d 888, 909 (E.D. Cal. 2010).  Nor are they the

5    law of this case.  *See California*, 2016 WL 4441221, at *7.  But this court's own reasoning in a

6    nearly identical case is "persuasive" if nothing else.  *E.g., Beco Dairy Automation, Inc. v. Glob.

7    Tech Sys., Inc.*, No. 12-01310, 2015 WL 9583012, at *2 n.1 (E.D. Cal. Dec. 31, 2015); *Fresno*,

8    709 F. Supp. at 909.  That is all the more true in this instance, as the Department's 2021 letter

9    cites no changes in the law and no factual distinctions between or among cases.  In response to

10   the State's motion, the Department and ATU urge the court simply to rethink what it has

11   thoroughly thought through before.  *See, e.g.*, DOL Opp'n at 1 (requesting this court "reexamine

12   its prior conclusions"); ATU Opp'n at 6 ("ATU respectfully submits that . . . a reexamination and

13   departure is warranted here.").  As a result, the State can prevail on its request for injunctive relief

14   if the potential for a departure by this court from its carefully reasoned prior conclusions in a

15   nearly identical case raises "serious questions."  *All. for the Wild Rockies*, 632 F.3d at 1135.  And

16   it undoubtedly does.

17   This conclusion alone would suffice to grant the State's motion, but the State also has

18   shown it is likely to prevail on its APA claim for a second, independent reason.  This litigation

19   over the Department of Labor's section 13(c) decisions bears a close resemblance to litigation

20   over the policy change underlying the Supreme Court's decision in *Department of Homeland

21   Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020).  At this early stage of

22   this case, that decision appears likely to be controlling.  Reviewing the history of that case and the

23   Supreme Court's reasoning helps explain why this court concludes it is.

24   In 2012, the Secretary of Homeland Security announced an immigration relief program for

25   young people who were brought to the United States as children.  *Id.* at 1901.  The Department of

26   Homeland Security decided not to pursue the removal of these persons from the United States if

27   they satisfied a number of prerequisites.  *See id.* at 1901–02.  The agency also decided it would

28   offer a number of other benefits to the same group, such as work authorizations.  *See id.* at 1902.

14

Litigation embroiled this policy and a similar policy regarding the removal of parents whose children were U.S. citizens or lawful permanent residents. *See id.*; *see also Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). In 2017, after a change in Presidential administrations, the Attorney General advised the Acting Secretary of the Department of Homeland Security to rescind the policy based on his conclusion that the deferral program suffered from a number of legal defects. *See id.* at 1903. The Acting Secretary heeded that advice and ended the program. *Id.*

Many different plaintiffs successfully challenged that decision in federal district courts around the country. *See id.* at 1904. The Supreme Court granted the United States' petition to examine the question immediately, consolidated the cases for argument, and affirmed. *See id.* at 1905. The Court found the agency had violated the APA in two ways.

First, the agency did not appear to have appreciated the true scope of its decision. *See id.* at 1911–13. As a result, it had not considered an alternative to the policy's wholesale termination: it could have decided not to offer benefits, such as work authorizations, but to continue deferring removals. *See id.* at 1911–12. An agency's decisions are arbitrary and capricious if that agency does not "consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Regents*, 140 S. Ct. at 1910.

Second, "[w]hen an agency changes course," the Court wrote, "it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 140 S. Ct. at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). "It would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). And yet that is what the Department of Homeland Security had done. *Id.* Although the Secretary of Homeland Security had acknowledged the potential claims of reliance on the deferral policy, she had not actually weighed those interests in the balance. *See id.* at 1914. People had made life-changing decisions based on their expectation that the government would not pursue their removal from the United

1    States.  For example, they had enrolled in college degree programs, started businesses, purchased

2    homes, married, and had children.  *See id.*  If the Department of Homeland Security had properly

3    weighed these interests, it might have found a way to avoid the severest pitfalls of outright

4    termination, but it did not, and so its actions were arbitrary and capricious.  *See id.*

5           Like the Department of Homeland Security, the Department of Labor has reversed course,

6    here more than once.  Both reversals have followed a change in Presidential administrations.  In

7    each instance, the federal agencies relied primarily on legal reasoning and cited problems they

8    perceived in a previous administration's legal positions.  As the Department of Homeland

9    Security had done in *Regents*, in this case the Department of Labor acknowledged that the

10   beneficiaries of its old policy had likely made decisions in reliance on the assumption the policy

11   would endure, but did not find these reliance interests were reason to stand by the previous

12   policy.  Here, the Department of Labor's decision to stop certifying grants under section 13(c)

13   also appears at this early stage to suffer from the same two flaws under the APA that proved fatal

14   in *Regents*.

15          First, the Department of Labor appears not to have appreciated the true scope and

16   consequences of its decision.  The Department recognized it would not be "fair and equitable, in

17   light of all the circumstances, to issue a decision that could de-obligate the funds that [had] been

18   obligated as a result of [past] grant certifications."  October 2021 Letter at 2.  That is, it decided

19   not to rescind any grants or take other "retrospective action."  *Id.*  But there is no indication the

20   Department recognized another class of interests at stake.  Some of the mass transit projects for

21   which California agencies are seeking funding had been planned in the past but would be funded

22   and completed in the future.  BART, for example, has planned for years to replace and modernize

23   its railcars, improve power infrastructure, and renovate passenger stations.  *See* Powers Decl.

24   ¶¶ 16–20.  The subway expansion in Los Angeles is a similar example.  *See* Wiggins Decl. ¶¶ 4–

25   5; *see also* Mot. Stay at 21–23 (summarizing other evidence).  As a result, mere uncertainty about

26   whether grants will be available in the future can be disruptive to such complex long-running

27   projects.  *See, e.g.*, Powers Decl. ¶ 20.  That is true for the State of California as well:  It must

28   reallocate funds from other sources of transit funding it previously had relied on if anticipated

1    prospective funding evaporates as a result of the Department's decision.  *See* Mot. Stay at 18

2    ("[T]he State relies on the continued vitality of its public transportation system—and the federal

3    funds necessary to support it—in almost every aspect of budgeting and planning the State's

4    operations.").  As California persuasively explains, the Department framed its decision in broad,

5    prospective terms, but it said "nothing about how other California transit agencies"—agencies

6    other than those listed in its 2021 decision—"may have relied on the June 14, 2019

7    Determination."  *Id.* at 14.

8         Nor did the Department mention one of the most crucial events intervening between its

9    2019 and 2021 decisions: the novel coronavirus pandemic.  As noted above, Congress responded

10   to the pandemic with at least three acts that offered funding to California transit agencies to fight

11   the spread of the novel coronavirus.  "[I]t is proper . . . to presume that Congress was aware of the

12   existing administrative regulations and interpretations" when it passed these special funding bills.

13   *Marchese v. Shearson Hayden Stone, Inc.*, 822 F.2d 876, 878 (9th Cir. 1987).  This is not to say

14   Congress modified section 13(c) by passing an appropriations statute.  *Cf.* DOL Opp'n at 18

15   (arguing Congress did not modify section 13(c)).  The correct legal interpretation of section 13(c)

16   is similarly beside the point.  *See id.* at 17.  In *Regents*, the Department of Homeland Security had

17   undisputed authority to rescind its prior policy, but that did not insulate its decision from an APA

18   challenge.  *See* 140 S. Ct. at 1905.  As California persuasively contends, the Department of Labor

19   simply did not "consider the impact of abruptly denying federal transit funding during a time of

20   unprecedented disruption for transit agencies."  Mot. Stay at 11.

21        Second, because the Department did not appreciate the broader reliance interests at stake,

22   it did not weigh those interests and their implications for its legal conclusions regarding section

23   13(c).  Nor did it consider whether it could reduce the negative consequences of its reversal by

24   excluding from the 2021 letter's operation a broader range of grants.  The Department might have

25   considered grants one at a time rather than announcing a plan to deny certification globally.  It

26   might have excluded a particular class of long-term, partially completed, and partially funded

27   projects.  Or it might have considered whether to exclude grants tied to pandemic relief efforts

28   and recent legislation.

1    The Department need not give controlling weight to any particular reliance interest.  As

2    the Supreme Court wrote in *Regents*, reliance interests are "not necessarily dispositive" even

3    when they are "noteworthy."  140 S. Ct. at 1914.  Nor must the Department consider every

4    possible option and exhaust every conceivable policy.  *See id.* at 1914–15.  "But, because [the

5    Department of Labor] was not writing on a blank slate, it *was* required to assess whether there

6    were reliance interests, determine whether they were significant, and weigh any such interests

7    against competing policy concerns."  *Id.* at 1915 (emphasis in original; citations and quotation

8    marks omitted).  Here, California is likely to prove the Department never performed that

9    mandatory exercise.

10    The Department may very well have avoided these pitfalls if it had solicited and

11    considered the views of the State of California and its individual transit agencies before it

12    reconsidered, but it did not.  Rather, the Department simply nullified its previous decision without

13    seeking comments.  California contends this failure was itself a violation of the APA, *see* Mot. at

14    12–13, but the court need not decide whether it was at this stage.  Whether or not the Department

15    was independently required to accept and consider comments, its decision not to do so further

16    supports the conclusion its process was arbitrary.

17    Nor is it necessary to decide now whether the Department had authority to issue a

18    prospective certification decision about applications by agencies other than those addressed in the

19    2019 determination.  *Compare* Mot. Stay at 5 n.3, 12 *with* DOL Opp'n at 16–17.

20    **IV.    CONCLUSION**

21    The motion for a stay or preliminary injunction is **granted**.  To prevent irreparable injury

22    and preserve the status quo while this court reviews California's claims, the Department of

23    Labor's October 28, 2021 determination is **stayed**.  Until further order of this court, the

24    Department is **enjoined** from failing to process and certify grant applications by California transit

25    agencies as required by the Urban Mass Transportation Act and its implementing regulations or

26    from relying on PEPRA as a basis to deny, withhold, delay, or otherwise limit the certification of

27    such grants under Section 13(c) of UMTA.

28    /////

1        A hearing on dispositive motions is set for **February 11, 2022 at 10 a.m.** before the

2    undersigned.  The parties are directed to meet and confer and file a jointly or individually

3    proposed briefing schedule or schedules no later than **December 27, 2021**.  These deadlines will

4    not be continued absent a showing of good cause.

5        This order resolves ECF No. 73.

6        IT IS SO ORDERED.

7    DATED:  December 19, 2021.

CHIEF UNITED STATES DISTRICT JUDGE