UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amalgamated Transit Union, International, et al., | No. 2:20-cv-00953-KJM-DB |
| Plaintiffs, | ORDER |
| v. | |
| United States Department of Labor, et al., | |
| Defendants, | |
| And Cross-Claims. | |

In October 2021, the United States Department of Labor publicized its intent to deny all future federal mass transit funds to local transit agencies throughout California. That announcement was the latest in a long series of heavily litigated disputes between the state, local transit agencies, unions representing transit employees, and the Department of Labor. In a previous order, this court preliminarily enjoined the Department from putting its 2021 policy into practice. California now asks the court to set aside the Department's decision formally under the Administrative Procedure Act (APA) and to make the injunction permanent.

As explained in this order, the Department had no authority to issue the broad, prospective decision it did in 2021. Congress clearly limited the Department to making decisions, one at a time, about specific funding applications by specific transit agencies and their employees. The

1   Department also reached the conclusions incorporated in its 2021 decision after an arbitrarily

2   truncated process.  As a result, it overlooked important parts of the problem and relied on

3   unpersuasive and arbitrary reasoning.  Under the APA, therefore, its decision must be set aside.

4   **I.      BACKGROUND**

5            Historically, private companies owned and operated local mass transit systems.  *Kramer v.*

6   *New Castle Area Transit Auth.*, 677 F.2d 308, 309 (3d Cir. 1982).  "[A]s late as 1960, 95% of

7   transit companies in the nation were privately owned and operated."  *Id.*  But mass transit

8   facilities in many American cities then began to deteriorate.  *See* Urban Mass Transportation Act

9   of 1964 (UMTA), Pub. L. No. 88-365 § 2(a)(2), 78 Stat. 302, *as amended by* Pub. L. No. 89-562,

10  80 Stat. 715 (1966).[1]  Roads were growing more congested.  *Id.*  Development was

11  uncoordinated.  *Id.*  Many private mass transit companies found themselves in precarious

12  financial conditions.  *Jackson Transit*, 457 U.S. at 17 (citing S. Rep. No. 88-82, 88th Cong., 1st

13  Sess. at 4–5, 19–20 (Mar. 28, 1963)).  Congress was concerned that the vitality of American cities

14  was in jeopardy.  UMTA § 2(a)(2).  It decided federal funds were "essential" to the solution of

15  these problems.  *Id.* § 2(a)(3).  It thus passed the UMTA to distribute federal money to state and

16  local governments for operating and improving their mass transit systems.  *See Kramer*, 677 F.2d

17  at 309.

18           Congress was concerned about the potential side effects of making available billions of

19  federal dollars, including the incentives state and local governments might have to acquire private

20  transit companies.  *See* H.R. Rep. No. 88-204, 88th Cong., 1st Sess. at 2 (April 9, 1963).  Public

21  acquisitions of private transit companies might lead to adverse consequences for people who

22  worked at a transit company where the employees were members of a union.  "If, for example,

---

[1] The UMTA had twelve numbered sections when it was originally passed.  *See* 78 Stat. 302, 302–08.  A few years later, Congress added three sections between the original ninth and tenth sections, and those sections are commonly cited using the post-amendment designations.  *See, e.g.*, *Jackson Transit Auth. v. Loc. Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 16 & n.1 (1982).  The court uses that convention in this order.  The relevant statutory provisions are now part of Title 49, Chapter 53 of the U.S. Code.  The UMTA provisions at the center of this case are found in 49 U.S.C. § 5333(b), as explained in more detail below.

2

1    state law forbade collective bargaining by state and local government employees, the workers

2    might lose their collective-bargaining rights when a private company was acquired by a local

3    government." *Jackson*, 457 U.S. at 17.  One catalyst for this concern was the acquisition of a

4    private transit company by a Miami-area government a few years before.  *Loc. Div. 589,*

5    *Amalgamated Transit Union, AFL-CIO, CLC v. Com. of Mass.*, 666 F.2d 618, 628 n.26 (1st Cir.

6    1981) (citing and summarizing legislative history).  After the acquisition, the transit agency's

7    employees lost their collective bargaining rights, as state law prevented the local government

8    from bargaining.  *See id.*  Many other states' laws "forbade collective bargaining by public

9    employers," *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 767 F.2d 939, 942 (D.C.

10   Cir. 1985), so labor officials and lawmakers were concerned that federal funding might set off a

11   series of similar acquisitions with similarly adverse labor consequences, *see Loc. Div. 589*,

12   666 F.2d at 628 n.26 (citing legislative history).

13        Labor leaders also worried that if the federal government spent large amounts of money to

14   modernize transit systems around the country, jobs might be automated away.  *See, e.g.*,

15   Testimony of Bernard Cushman, General Counsel, Amalgamated Association of Street, Electric

16   Railway & Motor Coach Employees of American, AFL-CIO in Hearings before a Subcommittee

17   of the Senate Committee on Banking and Currency on S. 9 and S. 917, 88th Cong., 1st Sess., at

18   328–30, 369–71 (Mar. 5, 1963).  These leaders and the Administration urged Congress to take

19   care of these workers "who might be hurt."  *Id.* at 372.

20        These concerns prompted Congress to adopt an amendment to the UMTA, "[t]o prevent

21   federal funds from being used to destroy the collective-bargaining rights of organized workers."

22   *Jackson Transit*, 457 U.S. at 17.  That amendment, which eventually became section 13(c), *see id.*

23   at 17 & n.1, provides today that "the interests of employees affected by [federal financial]

24   assistance shall be protected under arrangements the Secretary of Labor concludes are fair and

25   equitable."  49 U.S.C. § 5333(b)(1).  The agreement granting federal assistance must "specify the

26   /////

27   /////

28   /////

arrangements," *id.*, and section 13(c) requires those arrangements "include provisions that may be necessary for" six purposes:

> (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
>
> (B) the continuation of collective bargaining rights;
>
> (C) the protection of individual employees against a worsening of their positions related to employment;
>
> (D) assurances of employment to employees of acquired public transportation systems;
>
> (E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and
>
> (F) paid training or retraining programs.

*Id.* § 5333(b)(2).[2]

Legislators in both houses debated these provisions vigorously. Some who opposed them saw them as an intrusion into local governance. They believed section 13(c) would force states and local governments to acquiesce to the demands of a federal regulator or preempt state law entirely. *See, e.g.*, 109 Cong. Rec. 5414–16 (Apr. 2, 1963) (remarks of Senators Goldwater and Tower); 110 Cong. Rec. 14978–79 (June 25, 1964) (remarks of Congressman Griffin); H.R. Rep. No. 88-204 at 22–30 (minority views). These concerns seemed founded in part on trends in the U.S. Supreme Court's cases of that era. Just a few years earlier, for example, the Court had held California was required to comply with federal labor laws in its capacity as a railroad operator despite state laws to the contrary. *See generally California v. Taylor*, 353 U.S. 553 (1957). The proponents of section 13(c) on the other hand, along with the Secretary of Labor, its original

---

[2] When section 13(c) was passed, items (D) and (E) in the list above were combined into a single subsection. *See* Pub. L. No. 88-365, 78 Stat. at 307 ("assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off"). The fourth item in the list was separated into two parts in the 1990s when the UMTA was recodified "without substantive change." *See* Pub. L. No. 103-272, 108 Stat. 745, 745 (July 1994). For that reason, it is common to see references to five subject areas rather than six. *See, e.g.*, *Jackson Transit*, 457 U.S. at 23; *Donovan*, 767 F.2d at 944.

1   drafter, argued the section would not supersede state law. *See Local Div. 589*, 666 F.2d at 628–

2   33 (collecting and summarizing legislative history).

3        In the Senate, these debates culminated in a last-minute floor amendment championed by

4   Senator Wayne Morse of Oregon. *See* 109 Cong. Rec. 5670–85 (Apr. 4, 1963); *see also* Henny

5   Willis, "Morse Loses Last of Many Battles," *Eugene Register-Guard* (Jul. 22, 1974)

6   (remembering Morse, "the old 'Tiger of the Senate,'" as an attorney, law school dean, skilled

7   orator and one of only two Senators who opposed the 1964 Gulf of Tonkin Resolution). Senator

8   Morse portrayed section 13(c) as a hard-fought compromise with a limited scope and an attempt

9   to prevent federal funds from upsetting the status quo. *See, e.g.*, 109 Cong. Rec. 5672–73

10  (Apr. 4, 1963).

11       The UMTA was passed in 1964. Public acquisitions of private transit companies

12  accelerated. "By 1978, local publicly owned transit systems received 90% of the revenues from

13  all transit operations; accounted for 91% of total vehicle miles operated and 91% of all linked

14  passenger trips; and owned or leased 87% of total transit vehicles." *Kramer*, 677 F.2d at 309.

15       As more transit agencies came within government control, federal courts were asked to

16  intervene in disputes about the protections in section 13(c). Courts hesitated to insert themselves

17  into the Secretary's decisions under section 13(c). In the late 1960s, for example, several railroad

18  employees and a union local sued in federal court to stop the Secretary of Labor from certifying

19  an arrangement under section 13(c). *See Kendler v. Wirtz*, 388 F.2d 381, 382 (3d Cir. 1968).[3]

20  The district court dismissed the complaint, and the Third Circuit affirmed. *See id.* "[I]t would

21  not be appropriate for a court to substitute its judgment for the Secretary's judgment that railroad

22  /////

23  /////

---

[3] Willard Wirtz, the defendant, was the Secretary of Labor at the time the Kennedy Administration proposed the amendments that eventually became section 13(c); he testified in Committee hearings in both Houses of Congress. *See* Hearings Before a Subcommittee of the Committee on Banking & Currency of the United States Senate on S. 6 and S. 917, 88th Cong., 1st Sess., at 307–18 (Mar. 8, 1963); Hearings Before the Committee on Banking and Currency of the U.S. House of Representatives on H.R. 3881, 88th Cong., 1st Sess., at 475–87 (Mar. 8, 1963).

1    employees are afforded fair and equitable protection by the arrangements that have been made for

2    their benefit." *Id.* at 384.  A district court in Georgia reasoned similarly not quite ten years later.

3    *See City of Macon v. Marshall*, 439 F. Supp. 1209, 1218–23 (M.D. Ga. 1977).

4          Federal courts also confronted one of the disputes at the center of the congressional

5    debates: whether section 13(c) preempts or supersedes state law.  In 1981, in an opinion by then-

6    judge Stephen Breyer, the First Circuit held "the specific detailed assurances given by a union

7    and a transit authority to the Labor Department under [section 13(c)] do not invalidate a state law

8    to the contrary." *See Local Div. 589*, 666 F.2d at 636.  The next year, the Supreme Court held

9    that section 13(c) does not create a federal cause of action for breaches of section 13(c)

10   arrangements. *See Jackson Transit*, 457 U.S. at 29.  It relied extensively on that section's

11   legislative history, which it described as "explicit" and "absolutely clear" in demonstrating

12   Congress "did not intend to create a body of federal law applicable to labor regulations." *Id.* at

13   27, 29.

14         The six requirements Congress listed in section 13(c) were also the subject of litigation,

15   including the instruction that protective arrangements must "include provisions that may be

16   necessary for . . . the continuation of collective bargaining rights."  49 U.S.C. § 13(b)(2)(B).  In

17   1985, the D.C. Circuit held "[t]he Secretary is not free to certify a labor agreement that does not

18   provide for the continuation of collective bargaining rights simply because he believes that, on

19   balance, the agreement is fair." *Donovan*, 767 F.2d at 946.  It also interpreted the phrase

20   "continuation of collective bargaining rights" as requiring "that where employees enjoyed

21   collective bargaining rights prior to public acquisition of the transit system, they are entitled to be

22   represented in meaningful, 'good faith' negotiations with their employer over wages, hours and

23   other terms and conditions of employment." *Id.* at 951.  The same provision was the subject of

24   another decision issued two years later.  The same court held that section 13(c) was not a tool for

25   creating new rights: if employees did not have collective bargaining rights at the time their

26   employer sought the Secretary's certification, then section 13(c) did not require the employer to

27   "grant collective bargaining rights" as a condition of receiving federal assistance. *United Transp.*

28   *Union, AFL-CIO v. Brock*, 815 F.2d 1562, 1565 (D.C. Cir. 1987).  In other words, "[t]he only

1    interests protected by section 13(c) are those affected by the financial assistance sought." *Id.*

2    at 1364.

3         This was the state of things when, in late 2012, the Governor of California signed into law

4    the state's Public Employees Pension Reform Act, commonly known as "PEPRA."  *See*

5    *generally* 2012 Cal. Stats. Ch. 296.  PEPRA "substantially revised the laws governing the pension

6    plans of the state's public employees."  *Alameda Cty. Deputy Sheriff's Ass'n v. Alameda Cty.*

7    *Employees' Ret. Ass'n*, 9 Cal. 5th 1032, 1051 (2020).  "The Legislature viewed PEPRA as a

8    'comprehensive' reform of California's public pension systems."  *Id.* at 1059 (quoting Cal. Sen.

9    Rules Com., Office of Sen. Floor Analyses, Analysis of Assembly Bill No. 340 at 7 (Aug. 20,

10    2012)).  It created "a new pension plan applicable only to newly hired public employees that is

11    'less expansive, and therefore less burdensome for the state and local governments, than the plans

12    covering then-existing public employees.'"  *Id.* (quoting *Cal Fire Local 2881 v. Cal. Pub. Emps.*

13    *Ret. Sys.*, 6 Cal. 5th 965, 974–75 (2019)).  "But PEPRA also modified some statutes governing

14    the pensions of existing employees and incorporated provisions from separately pending

15    legislation . . . ."  *Id.* (citing *Cal. Fire*, 6 Cal. 5th at 975).

16         PEPRA applies to "all state and local public retirement systems and to their participating

17    employers."  Cal. Gov't Code § 7522.02(a)(1).  A "public retirement system" is "any pension or

18    retirement system of a public employer."  *Id.* § 7522.04(j).  PEPRA thus applies to the California

19    Public Employees' Retirement System (CalPERS), the California State Teachers' Retirement

20    System (CalSTRS), the retirement systems for state legislators and judges, county and district

21    retirement systems, independent public retirement systems, and individual retirement plans

22    offered by public employers.  *See id.* § 7522.02(a)(1).  These systems and plans are "governed by

23    a variety of statutes, local regulations, and agreements."  *Cal. Fire*, 6 Cal. at 971.

24         PEPRA's breadth can make it difficult to describe its effects accurately in general terms.

25    Some basic elements, however, are common to many public employees' pension plans.  *See id.*

26    State employees, for example, are members of CalPERS, the state pension system.  *Id.* at 971–72.

27    Both employees and their employers contribute to CalPERS.  *Id.* at 972.  A state employee

28    ordinarily becomes eligible for retirement after reaching fifty and working for at least five years.

1   *Id.* (citing Gov't Code § 21060(a)).  A retired state employee's pension is paid in monthly

2   benefits.  *Id.* (citing Cal. Gov't Code § 21250).  "[T]he amount of the benefit is generally

3   determined by the individual employee's compensation, age at retirement, and years of service."

4   *Id.*  The greater the employee's compensation, age, and years of service, the greater is the

5   monthly benefit.  *See, e.g.*, Cal. Gov't Code § 21354.1.

6          County employees' pension plans have similar features.  "Each county maintains its own

7   pension plan, administered by a retirement board whose general membership is dictated by

8   statute."  *Alameda Cty.*, 9 Cal. 5th at 1055.  Both employee and employer must regularly

9   contribute to the plan "in amounts determined by the county board of supervisors, upon

10   recommendation of the retirement board."  *Id.* at 1056.  Employees generally become eligible for

11   retirement at age fifty-five after ten years' service.  *See id.*  The amount of the monthly retirement

12   benefit is calculated using "a series of statutory benefit schedules that may be adopted by a

13   participating county."  *Id.*  As with the state pension system, the county calculation uses the

14   employee's age at retirement, years of service, and final compensation.  *See id.* at 1056–57.

15          Both systems described above are examples of "defined benefit" pension plans.  In a

16   defined benefit plan, an employer promises to pay its employees a fixed benefit on retirement—

17   the defined benefit.  *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637 n.1 (1990).

18   The plan maintains "a general pool of assets rather than individual dedicated accounts."  *Hughes*

19   *Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).  "[T]he employer typically bears the entire

20   investment risk and—short of the consequences of plan termination—must cover any

21   underfunding as the result of a shortfall that may occur from the plan's investments."  *Id.*  A more

22   common type of pension plan is a defined contribution plan, also known as an individual account

23   plan, in which an employer contributes to individual employee accounts.  *Comm'r v. Keystone*

24   *Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993); *Pension Ben. Guar. Corp.*, 496 U.S. at 637 n.1.

25   "Defined contribution plans dominate the retirement plan scene today," but defined benefit plans

26   were "the norm of American pension practice" in the past.  *LaRue v. DeWolff, Boberg & Assocs.,*

27   *Inc.*, 552 U.S. 248, 255 (2008).

28   /////

8

1    The California Supreme Court has described PEPRA's changes to defined benefit pension

2  plans as its "centerpiece." *Cal. Fire*, 6 Cal. 5th at 974–75.  After PEPRA, defined benefit plans

3  for new employees are generally "less favorable" than their pre-PEPRA equivalents. *Id.*  For

4  example, new employees are now required to pay half of the "normal costs" of any defined

5  benefit pension plan, Cal. Gov't Code § 7522.30; retirement ages have increased, *see, e.g.*, *id.*

6  § 7522.20(a); the final compensation used to calculate monthly retirement benefits is the average

7  over the last three years of employment rather than just the last year's pay, *id.* § 7522.32; and the

8  value of the compensation that can be used in the calculation is capped at certain maximum

9  amounts, *id.* § 7522.10(c).

10    In addition to changes to new employee pensions, PEPRA modified state laws governing

11  existing employee pensions.  One change was the elimination of "nonqualified service credits" or

12  "airtime." *See Cal. Fire*, 6 Cal. 5th at 973; Cal. Gov't Code § 7522.46.  Service credit purchases

13  began as a way to recognize the public service an employee had performed elsewhere in the past,

14  but which would not otherwise count toward that employee's retirement benefits. *See Cal. Fire*,

15  6 Cal. 5th at 973.  Consider, for example, an employee who had served in the military before

16  coming to work for the state, but whose military service would not count in the calculation of the

17  monthly retirement benefit. *See, e.g.*, *Marzec v. California Pub. Emps. Ret. Sys.*, 236 Cal.

18  App. 4th 889, 897 (2015).  California law permitted an employee to pay a lump sum in exchange

19  for a promise that the pension system would recognize these additional "qualified" years of

20  service. *See Cal. Fire*, 6 Cal. 5th at 973.  In 2003, the state expanded this benefit to

21  "nonqualified" service, that is, "service credit that did not reflect any type of service." *Id.*

22  Purchases like these might benefit an employee who had come to public service much later in life

23  or after time caring for children. *See id.* at 974.  Theoretically, if employees paid "the full present

24  value of the future benefits," service credit purchases would not increase a public pension plan's

25  liabilities. *Id.*  In practice, plans bore heavy costs. *Id.*  Significant pay increases were one reason.

26  If employees earned much more at retirement than at the time they purchased a credit, their lump

27  sum payment would be much lower than the true present value of the pension benefits they

28  received. *Id.*

9

1    Another set of changes that applies both to new and existing employees targets pension

2   "spiking," i.e., "the manipulation of an employee's pattern of work and pay to produce inflated

3   compensation" during the year in which the employee's retirement benefits were calculated.  *See*

4   *Alameda Cty.*, 9 Cal. 5th at 1061 (alterations omitted).  For example, before PEPRA, the law

5   "allowed an employee to considerably increase his or her pension benefit by volunteering for a

6   large quantity of on-call duty or by accumulating and cashing out a large quantity of unused leave

7   time during the final compensation period." *Id.* at 1063.  "[T]he Legislature appears to have been

8   concerned that some employees, presumably those in positions of unusual authority or influence,

9   were able to manipulate county compensation practices to artificially increase" their pension

10  benefits. *Id.* at 1062.

11    The California reforms collided with the Urban Mass Transit Act soon after PEPRA was

12  passed.  In 2012 and 2013, two local California transit agencies applied for federal funding and

13  certification under section 13(c).  *See California v. U.S. Dep't of Lab.* (*California I*), 76 F. Supp.

14  3d 1125, 1131, 1133 (E.D. Cal. 2014).  Many of the two transit agencies' employees are

15  represented by one of the plaintiffs here, the Amalgamated Transit Union (ATU), and its

16  affiliated locals.  *See id.*  The ATU objected to the applications and argued the Secretary should

17  not certify the grants, citing PEPRA's limits on defined benefit pension plans.  *Id.*  The Secretary

18  of Labor, acting through a designee at the Department's Office of Labor Management Standards,

19  ultimately denied the two transit agencies' applications.  *Id.* at 1131–34.  The Department

20  asserted that PEPRA prevented the two agencies' employees from bargaining "over the full

21  panoply of pension rights," so the Department would not certify the grants unless arrangements

22  were made to exempt employees from PEPRA.  *Id.* at 1132.  It focused on two of the six

23  requirements listed in section 13(c): "the preservation of rights, privileges, and benefits (including

24  continuation of pension rights and benefits) under existing collective bargaining agreements or

25  otherwise" and "the continuation of collective bargaining rights."  *See id.* at 1132–33.

1       The two agencies then filed a complaint in this court.[4]  They argued the Department had

2  acted arbitrarily and without authority in violation of the Administrative Procedure Act (APA);

3  that it had prejudged their applications, also in violation of the APA; and that the DOL's

4  decisions imposed unconstitutional conditions on the award of federal funds under the Spending

5  Clause.  *Id.* at 1128.  In late 2014, the court granted the agencies' motion for summary judgment

6  of their APA claims, *see id.* at 1134–45, while granting the Department's motion to dismiss the

7  agencies' Spending Clause claim, *see id.* at 1147–48.  In that decision, the court identified several

8  errors in the Department's process and decision.  *See id.* at 1134–45.  In short, the Department

9  had effectively usurped the court's role, and in doing so, it left several important factors out of

10  consideration and employed a faulty legal analysis, including reflexively applying case law

11  without regard for factual differences across cases.  *See State of California v. United States Dep't*

12  *of Lab.* (*California II*), 155 F. Supp. 3d 1089, 1094–95 (E.D. Cal. 2016) (summarizing previous

13  order); *California I*, 76 F. Supp. 3d at 1141–45.  The DOL filed an appeal, but later dismissed the

14  appeal voluntarily.  *See California II.* at 1095.

15       On remand, the Department again decided not to certify the grants.  *See id.*  The

16  Department first expressed its disagreement with this court's analysis of the relevant case law, but

17  rather than confronting the cases or this court's reasoning, resorted to the text of the UMTA and

18  the legislative history.  *See id.* at 1097.  The Department then addressed most of the factors this

19  court had said it had wrongly omitted from its previous decision, *see id.* at 1097–98, but with

20  respect to this court's decision about the rights of "new" employees under PEPRA, the

21  Department simply rejected this court's order as "in error," in effect assuming the role of a federal

22  court of appeals, *see id.* at 1098.  In the end, the Department stood by its decision not to certify

23  the two transit agencies' grants.  *See id.* at 1095.

24       The two transit agencies then moved to enforce the court's previous order.  The court

25  granted that motion in part as to the Department's decision that this court had erred.  *See id.* at

---

[4] For ease of reference, the court refers to this previous litigation as the *California* litigation.

1098.  If the Department believed this court had erred, it could have pursued its appeal.  *See id.*
The agencies and the Department then filed cross motions for summary judgment, and the court
granted summary judgment to the two transit agencies in 2016.  *See generally California v. U.S.*
*Dep't of Labor* (*California III*), No. 13-2069, 2016 WL 4441221 (E.D. Cal. Aug. 22, 2016).

First, under section 13(c)(2)—ensuring "the continuation of collective bargaining
rights"—the Department had again relied on an arbitrary legal analysis, this time of the UMTA's
language and legislative history.  The statutory language was ambiguous, and the legislative
history was inconclusive.  *See id.* at *9–12, 15–17.  At most, this court concluded, the UMTA and
its legislative history mean that section 13(c)(2) prevents certification if a state passes laws that
substantially clash with federal labor policy on collective bargaining.  *See id.* at *17.  The court
found it was not possible to conclude PEPRA substantially clashes with that federal policy.  *See*
*id.* at *21–26.  The Department had also wrongly focused on the results of collective bargaining
rather than on the process itself, which demonstrated its decision was arbitrary.  *See id.* at *27–28.

Second, under section 13(c)(1)—ensuring "the preservation of rights, privileges, and
benefits"—the court granted summary judgment to one of the transit agencies given the
Department's simple, summary rejection of this court's order as erroneous.  *See id.* at *31.  The
court granted partial summary judgment to the other transit agency because the Department had
not explained why PEPRA prevented the transit agency from negotiating its way around
PEPRA's limits.  *Id.* at *34.

A portion of this other case remained pending until 2018, when the court ultimately
resolved a lingering dispute and entered a permanent injunction in the plaintiff agencies' favor:
"The court enjoin[ed] the DOL from relying on PEPRA, as currently enacted, to deny the State's
application for funding under either § 13(c)(1) or § 13(c)(2) to the extent the State intends those
funds to benefit MST or SacRT," the two plaintiff transit agencies.  *California v. U.S. Dep't of*
*Labor* (*California IV*), 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018).  The court did not extend
that injunction to other transit agencies.  *See id.*  The case was not a class action, and the court's
reasoning was specific to the two plaintiff transit agencies.  *See id.*  The Department again
/////

1    pursued an appeal, which it again dismissed voluntarily.  *See* Order, *California v. U.S. Dep't of*

2    *Labor*, No. 18-15509 (9th Cir. Dec. 19, 2018), Dkt. No. 33.

3         Also after PEPRA passed, and while the *California* litigation was still ongoing, several

4    California transit agencies negotiated over pension benefits with employee representatives.  Here,

5    the court detours to resolve a dispute about these negotiations.

6         The Department did not allow California to present evidence about what happened in

7    these negotiations before issuing the decision disputed in this case.  In an APA challenge like this

8    one, a reviewing court ordinarily is limited to the evidence the agency considered.  *See Fla.*

9    *Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  If crucial evidence is missing, "the

10   proper course, except in rare circumstances, is to remand to the agency."  *Id.*  Sometimes,

11   however, the circumstances may "justify expanding review beyond the record or permitting

12   discovery."  *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *as amended*,

13   867 F.2d 1244 (9th Cir. 1989).  For example, a district court may look beyond the existing record

14   to determine "whether the agency has considered all relevant factors."  *Id.*  But the court "may

15   admit evidence under this exception only to help the court understand whether the agency

16   complied with the APA's requirement that the agency's decision be neither arbitrary nor

17   capricious."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

18   The reviewing court may not admit the evidence "to judge the wisdom of the agency's action."

19   *Id.*  The party seeking to admit evidence from outside the record must show this exception

20   applies.  *Id.* at 992.

21        Here, California has shown the exception applies.  It argues the Department arbitrarily

22   refused to consider whether collective bargaining continued despite PEPRA's passage.  *See, e.g.*,

23   Cal. Mot. Summ. J. at 17–20, ECF No. .  That argument is at the foundation of this case; a similar

24   contention prevailed in one of the prior cases, with the court's finding the Department's 2015

25   decisions were arbitrary and capricious.  *See California III*, 2016 WL 4441221, at *25, 28.

26   Although it is undisputed the Department did not consider whether pension negotiations actually

27   continued, without knowing more about these negotiations, the court cannot decide whether the

28   Department acted arbitrarily by disregarding them.  The court therefore **grants** the State's motion

1    to expand the record (ECF No. 88).  The court will review the additional evidence for the limited

2    purpose of understanding what the Department refused to consider, but not to judge whether that

3    evidence would have compelled any particular decision.

4          The evidence shows several transit agencies negotiated over pensions as PEPRA went into

5    effect.  Agencies in Sacramento, San Bernadino and Santa Clara negotiated with local divisions

6    of the ATU to increase employee wages to offset or cover rising pension contributions.  *See*

7    SacRT Am. Plan, AR 1935; Chu Email, AR 1932; Mot. Expand Exs. 1 & 2, ECF Nos. 88-1 & 88-

8    2; Cal. Mot. Summ. J. at 17–18.  The Bay Area Rapid Transit District also negotiated over

9    pension contributions with organizations representing its employees in the shadow of PEPRA and

10   during the *California* litigation.  *See generally* Neutzel Decl., ECF No. 88-4.  Employees agreed

11   to begin contributing to their pensions, and the agency agreed to increase wages faster than these

12   contributions would grow.  *See* BART Press Release at 1, Mot. Expand Ex. 5, ECF No. 88-5;

13   BART Agreements, Mot. Expand Ex. 6, ECF No. 88-6.  A transit agency serving the City of

14   Stockton, California and surrounds also negotiated with a local division of the ATU over pension

15   contributions in 2019.  *See* Mot. Expand Exs. 7 & 8, ECF Nos. 88-7 & 88-8.  It proposed a new

16   defined contribution plan for new hires, and the ATU Local responded with a counterproposal

17   that would permit new employees to participate in the existing plan.  *See* Mot. Expand Ex. 8.  The

18   agency and the local eventually agreed to adopt a version of the ATU's proposal.  *See* Mot.

19   Expand Ex. 9, ECF No. 88-9.

20         In the months and years that followed this court's decision in the *California* litigation,

21   many California transit agencies submitted applications for federal funding, and the Department

22   certified those applications over the ATU's objection.  *See* Letter from Arthur Rosenfeld to

23   Robert Molofsky (June 14, 2019), Mot. Stay Ex. B, ECF No. 73-2.  The Department explained it

24   had "independently reexamined the scope of its authority under section 13(c) and the best way to

25   provide fair and equitable employee protective arrangements."  *Id.* at 4.  It concluded section

26   13(c) was intended to give the Secretary of Labor "discretion" and "flexibility" and, in

27   California's case, the disputed pension reforms did not "substantially affect transit employees'

28   benefits under existing collective bargaining agreements."  *Id.* at 6–7.  The Department cited, for

example, California's argument that nothing in the state's pension reforms "prohibit[ed] the negotiation of an actuarially equivalent retirement benefit to that which may have been allowable through a defined benefit pension" before the reforms.  *Id.* at 7.  The Department acknowledged its decision was a departure from its decisions not to certify the two transit agency grants in 2013 and 2015.  *Id.* at 8–9.  It explained it had reconsidered its position after reviewing this court's orders and other case law.  *See id.*

The ATU challenged the Department's 2019 decision to certify the grants by filing an action in the United States District Court for the District of Columbia.  *See generally* Compl., ECF No. 1.  California moved to intervene and to transfer the case to this district, and the D.C. district court granted both motions.  *See* Min. Order (Dec. 19, 2019); Mem. Opinion & Order, ECF No. 20.  Upon arrival here, this court ordered reassignment of the case as a related case.  *See* Related Case Order, ECF No. 28.  The parties filed and began briefing cross-motions for summary judgment.

While those motions were pending, and before the Department's reply brief came due, the Department informed the court it was considering whether to revisit the disputed 2019 decision.  *See* Mot. Stay, ECF No. 44.  The court held the pending cross-motions for summary judgment in abeyance and remanded the matter to the Department to permit it to decide whether it would stand by its 2019 decision.  Order, ECF No. 51.  The Department eventually withdrew both its motion for summary judgment and its 2019 decision.  *See* Withdrawal, ECF No. 55; Notice, ECF No. 65.  It issued a new determination in late October 2021.  *See* Letter from Andrew Auerbach to Ray Tellis (Oct. 28, 2021), Mot. Stay Ex. C, ECF No. 73-3.  The 2021 determination "nullifies" the 2019 determination, which the Department dismisses as a "deviation."  *Id.* at 2.  The Department returned to the position it had adopted in 2013 and 2015.  *Id.*

The foundation of the Department's 2021 determination is its conclusion that PEPRA interferes with collective bargaining by placing limits on the defined benefits pension plans that transit agencies can offer their employees.  *See, e.g.*, 2021 Determination at 7.  The Department was unpersuaded that collective bargaining over pension plans would continue even though PEPRA places no restrictions on defined contribution plans.  *Id.* at 7–8 & n.7.  In the

1    Department's assessment, restrictions on defined benefit plans discontinued collective bargaining

2    rights because defined benefit plans offer "advantages" over defined contribution plans, for

3    example by allocating investment risks to the transit agencies rather than to their employees. *Id.*

4    at 8.  Nor was the Department convinced by arguments that PEPRA places no restrictions on the

5    bargaining process itself. *See id.* at 9.  The Department interpreted PEPRA as a "unilateral

6    change to terms and conditions of employment" and thus an effective mandate that collective

7    bargaining over pensions must conclude in a specific way. *Id.*  Similarly, the Department did not

8    believe collective bargaining would continue if transit agencies negotiated about other benefits or

9    made other concessions in recognition of PEPRA's limits on defined benefit pension plans. *See*

10   *id.*  "For collective bargaining rights to continue," the Department wrote, "state employers cannot

11   have authority to unilaterally diminish significant terms and conditions of employment." *Id.*

12   Finally, the Department was not reassured by the fact that PEPRA's "most significant changes"

13   apply only to "recently hired employees." *Id.* at 10.  Under its reading of federal labor law, "new

14   employees are entitled to the rights granted under collective bargaining agreements." *Id.* at 10.

15          The Department dismissed the possibility that PEPRA shapes the state legal environment

16   in which negotiations must always occur. *See id.* at 10–13.  For guidance it looked to the federal

17   labor law that has developed in cases interpreting the National Labor Relations Act. *See id.* at 10.

18   The National Labor Relations Act does not apply to state and local governments, but the

19   Department was unconcerned by this distinction. *See id.* at 11.  Based on its analysis of several

20   judicial decisions, the Department concluded PEPRA had essentially halted collective bargaining

21   over defined benefit pension plans. *See id.* at 11–12.  It refused to make exceptions for any

22   "extraordinary unforeseen economic exigencies" that might have motivated California to enact

23   PEPRA. *Id.* at 11–12.  The Department also expressly rejected this court's previous analysis of

24   federal labor law as "unhelpful" and "ill-suited to making any necessary nuanced distinctions

25   between state laws affecting transit employee rights to varying degrees." *See id.* at 13–14.

26          Despite its critique of this court's prior decision, the Department made clear it has and

27   will continue to comply with the permanent injunction this court imposed in 2018. *Id.* at 2 n.2.  It

28   likewise clarified that its 2021 determination applies only to future grant applications.  It was not

1   "rescinding or otherwise taking retrospective action as to the particular grant applications

2   addressed in the 2019 Determination." *Id.* at 2.  The Department intended this limitation to

3   account "for any reliance interests that the State of California and its transit agencies may have in

4   the 2019 Determination." *Id.*

5        In response, California requested and obtained leave from this court to file a cross-claim

6   in this action.  *See* Order, ECF No. 76; Cross-Compl., ECF No. 70-1.  The state then moved for

7   and obtained an order staying the Department's 2021 determination.  *See generally* Order

8   (Dec. 20, 2021), ECF No. 83.  This court held that California and its transit agencies were likely

9   to suffer irreparable harm without a preliminary injunction, and the public interest and balance of

10   harms tipped sharply in the state's favor.  *See id.* at 11–13.  The state's cross-complaint also

11   raised serious questions.  The ATU and Department were essentially asking the court to reverse

12   its own decisions in the *California* litigation.  *See id.* at 14.  The record also suggested the State

13   was likely to prevail on a claim the Department had misperceived and disregarded how heavily

14   California transit agencies had relied on its 2019 determination.  *See id.* at 14–18.

15        After the court stayed the Department's 2021 determination, the parties filed and briefed

16   cross-motions for summary judgment on an expedited schedule.  *See generally* Cal. Mot. Summ.

17   J., ECF No. 87; ATU Mot. Summ. J., ECF No. 90; DOL Mot. Summ. J., ECF No. 92; Cal. Opp'n

18   Summ. J., ECF No. 96.  California also moved to expand the administrative record, over the

19   Department's opposition, as explained above.  *See generally* Cal. Mot. Evid., ECF No. 88; DOL

20   Opp'n Evid., ECF No. 93; Cal. Reply Evid., ECF No. 97.  The court heard oral argument by

21   videoconference on February 17, 2022.  Mins., ECF No. 99.  Andrew Roth and Benjamin Lunch

22   appeared for the ATU.  Joel McElwain appeared for the Department of Labor.  Anna Ferrari and

23   Warren Dean appeared for the state of California.

24        After hearing, California sought permission to file a supplemental brief, and the ATU and

25   the Department opposed its request.  *See* Mot. Suppl., ECF No. 104; ATU Opp'n Suppl., ECF

26   No. 105; DOL Opp'n Suppl. ECF No. 106; Reply Suppl., ECF No. 107.  The state has not

27   explained why additional briefing is necessary.  The parties have already dedicated hundreds of

28   /////

1   pages and hours of oral argument to this dispute.  The motion for leave to file a supplemental

2   brief is **denied**.

3        The parties' briefs make clear one of the state's claims is moot.  California's cross-

4   complaint charges the Department with violating the APA to the extent the 2021 determination

5   relied on section 13(c)(1) of the UMTA.  *See* Cross-Compl. ¶¶ 82–88.  The Department has

6   confirmed it did not deny certification under section 13(c)(1).  DOL Mot. at 20 n.3.  For this

7   claim, the court **denies the state's motion in part as moot and grants the Department's**

8   **motion in part**.

9        The remaining disputes fall into three categories.  First, California argues the

10  Department's 2021 determination exceeds the authority Congress has given to the Secretary of

11  Labor.  Second, the state contends the process leading up to the Department's 2021 determination

12  was arbitrarily truncated and led to a decision that misperceives or disregards how heavily

13  California transit agencies had come to rely on the status quo.  Third, the parties contest the

14  substance of the Department's 2021 determination: whether PEPRA precludes certification under

15  section 13(c)(2) of the UMTA by preventing the "continuation of collective bargaining rights."

16  **II.    STANDARD OF REVIEW**

17       Unless Congress specifies otherwise, as it has not in this case, federal courts review an

18  agency's actions under the standard specified in the APA.  *Hopi Tribe v. Navajo Tribe*, 46 F.3d

19  908, 914 (9th Cir. 1995).  The APA "establishes a scheme of 'reasoned decisionmaking.'"

20  *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle*

21  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)).  An agency's

22  "decreed result" must be "within the scope of its lawful authority," and "the process by which it

23  reaches that result must be logical and rational."  *Id.*  The court must also "hold unlawful and set

24  aside agency action, findings, and conclusions" if they are, among other things, "arbitrary,

25  capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

26  § 706(2)(A).  When a court applies this standard, it considers whether the agency's "decision was

27  based on a consideration of the relevant factors and whether there has been a clear error of

28  judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971),

*overruled in part on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Id.*

California and the ATU refer extensively to two additional legal standards that often arise in APA challenges.  California cites *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and urges the court to give "minimal deference" to the Department's decisions, as it did in the previous *California* litigation.  Cal. Mot. at 9; *see also California I*, 76 F. Supp. 3d at 1137–38; *California III*, 2016 WL 4441221, at *12–13.  The ATU argues this court should offer the Department no lenience whatsoever and should adopt whatever interpretation the court determines is correct, urging the court, in other words, to review "de novo," relying on a different interpretation of this court's orders in the *California* litigation and other cases.  *See, e.g.*, ATU Mot. at 3–4 (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001); *Donovan*, 767 F.2d 939; and *California I*, 76 F. Supp. 3d at 1137).  Both the state's and the ATU's arguments rest on a collection of legal rules that developed in cases involving respective decisions by the three branches of the federal government: what must a court do when a litigant argues an executive agency has misinterpreted a statute passed by Congress?

If a statute is unambiguous, of course, then its interpretation is straightforward.  Courts and agencies alike "must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A. Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842–43 (1984).  The court interprets the statute and decides whether it is ambiguous.  If it is not, "that is the end of the matter."  *Id.* at 842.  The court does not defer to the agency's conclusions.  *See id.*

If, however, the statute is ambiguous, then the problem is more complicated.  "If Congress has explicitly left a gap for an agency to fill," then courts defer to the agency's authority "to elucidate a specific provision of the statute by regulation."  *Id.* at 843–44.  Congress might also delegate interpretive authority implicitly, or the circumstances might make it clear Congress intended for an agency to interpret the statute.  *See Mead*, 533 U.S. at 229.  Whether explicit or implicit, if Congress has delegated interpretive authority to an agency, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular

statutory ambiguity simply because the agency's chosen resolution seems unwise." *Id.*  The court "is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." *Id.*  Reasonable interpretations receive "controlling weight." *Chevron*, 467 U.S. at 844.

If Congress did not intend for the agency to interpret the statute, the agency's reasoning is not controlling, but it may be persuasive nonetheless. *Mead*, 533 U.S. at 227.  The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* (quoting *Chevron*, 467 U.S. at 844).  "The deference allowed to an agency depends on a number of commonsense considerations:  How thorough and careful is the agency's reasoning?  Is the agency's decision consistent with its earlier and later pronouncements?  Is its reasoning valid? Does the decision concern a subject matter within the agency's technical expertise?" *California III*, 2016 WL 4441221, at *12 (citing *Mead*, 533 U.S. at 228).  "The approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other." *Mead*, 533 U.S. at 228 (citations omitted).  "This less-permissive and widely varying level of deference is usually referred to in shorthand as *Skidmore* deference," after *Skidmore v. Swift & Co.*, cited above.  *California III*, 2016 WL 4441221, at *12.

These interpretive rules and deference doctrines do not serve as alternatives to the APA's prohibition against "arbitrary and capricious" actions, findings, and conclusions; they instead define the boundaries of what a given statute allows and forbids.  Congress might explicitly leave a gap for an agency to fill with "legislative regulations," and although the court would defer to an agency's interpretation of the statute under *Chevron*, it would still set aside any regulations that are "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844.  An agency can also act arbitrarily even while exercising the authority Congress has delegated to it. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220–21 (2016).  As the Supreme Court observed in *Mead*, the APA's prohibition against arbitrary and capricious decisions functions as something of a proviso to the interpretive rule of *Chevron*: "When Congress has explicitly left a gap for an agency to fill, . . . any ensuing regulation is binding on the courts

1     unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the

2     statute." 533 U.S. at 227 (citation and quotation marks omitted).  Conversely, an agency does not

3     forfeit the interpretive authority Congress has delegated to it by making arbitrary decisions.  The

4     arbitrary decision is set aside, but the delegation remains.  *See Nat'l Cable &*

5     *Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *Smiley v.*

6     *Citibank* (*S. Dakota*)*, N.A.*, 517 U.S. 735, 742 (1996).

7          The APA and the interpretive rules explained in *Chevron* and *Mead* can also overlap.  The

8     same flaws that might lead a court to conclude an agency's decision "lacks the power to

9     persuade" under *Skidmore* might "also demonstrate that the process by which the agency reached

10    its judgment was neither 'logical' nor 'rational,'" and thus arbitrary and capricious under the

11    APA.  *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) (quoting *Tripoli Rocketry Ass'n, Inc. v.*

12    *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).

13          Turning back to this case, what approach applies given the dispute before the court?  First,

14    the APA is the source of this court's authority to set aside any actions the Department undertook

15    "in excess of statutory jurisdiction."  5 U.S.C. § 706(2)(C).  The court also looks to the APA to

16    decide whether the Department wrongly deprived California or its transit agencies of procedural

17    safeguards, that is, whether the Department's process was "arbitrary."  *Id.* § 706(2)(A).  The

18    arbitrary and capricious standard of the APA also governs California's claim that the Department

19    overlooked how heavily transit agencies had relied on the Department's 2019 determination.  By

20    contrast, California's challenge to the Department's interpretation of the phrase "the continuation

21    of collective bargaining rights" in the UMTA invokes both the interpretive exercise explained in

22    cases like *Chevron*, *Mead* and *Skidmore*, and the APA's prohibitions against arbitrary agency

23    actions.  As explained in more detail below, *see infra* section V, it is not useful to carefully

24    disentangle those standards for this last part of California's challenge.

25          The ATU does not see the case this way.  It argues this court should not review the

26    Department's previous decision under the "arbitrary and capricious" standard at any point.

27    Instead, the ATU contends, the court should reach its own conclusions about section 13(c)(2) and

28    do so on a clean slate.  *See, e.g.*, ATU Mot. at 3–4 (citing *Mead*, 533 U.S. 218; *Donovan*,

767 F.2d 939; and *California I*, 76 F. Supp. 3d at 1137).  But binding Supreme Court precedent demands otherwise.  This court "is not empowered to substitute its judgment for that of the agency."  *Overton Park*, 401 U.S. at 416.  Rather, it must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Fox*, 556 U.S. at 513–14 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

        In addition, contrary to ATU's argument, "arbitrary" and "capricious" review is not limited to formal rulemaking.  *See* ATU Mot. at 5.  The APA includes no such limit; it refers to all final agency actions, findings, and conclusions without limit.  5 U.S.C. §§ 704, 706(2).  The ATU cites the D.C. Circuit's 1985 decision in *Donovan* in support of its argument, but that case is not helpful to ATU.  In *Donovan*, the D.C. Circuit rejected the Secretary of Labor's contention that his certification decisions were unreviewable.  *See* 767 F.2d at 944–46 & n.7.  It distinguished cases involving "the exercise of recognized discretionary authority" by noting the dispute it had been asked to resolve concerned "an agency's interpretation of the authority delegated to it."  *Id.* at 944 n.7.  If the D.C. Circuit meant to say *Chevron* does not apply to "jurisdictional" interpretations, the Supreme Court overruled that holding in 2013.  *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 307 (2013).  But the D.C. Circuit's reasoning is otherwise consistent with the interpretive rules summarized above.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 843–44.  If a statute is ambiguous, then the court must determine whether Congress delegated interpretive authority to the agency and, if not, whether the agency's interpretation is persuasive nonetheless using the *Skidmore* standard.  *See Mead*, 533 U.S. at 227.

        The court proceeds to apply the approach it has concluded makes sense here.

## III.    THE DEPARTMENT'S AUTHORITY

        "The court is first required to decide whether the [Department] acted within the scope of [its] authority" and begins with that question.  *Overton Park*, 401 U.S. at 415.  California claims the Department's 2021 determination is, in effect, a "rule of general applicability" the Department has no authority to issue.  *See* Cal. Mot. at 28–29.

1    /////

2       "[A]n administrative agency's power to regulate in the public interest must always be

3    grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown &*

4    *Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (citations omitted). "[A]n agency literally

5    has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Com'n*

6    *v. F.C.C.*, 476 U.S. 355, 374 (1986). "[T]he question—whether framed as an incorrect

7    application of agency authority or an assertion of authority not conferred—is always whether the

8    agency has gone beyond what Congress has permitted it to do . . . ." *City of Arlington*, 569 U.S.

9    at 297–98.

10      Questions about an agency's authority often arise when Congress has charged the agency

11   with administering a statutory regime. *See, e.g.*, *id.* at 296–97; *Brown & Williamson*, 529 U.S. at

12   132. When Congress has left an ambiguity in a statute it has tasked an agency with

13   administering, federal courts presume Congress intended to grant the agency "whatever degree of

14   discretion the ambiguity allows." *Smiley v. Citibank* (*S. Dakota*), *N.A.*, 517 U.S. 735, 740–41

15   (1996). Given this presumption, courts adopt the agency's resolution of the ambiguity if it is

16   permissible. *See Chevron*, 467 U.S. at 843. As applicable here, Congress did not intend for the

17   Department of Labor to administer section 13(c) of the UMTA or to resolve every ambiguity

18   within that section. *See supra* section II; *California III*, 2016 WL 4441221, at *12–13;

19   *California I*, 76 F. Supp. 3d at 1135–38. That does not mean this court must answer a different

20   question than courts have answered when an agency administers a statute. "[T]he question in

21   every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or

22   not." *City of Arlington*, 569 U.S. at 301.

23      Whether the Department acted within its statutory authority is a question of statutory

24   interpretation. *See Brown & Williamson*, 529 U.S. at 132; *San Luis & Delta-Mendota Water*

25   *Auth. v. Haugrud*, 848 F.3d 1216, 1227 (9th Cir. 2017). "It is well settled 'that the starting point

26   for interpreting a statute is the language of the statute itself.'" *San Luis*, 848 F.3d at 1227

27   /////

28   /////

23

1    (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).

2    Section 13(c) provides as follows:

> (1) As a condition of financial assistance under [several listed sections of Title 49], the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable.
>
> (2) Arrangements under this subsection shall include provisions that may be necessary for—
>
>> (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
>>
>> (B) the continuation of collective bargaining rights;
>>
>> (C) the protection of individual employees against a worsening of their positions related to employment;
>>
>> (D) assurances of employment to employees of acquired public transportation systems;
>>
>> (E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and
>>
>> (F) paid training or retraining programs.

20   49 U.S.C. § 5333(b).

21           This language is notable first for what it does not include.  It does not task the Department

22   with developing regulations, standards or rules.  The Department claims no authority to issue

23   regulations under section 13(c).  *See California I*, 76 F. Supp. 3d at 1137 (citing *City of Colo.*

24   *Springs v. Solis*, 589 F.3d 1121, 1129–30 (10th Cir. 2009)).  Although the Department has

25   published guidelines for section 13(c) certifications, those guidelines describe the process the

26   Department follows, not what it considers or what types of arrangements are "fair and equitable."

27   *See* 29 C.F.R. § 215.1 ("The purpose of these guidelines is to provide information concerning the

28   Department of Labor's administrative procedures in processing applications for assistance under

29   the Federal Transit law . . . .").

30           Section 13(c) also lacks any language suggesting the Secretary of Labor can make broad,

31   prospective decisions about future cases.  Its terms instead indicate Congress expected the

1  Department to consider each funding application on its own.  For example, the Secretary of Labor

2  must consider "the interests of employees affected by the assistance."  49 U.S.C. § 5333(b)(1).

3  The definite article "the" before the nouns "interests" and "assistance" signals those phrases refer

4  to the interests of a specific transit agency's employees and a specific request for assistance.

5  Section 13(c) similarly requires the Secretary to decide whether the employees' interests are

6  "protected under arrangements the Secretary of Labor concludes are fair and equitable."

7  49 U.S.C. § 5333(b)(1).  Because section 13(c) anticipates a particular application for "financial

8  assistance," *id*., and because the Department must take account of the "interests" of a particular

9  group of "employees," *id.*, the "arrangements" referenced in section 13(c) are necessarily specific

10  to the particular application and group of employees.

11  The words "fair and equitable" also suggest the Department must make decisions case by

12  case.  This language is similar to that of the Interstate Commerce Act, which referred to merger

13  agreements between railroads and their effects on those railroads' employees. *See generally, e.g.*,

14  *Bhd. of Maint. of Way Emps. v. United States*, 366 U.S. 169 (1961); *Ry. Lab. Executives' Ass'n v.*

15  *United States*, 339 U.S. 142 (1950).  In this context, "fair" refers to "arrangements" as an "object

16  considered for its value," suggesting arrangements must be "reasonably good in kind, quality, or

17  degree" and "free from any pronounced defect." *Fair*, *Black's Law Dictionary* (11th ed. 2019).

18  The word "equitable," in turn, similarly requires a comparison against "principles of justice and

19  right." *Equitable*, *Black's Law Dictionary* (11th ed. 2019).  Congress thus tasked the Secretary of

20  Labor with deciding whether an arrangement was reasonably good in quality, kind, or degree;

21  free from any pronounced defects; and consistent with the principles of justice and possession of

22  rights.  The Secretary could not have undertaken this exercise without considering a particular

23  "arrangement" and its circumstances. *Cf Ry. Lab. Executives' Ass'n*, 339 U.S. at 153–55

24  (interpreting analogous Interstate Commerce Act provisions as granting discretion to tailor

25  "arrangements" to specific cases).

26  Congress's decision to list six broad but mandatory topics for the Secretary to consider

27  gives further support to this conclusion.  On the one hand, by affirmatively listing six mandatory

28  topics, Congress limited the Secretary's authority to say what is "fair and equitable." *See*

25

*Donovan*, 767 F.2d at 946–47.  The Secretary may not conclude that arrangements are fair and equitable overall if they do not include provisions addressing each of the six topics.  *See id.*  On the other hand, the six topics are expressed generically: section 13(c) does not, for example, define "collective bargaining rights" or describe what "paid training programs" make an arrangement "fair and equitable."  Section 13(c) thus leaves the Secretary to decide what is necessary for each application, each agency, and each group of affected employees.  It balances guidance with flexibility.  Any interpretation of section 13(c) that upends this balance, whether by divorcing section 13(c) certification decisions from specific applications or by ignoring the limits on the Secretary's discretion, would contradict Congress's intent.

The Department of Labor's procedural regulations are built on a similar expectation that the Secretary will consider applications one at a time.  *See* 29 C.F.R. §§ 215.1–215.8; *see also City of Colo. Springs*, 589 F.3d at 1125–26 (summarizing regulations).  For example, under these regulations, the Department forwards "protective arrangements" to the labor organizations representing the employees in question, 29 C.F.R. §§ 215.2, 215.3(b); refers disputing parties to negotiations, *id.* § 215.3(c), (d); and makes decisions after receiving the parties' competing proposals and arguments in the circumstances, *see id.* §§ 215.3(e), (h).

The legislative history of section 13(c) confirms this interpretation as correct.  Several lawmakers expected the UMTA would not be a burden to very many agencies or employees.  They suggested section 13(c) should permit the Secretary to account for local circumstances.  Senator Williams, for example, a chief sponsor of the legislation that eventually became the UMTA, expected the law would change "very few" transit systems "in a way that a few employees might be adversely affected."  109 Cong. Rec. 5678 (Apr. 4, 1963).  Senator Morse, who championed the amendment that eventually became section 13(c), explained how it might be possible to resolve one of the "rare cases" of a conflict between local law and collective bargaining rights.  109 Cong. Rec. 5684 (Apr. 4, 1963).  For example, a transit agency in Memphis, Tennessee had found a way to bargain collectively with its employees without violating state laws that prohibited public entities from collectively bargaining.  *See id.*  This example showed, in Morse's view, that "all a city needs is a good lawyer" to devise a plan for its

situation.  *Id.*  Congressman Rains, another of UMTA's proponents, made a similar point to a labor representative: "[W]e cannot write it into a statute saying, 'You must do like you did in Memphis,' or 'You must have this formula,' or 'that formula.'"  Statement of Albert Rains, Hearings Before the House Committee on Banking and Currency on H.R. 3881, 88th Cong., 1st Sess., at 634 (Mar. 1, 1963).  "[W]e must give general guidelines and depend upon good administration."  *Id.*

Secretary of Labor Wirtz, under whose leadership the Department of Labor originally drafted and proposed section 13(c), made a similar point by emphasizing the importance of "flexibility" in his testimony before a House subcommittee.  Testimony of Willard Wirtz, Hearings Before the House Comm. on Banking and Currency on H.R. 3881, 88th Cong., 1st Sess., at 482 (Mar. 8, 1963).  "[D]ifferent answers may be appropriate in different cases . . . . [W]e shall do what is appropriate in the circumstances."  *Id.*; *see also, e.g.*, Testimony of Willard Wirtz, Hearings Before a Subcommittee of the Senate Committee on Banking and Currency, 88th Cong., 1st Sess., at 308 (Mar. 8, 1963) (discussing administration's belief it was necessary to consider "particular groups of employees whose interests might be adversely affected").

To summarize, section 13(c) does not grant the Department of Labor authority to adopt broad regulations or guidance for future cases.  The Department must instead consider each application as it comes, and it must account for the situation of each transit agency and each group of affected employees.  The parties have cited no authority suggesting the Department has authority to issue broad, prospective decisions, and the court's own searches have yielded none.

The Department's 2021 determination does not follow that Congressional directive.  The Department did not tie its decision to any specific application.  It did not discuss any particular collective bargaining agreement or pension plans.  It did not examine the collective bargaining efforts of any transit agency or group of employees.  It refused to do so, expressly.  *See* 2021 Determination at 9, 14 (declining to consider whether any California transit agencies had successfully "bargain[ed] around PEPRA's effects"); Hr'g Tr. (Feb. 17, 2022) at 14, ECF No. 101 ("[I]n the agency's view, that is not a relevant fact . . . .").  Although the 2021 determination is tied to the same funding applications the Department certified in 2019, it does not affect any of

1    those applications.  *See* 2021 Determination at 2.  Its reasoning is legal, prospective and applies

2    equally to all funding applications by all California transit agencies whose employees are subject

3    to PEPRA.

4           The Department also has treated its 2021 determination as effectively binding on all future

5    applications.  It informed California that based on its 2021 determination, it would begin denying

6    all funding applications by agencies whose employees were covered by PEPRA.  *See* Joint Status

7    Report at 4, ECF No. 68.  This prompted California to move for a stay or preliminary injunction

8    in this court.  In the hearing on that motion, the Department confirmed it could begin denying

9    applications within days.  *See* Hr'g Tr. (Dec. 17, 2021) at 5–6, ECF No. 94.  Similarly, at hearing

10   on the pending cross-motions for summary judgment, the Department described its 2021

11   determination as "categorical."  Hr'g Tr. (Feb. 17, 2022) at 6, ECF No. 101.  Although it refused

12   to describe the 2021 determination as binding in a technical sense, it agreed the determination

13   was binding in practice.  "It would be presumptively the case that . . . no transit agency affected

14   by PEPRA would be certified."  *Id.* at 14–15.  "It's binding until the agency decides otherwise,

15   would be one way to put it."  *Id.* at 15.

16          The 2021 determination is thus a regulation in all but name:  It is generally applicable,

17   categorical, prospective and binding until the Department decides otherwise.  *See Yesler Terrace*

18   *Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (holding agency determination had

19   "all the hallmarks of a rule" because it "had no immediate, concrete effect on anyone" and

20   "affected the rights of a broad category of individuals not yet identified").  Section 13(c) does not

21   permit the Department to issue such broad, prospective, indefinitely binding rules and regulations.

22   The 2021 determination exceeded the Department's statutory authority.

23          The Department argues it had authority to issue its 2021 determination because it was

24   simply reconsidering its 2019 determinations, and agencies can reconsider their own previous

25   decisions.  *See, e.g.*, DOL Mem. at 16–18.  It is true agencies generally have authority to

26   reconsider their decisions.  *See, e.g.*, *Dun & Bradstreet Corp. Found. v. U.S. Postal Serv.*,

27   946 F.2d 189, 193 (2d Cir. 1991) (collecting authority).  They may also change their policies.  *See*

28   *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  But the authority to reconsider

a decision or to change a policy does not extend to ignoring Congress's instructions.  If the Department was no longer persuaded by the reasoning in its 2019 decision, it could have stopped defending that decision in this court and applied the reasoning and policy it found more compelling when the next 13(c) application came along.  If the Department had waited for a specific application from a specific agency and had then considered the interests of that agency's employees and the arrangements between those employees and the agency or state, it could have proposed arrangements to neutralize any negative effects of PEPRA on collective bargaining over pensions.  This approach is what the language, context and legislative history of section 13(c) unambiguously anticipate.

The Department had no authority to issue its 2021 determination.

## IV.   THE DEPARTMENT'S PROCESS

California also has shown the Department's 2021 determination was the result of an arbitrarily truncated process, which led the Department to overlook the consequences of its decision.

The APA requires courts to set aside agency actions if they are "arbitrary" or if the agency has not observed a "procedure required by law."  5 U.S.C. § 706(2)(A), (D).  The Supreme Court has recognized for many years "that a federal agency is obliged to abide by the regulations it promulgates."  *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *Service v. Dulles*, 354 U.S. 363, 372 (1957); and *Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954)).  If an agency prescribes a procedure "to protect the interests of a party before the agency, 'even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.'"  *Id.* (quoting *Vitarelli*, 359 U.S. at 547 (Frankfurter, J., concurring)); *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) (collecting authority).  For this reason, agencies may be required to abide by their internal policies, even those not adopted in formal regulations.  *Alcaraz*, 384 F.3d at 1162 (citing *Accardi*, 347 U.S. 260); *see also, e.g.*, *Steenholdt v. F.A.A.*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("The *Accardi* doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions.").  "[C]ourts have generally

1    invalidated adjudicatory actions by federal agencies which violated their own regulations

2    promulgated to give a party a procedural safeguard . . . .” *Brown v. Holder*, 763 F.3d 1141, 1148

3    (9th Cir. 2014) (quoting *United States v. Calderon–Medina*, 591 F.2d 529, 531 (9th Cir. 1979)).

4    “Having chosen to promulgate [a policy], the [agency] must follow that policy.” *Nat’l Ass’n of*

5    *Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).

6            As relevant here, the Department follows a detailed process for deciding whether to

7    certify a grant application under section 13(c), and it has laid that process out in its regulations.

8    *See* 29 C.F.R. §§ 215.1–215.8; *see also City of Colo. Springs*, 589 F.3d at 1125–26 (summarizing

9    regulations).  Under these regulations, when the Department of Transportation receives an

10   application for federal assistance, it forwards that application and a request for certification to the

11   Department of Labor along with copies of any related “protective arrangements.”  29 C.F.R.

12   § 215.2.  If employees affected by the funding applications are represented by a labor

13   organization, the Department of Labor forwards copies of the application and proposed

14   certification terms to that organization and to the applicant.  *Id.* § 215.3(b).  The applicant and any

15   labor organization are “expected to engage in good faith efforts to reach mutually acceptable

16   protective arrangements.”  *Id.* § 215.3(c).  If these negotiations are unsuccessful, any party may

17   object to the proposed protective arrangement within fifteen days.  *Id.* § 215.3(d)(1).  Within ten

18   days, the Department then determines “whether the objections raised are sufficient.”  *Id.*

19   § 215.3(d)(2)(i).  The Department considers an objection “sufficient” if it “raises material issues

20   that may require alternative employee protections” under section 13(c) or if it “concerns changes

21   in legal or factual circumstances that may materially affect the rights or interests of employees.”

22   *Id.* § 215.3(d)(3).  The Department “will consult with the Federal Transit Administration for

23   technical advice as to the validity of objections.”  *Id.* § 215.3(d)(4).

24           If the Department decides an objection is not sufficient, it certifies the application.  *Id.*

25   § 215.3(d)(5).  Otherwise it can direct the parties to “commence or continue

26   negotiations / discussions, limited to issues that the Department deems appropriate” for up to

27   thirty days.  *Id.* § 215.3(d)(6).  The Department can also “develop[] new terms and conditions

28   acceptable to the parties.”  *Id.*  If disputes remain unresolved after thirty days, “each party must

30

1    submit to the Department its final proposal and a statement describing the issues still in dispute."

2    *Id.*  The Department then defines the issues, sets a schedule for resolving these issues, decides

3    how the dispute will be resolved and makes a final decision.  *Id.* § 215.3(e).

4         In 2019, the Department followed this process in response to the California transit

5    agencies' funding applications.  It forwarded the applications to the organizations that represented

6    their employees, including the ATU.  *See* 2019 Determination at 1.  The ATU objected, and the

7    Department considered whether the objections were "sufficient."  *See id.* at 1–2.  It concluded

8    they were not, so it certified the applications.  *See id.* at 2.

9         In 2021, however, the Department did not follow the process in its regulations.  It did not

10   say whether it had decided the ATU's objections were "sufficient" under the terms of the

11   Department's regulations; it simply "nullified" its 2019 determination, which it now found

12   "unpersuasive."  2021 Determination at 2, 10.  It did not direct the agencies to try again to resolve

13   their disputes with ATU through "discussion / negotiation."  It did not permit California or the

14   ATU to submit proposals describing what issues were still in dispute, did not define the issues,

15   did not set a schedule and did not receive briefs.  The Department did not explain why it had

16   decided not to follow the course it had laid out in detail in its regulations.  It did not acknowledge

17   those regulations at all, which it has itself described as "binding."  *City of Colo. Springs*, 589 F.3d

18   at 1130 (quoting 60 Fed. Reg. 62968 (Dec. 7, 1995)).  Those safeguards would have protected the

19   California transit agencies whose funding requests were at stake.  Under the APA, the court must

20   therefore set the Department's 2021 determination aside.

21        The Department again defends its departure from the regulatory process by portraying its

22   2021 Determination as a permissible decision merely to reconsider.  *See* DOL Mot. at 18–19.  But

23   the Department could have reconsidered without abandoning the procedural safeguards it had

24   adopted.  It could have informed the parties it had reconsidered and then moved forward with the

25   process outlined in 29 C.F.R. § 215.3(d) and (e).  It could have decided an objection to the next

26   /////

27   /////

28   /////

1    application from a California transit agency was "sufficient," or it could have decided to withhold

2    certification of an application under 29 C.F.R. § 215.3(h) at an appropriate time in the future.[5]

3        The Department further contends any procedural shortfall was harmless because

4    California can and has made its case in this litigation. *See* DOL Mot. at 19.  But the Department

5    did not offer this explanation in its 2021 determination.  "It is a 'foundational principle of

6    administrative law' that judicial review of agency action is limited to 'the grounds that the agency

7    invoked when it took the action.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

8    140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)).  The

9    Department's harmlessness argument is fundamentally unpersuasive on its own terms.  The error

10   was not harmless simply because this court can conduct a *de novo* review.  If post hoc *de novo*

11   review rendered a procedural error harmless, then agencies could abandon regulations and

12   policies in virtually any case; adversely affected parties can always file challenges in court.

13       The Department cannot defend its decision to forego its regulatory process as a rational

14   exercise of discretion.  An agency may, of course, "relax or modify its procedural rules adopted

15   for the orderly transaction of business before it when in a given case the ends of justice require

16   it."  *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (quoting *N.L.R.B. v.

17   Monsanto Chem. Co.*, 205 F.2d 763, 764 (8th Cir. 1953)).  But if that decision causes "substantial

18   prejudice," the disadvantaged party may challenge it in court.  *See id.* (quoting *Monsanto*,

19   205 F.2d at 764).  Here, the Department's truncated procedure substantially prejudiced the state

20   and local California transit agencies.

21       When the Department reversed course in 2021, it recognized its policy change could

22   endanger federal transit funds awarded to California transit agencies under the Department's

23   previous policy.  *See* 2021 Determination at 2.  The Department decided not to ask these transit

24   agencies to return the funds they had already received, but gave notice it would not certify future

25   /////

---

[5] "[T]he Department retains the right to withhold certification where circumstances inconsistent with the statute so warrant until such circumstances have been resolved."  29 C.F.R. § 215.3(h).

1   grants.  *See id.*  It believed this course avoided harms to California and local transit agencies as a

2   result of any decisions they had made in reliance on the Department's previous policy.  *See id.*

3          In making this decision, the Department did not appreciate or consider how heavily

4   California and several local transit agencies had relied on the policy it was reversing.  For

5   example, after the Department began certifying federal grant applications in 2019, and before it

6   changed policies in 2021, the Federal Transportation Administration and Bay Area Rapid Transit

7   signed an agreement worth more than $1.1 billion to fund a project to expand and modernize the

8   train system that connects Oakland, San Francisco, San Jose and other large cities in the San

9   Francisco Bay Area.  *See* Powers Decl. ¶ 16, ECF No. 73-6.  The plan was for the project to be

10  completed and the billion dollar grant distributed over several years.  Edison Decl. ¶ 9, ECF

11  No. 73-11.  The project cannot be completed without federal funds, and if future federal funds are

12  cut off, the state stands to lose about $486 million it has invested thus far.  Power Decl. ¶ 16;

13  Edison Decl. ¶ 9; *see also* Prelim. Inj. Order at 7–8.

14         Transit agencies in other California cities, including agencies in Los Angeles, Orange

15  County and San Jose, had made similarly long-term plans based on the expectation that federal

16  transit applications would be certified under the Department of Labor's pre-2021 policy.  *See*

17  Wiggins Decl. ¶¶ 4, 9, ECF No. 73-7; Johnson Decl. ¶¶ 6, 25, ECF No. 73-8; Ganot Decl. ¶ 17,

18  ECF No. 73-9; *see also* Prelim. Inj. Order at 9.  The Department's decision not to claw back

19  previously certified grant funds was cold comfort to these agencies that had begun or continued

20  multi-year, multi-billion dollar transit projects in reliance on future grant funds.

21         The Department also said nothing about the intervening COVID-19 pandemic.  In 2020

22  and early 2021, Congress passed three acts in response to the pandemic, and each included funds

23  for state and local transit agencies.  *See* Prelim. Inj. Order at 9–10.  By 2021, local transit

24  agencies in California had relied on those funds to weather the pandemic.  *See id.* (citing

25  Mulligan Decl. ¶¶ 17, 19, 24, ECF No. 73-10 and Powers Decl. ¶ 23).  "[I]t is proper . . . to

26  presume that Congress was aware of the existing administrative regulations and interpretations"

27  when it passed these special funding bills.  *Marchese v. Shearson Hayden Stone, Inc.*, 822 F.2d

28  876, 878 (9th Cir. 1987).  For that reason, it is appropriate to presume Congress knew transit

1  funding applications would be subject to the regulatory process and policies then in place.  The

2  Department did not consider whether Congress, the state or any local transit agencies had relied

3  on the Department's 2019 interpretation of section 13(c) in their responses to the pandemic.

4      The Department's 2021 determination mentions none of these potential reliance interests.

5  It declared only that it had "account[ed] for any reliance interests" because it would not attempt to

6  claw back or "de-obligate" any previously awarded funds.  2021 Determination at 2.  Nor does

7  the record show the Department made an effort to discover and understand how California transit

8  agencies or the state might have relied on the 2019 determination.  If the Department had

9  followed its own procedural regulations, it would have consulted with the Department of

10  Transportation for "technical advice" about the transit projects and funds at stake.  29 C.F.R.

11  § 215.3(d)(4).  It would have informed local agencies in advance that it had reconsidered and now

12  believed the ATU's objections were "sufficient."  *See* 29 C.F.R. § 215.3(d)(2).  The state and

13  local transit agencies would have discussed the implications of a policy change with the

14  Department and the unions that represent transit agency employees.  *See id.* § 215.3(d)(6).  They

15  would have submitted arguments and evidence.  *See id.* § 215.3(e).

16      This is not to say the Department could not have proceeded with its new policy, as the

17  policy itself is not the point.  The Department simply did not address how much transit agencies

18  had relied on the status quo, and as a result, it did not consider how to avoid the harshest negative

19  consequences of its policy change.  If the Department had followed the ordinary procedure, it

20  could likely have taken steps to avoid the negative consequences of a policy change for those who

21  had relied on the past policy.  The Department could have considered whether to exclude a

22  broader range of grant applications from its new policy, such as those based on long-term,

23  partially completed and partially funded projects.  It could have considered grant applications one

24  at a time rather than announcing a plan to deny certification globally and immediately.  Each local

25  agency could likely have identified transit projects that had already begun based on the

26  Department's 2019 policy, and any related commitments the agency had made.  The Department

27  could have considered making exceptions for COVID-19 pandemic relief funds.

28  /////

1       In addition, the Department expressly decided not to ask any of the thirteen California

2  transit agencies in question to return the money they had already received.  2021 Determination

3  at 2.  But in any event, the Department's policy change is not limited to those thirteen agencies.

4  It is global and categorical.  As the Department confirmed at oral argument, it expects to deny

5  certification to every California transit agency whose employees are covered by PEPRA.  Again,

6  however, the Department did not consider whether every California transit agency had made

7  long-term decisions in reliance on the policy the Department was abandoning.  Nor did the

8  Department consider whether mere uncertainty might be costly to these agencies and the state

9  itself, a fact it does not now dispute.  *See* Prelim. Inj. Order at 16–17.

10       In sum, the Department abandoned a process it has described as binding.  As a result, it

11  did not take account of how its policy change would likely upend long-term plans worth billions

12  of dollars and emergency pandemic relief funding, also sowing uncertainty.  An agency's

13  decision is arbitrary and capricious if it does not "consider an important aspect of the problem."

14  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983);

15  *see also Regents*, 140 S. Ct. at 1912.  In addition, "[w]hen an agency changes course, it must 'be

16  cognizant that longstanding policies may have engendered serious reliance interests that must be

17  taken into account.'"  *Regents*, 140 S. Ct. at 1913 (quoting *Encino Motorcars, LLC v. Navarro*,

18  579 U.S. 211, 212 (2016)).  "It would be arbitrary and capricious to ignore such matters."  *Id.*

19  (quoting *Fox*, 556 U.S. at 515).  The Department's adopting a limited process was thus arbitrary

20  and capricious in violation of the APA.

21       The Department and the ATU contend the state and local transit agencies do not truly face

22  any risk of harm as a result of their reliance on the Department's previous policy.  They argue

23  California can avoid any negative effects of the 2021 policy change by exempting transit

24  employees from PEPRA.  *See, e.g.*, DOL Mot. at 5 n.1 & 18.  The Department did not rely on this

25  rationale when it was weighing reliance interests.  "An agency must defend its actions based on

26  the reasons it gave when it acted.  This is not the case for cutting corners to allow [the

27  Department] to rely upon reasons absent from its original decision."  *Regents*, 140 S. Ct. at 1909–

28  10.  But even if the Department had dismissed reliance interests based on the potential for an

1    amendment to PEPRA, it would have wrongly equated the transit agencies who were applying for

2    federal funds with the State of California.  The transit agencies that relied on the Department's

3    prior policy cannot unilaterally exempt themselves from PEPRA.

4         Moreover, the Department and the ATU assume, and ask the court to assume as well, that

5    California could exclude transit workers from PEPRA again today just as it did many years ago.

6    *See* Prelim. Inj. Order at 4 n.1.  Nothing in the record shows California could make the necessary

7    changes to its laws without putting transit projects in danger and without increasing the costs

8    local transit agencies would shoulder.  It is not clear how the legislature would weigh the interests

9    at stake.  For example, if the legislature exempted transit workers from PEPRA, it presumably

10   would be rewarding these workers with the benefits of a stable pension system while saddling

11   other workers with that system's costs.  *See* Cal. Mot. at 21 n.9.  If federal agencies could

12   disregard reliance interests by assuming a third party will step up to satisfy them, then reliance

13   interests would mean very little.  The court concludes it is arbitrary for an agency such as the

14   Department to disregard the harm a policy change will visit on those who relied on the previous

15   policy based on the assumption a third party could redress or avoid that harm.

16        The ATU also argues the Department had no obligation to discuss or consider reliance

17   interests, or to explain its decision at all, because the Department was not making a formal "rule."

18   *See* ATU Mot. at 5–6.  It cites no case in which any court has espoused this position, and this

19   court has not found one.  The relevant APA provisions do not differentiate between agency

20   decisions with and without the force of law.  *See* 5 U.S.C. § 706 ("The reviewing court shall . . .

21   hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

22   capricious, an abuse of discretion, or otherwise not in accordance with law . . . .").  Results in

23   similar cases should also be similar, no matter whether an agency's decisions are binding or have

24   the force of law.  *See, e.g.*, *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d

25   1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an

26   agency to treat like cases alike.  If the agency makes an exception in one case, then it must either

27   make an exception in a similar case or point to a relevant distinction between the two cases.");

28   *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011) (same).  It is arbitrary for an agency

1   to ignore relevant evidence and important parts of a decision in any case.  *See California I*,

2   76 F. Supp. 3d at 1137–38 (collecting authority).  If the ATU is correct that the Department has

3   no obligation to explain itself or weigh the interests of those who have relied on its past policies,

4   than any agency could adopt one position after the other without any principled basis, an absurd

5   result this court cannot countenance.

6          The reasons behind the requirement to consider reliance interests apply just as well to the

7   Department's 2021 decision as they do to any number of more formal regulatory choices.  The

8   Supreme Court's recent decision in *Regents* offers an example, as explained in this court's

9   previous order granting injunctive relief.  *See* Prelim. Inj. Order at 16–18 (citing 140 S. Ct. at

10  1910–15).  In *Regents*, as in this case, the plaintiffs made consequential, long-lasting decisions

11  they could not easily reverse, in reliance on a federal authority's discretionary policy choices.  In

12  *Regents*, certain people had decided to pursue higher education, start businesses, buy homes,

13  marry and have children in reliance on the Attorney General's decision not to pursue their

14  removal from the United States.  *See* 140 S. Ct. at 1901–02, 1914.  In this case, local transit

15  agencies had committed hundreds of millions or even billions of dollars to years-long transit

16  projects in reliance on future federal transit funds.  *See* Prelim. Inj. Order at 7–9.  Congress also

17  had made money available to local transit agencies to weather the pandemic and the transit

18  agencies relied on those funds for that purpose.  *See id.* at 9–10.  In both *Regents* and this case, a

19  federal agency changed course without recognizing or considering the power it had to prevent

20  harm to those who had relied on the previous policy.

21         In sum, California has established the Department acted without authority, abandoned its

22  ordinary process arbitrarily, and changed its policy without considering or addressing whether

23  that change would harm the transit agencies that had relied on the previous policy.

24  /////

25  /////

26  /////

27  /////

1   **V.      THE DEPARTMENT'S RATIONALE**

2          California also has shown the Department's interpretation of section 13(c)(2) is

3   unreasonable and its application of that section was arbitrary and capricious.  The disputed

4   portion of section 13 concerns "collective bargaining rights":

5                      (1) As a condition of financial assistance under [various provisions
6                      of federal law] the interests of employees affected by the assistance
7                      shall be protected under arrangements the Secretary of Labor
8                      concludes are fair and equitable. The agreement granting the
9                      assistance . . . shall specify the arrangements.

10                     (2) Arrangements under this subsection shall include provisions that
11                     may be necessary for . . . the continuation of collective bargaining
12                     rights . . . .

13  49 U.S.C. § 5333(b).

14         This court held in 2016 that the phrase "the continuation of collective bargaining rights" is

15  ambiguous.  *See California III*, 2016 WL 4441221, at *9–12.  The court decides the same today.

16  "Continuation" is not a precise word with only one definition for all contexts, let alone its context

17  in section 13(c)(2).  *See id.* at *10–11.  By tasking the Secretary of Labor with evaluating whether

18  protective agreements contain "provisions that may be necessary for . . . the continuation of

19  collective bargaining rights," Congress could have intended the Secretary of Labor to investigate

20  whether a particular protective arrangement ensured employees could continue bargaining with

21  their employer.  *See id.* at *10–11.  Congress could also have meant for the Secretary to ensure

22  bargaining would continue exactly as it had before, without any changes at all, at least not

23  changes for the worse.  *See id.*  Congress might have used "continuation" because it is vague; it

24  had more precise words at its disposal, and it used one of these more precise words, "worsening,"

25  in the same section.  *See id.* at *12, 17.  "Congress could have meant to prevent the end of

26  collective bargaining between the employees and employers of mass transportation systems in the

27  United States.  Congress could also have meant to prevent state and local governments from

28  chipping away at the collective bargaining rights of their mass transportation employees. . . . The

29  statute is ambiguous."  *Id.* at *12.

30  /////

In the *California* litigation, after deciding 13(c)(2) is ambiguous, this court interpreted that section as imposing a somewhat flexible limit on state laws:

> "[T]he continuation of collective bargaining rights" means that collective bargaining rights will not cease, and they will not diminish to the point that the bargaining relationship substantially clashes with federal policy on collective bargaining. This interpretation marries the notion that "continuation" may reasonably mean both "not end" and "not diminish" . . . with the context and history of UMTA's passage. This history and context shows Congress was concerned that the hard-fought bargaining rights of private transit workers would no longer be protected by federal law. . . . [I]t was motivated primarily by larger-scale restrictions on collective bargaining rights, changes proportionate to the national collapse of the private mass transit industry, changes that would be easy to see when overlaid with the fundamentals of federal labor policy.

*Id.* at *17.

Some passages of the Department's 2021 determination suggest it has adopted this interpretation. The Department considered, for example, whether "PEPRA substantially interferes with the scope of permissible collective bargaining . . . such that Section 13(c)(2)'s requirement regarding 'the continuation of collective bargaining rights' is not met." 2021 Decision at 7. The Department also appears to accept the court's interpretation of section 13(c)(2) in its briefs in this case. It argues, for example, on the first page of its cross-motion that "PEPRA substantially interferes with the continuation of collective bargaining rights." DOL Mot. at 1.

At the same time however, the Department's 2021 Determination unambiguously espouses an interpretation of section 13(c)(2) that this court rejected in the *California* litigation, i.e., that collective bargaining must not change in any respect. The Department introduced its 2021 determination by explaining it has returned to "its original superior position." 2021 Determination at 2. It also relies on many of the legal arguments it once offered in conjunction with its prior interpretation of section 13(c)(2). In 2015, for example, it argued federal labor law prohibited any unilateral change to any mandatory subject of collective bargaining, such as pensions. *See* 2015 Determination (SacRT) at 11–12, ECF No. 73-5. It makes the same

1   argument now. *See* 2021 Determination at 9 ("PEPRA's unilateral changes to obtainable pension

2   benefits is inconsistent with the continuation of collective bargaining rights, just as changes to

3   aspects of collective bargaining procedures may be as well."). The court finds this reasoning

4   unpersuasive for the reasons explained in its orders in the *California* litigation. *See California III*,

5   2016 WL 4441221, at \*9–26; *California I*, 76 F. Supp. 3d at 1134–45. Events since those

6   decisions reinforce this conclusion. Whether evaluated as an interpretation of section 13(c)(2)

7   under the *Skidmore* standard or the "arbitrary" and "capricious" standard of the APA, the

8   Department's 2021 decision cannot stand, for at least four reasons.

9          **A.**     **Relying on Legal Reasoning Rather than Subject Matter Expertise**

10       First, the Department in 2021 has relied primarily on judicial decisions and statutes. But it

11   is "courts, rather than agencies, [that] have expertise in interpreting case law." *Wachovia Bank,*

12   *N.A. v. Burke*, 414 F.3d 305, 320 (2d Cir. 2005) (citing *New York New York, LLC v. N.L.R.B.*,

13   313 F.3d 585, 590 (D.C. Cir. 2002), and *Univ. of Great Falls v. N.L.R.B.*, 278 F.3d 1335, 1341

14   (D.C. Cir. 2002)). As the Supreme Court declared in *Chevron*, the "judiciary is the final authority

15   on issues of statutory construction." *Chevron*, 467 U.S. at 843 n.9. In this respect, the

16   Department here did not bring its subject matter expertise or specialized knowledge to bear.

17       The Department's legal reasoning also is questionable on its own terms. As explained in

18   this court's 2016 order in the *California* litigation, the Department's 2013 and 2015 decisions

19   overlook a number of critical factors: ambiguities in the language of section 13(c); conflicts in the

20   UMTA's legislative history; difficulties in applying sparse and aging case law; and the challenge

21   of applying the UMTA, focused, as it was, on the challenges of the 1950s and 1960s, rather than a

22   law like PEPRA. *See* 2016 WL 4441221, at \*9–25. The Department also rejected the factors this

23   court identified in the *California* litigation that can help decide whether state law clashes with

24   federal labor policy. *Id.* \*22–26. The Department was "not persuaded" by this court's order, and

25   it found these factors "unhelpful." *See* 2021 Determination at 13–14. While it is not necessary to

26   revisit the factors in detail here, their utility in distinguishing this case from *Donovan* cannot

27   reasonably be questioned, as explained in the court's previous order. *See* 2016 WL 4441221 at

28   \*25–26 (citing 767 F.2d at 942–43).

1        The Department's 2021 determination also depends on the assumption that Congress

2   incorporated many nuances from the National Labor Relations Act into the UMTA, including the

3   meaning many federal appellate courts had assigned to the NLRA in years past. *See, e.g.*, 2021

4   Determination at 11–12.  But "Congress did not intend to subject local government employers to

5   the precise strictures of the NLRA." *Donovan*, 767 F.2d at 949.  "Nor did it 'impose[ ] upon the

6   states the precise definition of 'collective bargaining' established by the NLRA.'" *California III*,

7   2016 WL 4441221, at *19 (alterations in original) (quoting *Donovan*, 767 F.2d at 949).  Rather,

8   Congress likely used "collective bargaining" in a generic sense: negotiations in good faith over

9   the terms and conditions of employment, to impasse if necessary.  *See Donovan*, 767 F.2d at 949.

10       The ATU argues in a footnote that Congress actually did intend that if states accepted

11   federal transit funds, they would accept the limits of the National Labor Relations Act, but their

12   employees could not strike.  *See* Prev. ATU Mem. Summ. J. at 14 n.7, ECF No. 33-1.  It points

13   out that in *Donovan*, the D.C. Circuit specifically carved out the right to strike.  *See id.* (citing

14   767 F.2d at 953–54).  But the D.C. Circuit held the UMTA does not wholly incorporate the

15   National Labor Relations Act because the UMTA does not guarantee public transit employees the

16   right to strike; it did not hold the right to strike was the only collective bargaining right the

17   UMTA did not incorporate.

18       **B.      Arbitrarily Changing Positions**

19       Second, the Department's 2021 determination rests on many of the arguments supporting

20   its position in the *California* litigation, and reaches largely the same conclusions.  *See, e.g.*, 2021

21   Determination at 8 (Department "remains convinced" it was correct in 2013 and 2015).  Courts

22   are wary of agency decisions that reach "precisely the same conclusion" as before.  *Food Mktg.*

23   *Inst. v. I.C.C.*, 587 F.2d 1285, 1290 (D.C. Cir. 1978) (Circuit in second appeal upheld agency's

24   reaching same decision but based on new reasoning, only after careful, skeptical review).  And

25   this court has more closely scrutinized an agency's reasoning when the agency has held fast to a

26   particular outcome given the danger of the outcome's motivating the reasoning.  *See, e.g.*,

27   *California III*, 2016 WL 4441221, at *14 (collecting authority).  "A reviewing court . . . will

28   accord a somewhat greater degree of scrutiny to an order that arrives at substantially the same

1  conclusion as an order previously remanded by the same court." *Id.* (quoting *Greyhound Corp. v.*

2  *Interstate Commerce Comm'n*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

3       In addition to adhering to reasoning this court has rejected, the Department has taken

4  inconsistent and conflicting positions.  "[A]n administrative agency is not disqualified from

5  changing its mind; and when it does, the courts still sit in review of the administrative decision

6  and should not approach the statutory construction issue de novo and without regard to the

7  administrative understanding of the statutes."  *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402,

8  417 (1993) (quoting *N.L.R.B. v. Iron Workers*, 434 U.S. 335, 351 (1978)).  But "[a]n agency

9  interpretation of a relevant provision which conflicts with the agency's earlier interpretation is

10  entitled to considerably less deference than a consistently held agency view."  *Id.* (quoting *I.N.S.*

11  *v. Cardoza–Fonseca*, 480 U.S. 421, 446, n.30 (1987)).

12       Here of course, the Department's 2021 Determination is both consistent and inconsistent

13  with its prior determinations.  But the court's critique takes account of this history.  On the path to

14  its current position, the Department has both adhered to predetermined outcomes and changed

15  course arbitrarily.

16       In 2013, the Department first blocked federal funds to California transit agencies, citing

17  PEPRA.  *See, e.g.*, 2013 Determination (MST), ECF No. 73-4.  In 2015, after this court remanded

18  those decisions, *see generally* 76 F. Supp. 3d 1125, the Department abandoned its previous

19  reasoning and the legal authority it had relied on—authority it had considered essentially all-but-

20  binding—but reached the same conclusion as before, *see, e.g.*, 2015 Determination (SacRT), ECF

21  No. 73-5.  When the plaintiffs in the *California* litigation challenged the Department's 2015

22  reasoning, the court concluded the Department's reasoning was again faulty and had likely been

23  an effort to justify a "foreordained" outcome.  *California III*, 2016 WL 4441221, at *13–15, 21.

24       In 2019, however, after a change in administrations, the Department reversed course

25  completely.  It wrote off the reasoning it had previously relied upon.  *See* 2019 Determination at

26  8–9.  Again it relied on a legal analysis rather than its subject matter expertise.  *See id.*  For

27  example, it did not investigate the terms of any specific protective arraingments, did not consider

28  the effects of PEPRA on any particular transit agency, and did not test claims by the state's

1  attorneys that "nothing in PEPRA prohibits the negotiation of an actuarially equivalent retirement

2  benefit to that which may have been allowable through a defined benefit pension prior to

3  PEPRA." *See id.* at 7.  Its 2019 decision thus suffered from many of the same faults as those it

4  issued in 2013 and 2015, but reached the opposite conclusion.

5        Unlike the Department's 2013 and 2015 determinations, however, its 2019 determination

6  was never tested in litigation.  In 2021, after another change in administrations, the Department

7  reversed itself yet again.  It expressly embraced the reasoning behind its 2013 and 2015 decisions,

8  the same reasoning this court had rejected twice in the *California* litigation, as noted above.  *See*

9  2021 Determination at 2, 8.  As explained in the previous section above, it did so without

10  following its usual process, without considering the consequences of its reversal, and without

11  recognizing the limits Congress has placed on its authority.  It expressly rejected California's

12  request to consider whether collective bargaining had continued despite PEPRA's passage.  *See*

13  *id.* at 9 (refusing to consider whether "employees and employers are free to bargain around

14  PEPRA's effects and within its restrictions").  The Department's actions thus signal that its

15  certification decisions have been motivated by a desire to reach a specific outcome, and are not

16  informed by expertise, evidence or careful analysis.

17        Although section 13(c) gives the Secretary of Labor authority to decide what provisions

18  "may be necessary for . . . the continuation of collective bargaining rights," it does so when

19  referring to protective arrangements, "provisions" and "the interests of employees affected by the

20  assistance," 49 U.S.C. § 5333(b), not when referring to the interpretation of statutory language,

21  legislative history, judicial decisions and state law.  Nothing in section 13(c) suggests Congress

22  intended the Department of Labor to rely inconsistently on legal reasoning a federal district court

23  has rejected.  It is not persuasive for the Department to just say it has discretion to find unique

24  solutions to specific problems.  The Department does have that discretion.  *See, e.g.*, *Local*

25  *Div. 589*, 666 F.2d at 628–29 (reviewing UMTA legislative history suggesting Congress intended

26  to give Secretary of Labor "flexibility" in each case).  It has not exercised it, because it

27  considered no specific protective arrangements and no details regarding particular transit agencies

28  applying for funding.

1          **C.      Rejecting Directly Relevant Evidence**

2          Third, the Department disregarded directly relevant evidence.  It could not rationally have

3  determined whether prevailing "protective arrangements" ensured a "continuation of collective

4  bargaining" without knowing whether collective bargaining has in fact continued.  49 U.S.C.

5  § 5333(b)(2).  California argued and offered evidence, in its view, showing local transit agencies

6  continued negotiating with employee representatives over their pension benefits after PEPRA

7  took effect.  According to the state, a number of transit agencies and their employees bargained

8  over wage increases to make up for pension contribution increases, and they negotiated

9  agreements to shore up underfunded pension plans.  The Department refused to consider this

10 evidence.  *See* 2021 Determination at 9, 14.  Courts set aside agencies' decisions under the APA

11 when they do not "consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*,

12 463 U.S. at 43.  Direct evidence that collective bargaining has continued is an "important aspect"

13 of deciding whether California law forecloses a "continuation of collective bargaining rights"

14 under section 13(c)(2).  The Department's 2021 determination must therefore be set aside.

15         The Department defends its refusal to consider this evidence by arguing PEPRA removed

16 options from the bargaining table.  *See* Gov't Mot. Summ. J. at 10 (citing 2021 Determination at

17 9).  The court rejected this argument in the *California* litigation and reaches the same conclusion

18 now.  *See, e.g.*, *California III*, 2016 WL 4441221, at *28.  The Department's position is

19 tantamount to an argument that section 13(c)(2) freezes the terms and conditions of employment

20 in place.  But section 13(c)(2) does not govern specific rights, privileges or benefits.  A different

21 part of section 13(c)—section 13(c)(1), a section the Department does not rely on—governs "the

22 preservation of rights, privileges, and benefits (including continuation of pension rights and

23 benefits) under existing collective bargaining agreements."  49 U.S.C. § 5333(b)(2)(A).  Even

24 with some options off the table, bargaining may still continue as the state represents it has.

25         The Department argues if bargaining can be said to "continue" even though California has

26 taken some options off the table, then states could impose whatever unilateral changes they

27 please.  *See* DOL Mot. Summ. J. at 9–10 (citing 2021 Determination at 9).  This "slippery slope"

28 argument is unavailing.  California has not banned all collective bargaining, nor has it banned

1   collective bargaining over pensions.  The Department would not be blessing PEPRA, or any other

2   future restriction, simply by considering California's evidence.  If, in the future, California does

3   go too far, or if experience eventually proves PEPRA goes too far, then the Department could

4   deny certification.  The D.C. Circuit's decision in *Donovan* is an example of a state law that went

5   too far.  The Georgia law in dispute there took a whole array of options off the table, from

6   employee assignments and subcontracting, to hiring and discharges, and hours and overtime.  *See*

7   767 F.2d at 951–53.

8       **D.       Offering Explanations without Support in the Record**

9       Fourth, an agency acts arbitrarily if it offers "an explanation for its decision that runs

10   counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The

11   Department's reasoning as relevant here exhibits this fault.

12       The Department assumed without support that PEPRA reduces California's liabilities as a

13   transit agency employer.  *See, e.g.*, 2021 Determination at 9.  California does not employ the

14   transit workers whose rights are in dispute in this case.  *See* Cal. Mot. at 13–14 (citing applicable

15   state laws).  PEPRA also applies to many people who do not work for local transit agencies.

16   According to the state, more than 95 percent of the public employees who are subject to PEPRA

17   do not work for transit agencies.  *See id.* at 14 (citing legislative findings).  The Department did

18   not confront this disjunction.  Nor did it consider whether some transit agencies' liabilities were

19   unchanged despite PEPRA.  It decided that because "California had enacted a law 'defining

20   benefits available to public employees,'" state law prevented certification uniformly.  DOL Mot.

21   at 16 (quoting 2021 Determination at 13).

22       In its briefing to this court, the Department now flatly rejects the distinction between state

23   and local governments.  It contends, in effect, it is irrelevant whether California or a local transit

24   agency is the true employer because public employees are subject to PEPRA all the same.  *See id.*

25   ("Section 13(c)'s protections apply for all state and local transit employees, whether they work

26   directly for the State or for a separate public entity.").  It did not rely on this reasoning in reaching

27   its 2021 Determination.  The court may not uphold the Department's decision for reasons it did

28   not offer at the time.  *Regents*, 140 S. Ct. at 1907.

In its determination, the Department did incorrectly attribute the state's actions solely to transit agencies. It described PEPRA as a "unilateral" employer action. *See, e.g.*, 2021 Determination at 9. California argues without contradiction that employees and their representatives help decide which retirement system to join. *See* Cal. Mot. at 15 & n.7; *see also* 2021 Determination at 3 n.4 (acknowledging some "transit agencies participate in pension trusts governed by the Employee Retirement Income Security Act of 1974 or have established their own locally administered retirement system"). In some agencies, employees have expressly recognized the state may change the pension laws governing the plan they choose. *See* Cal. Mot. at 15–16 & n.7 (citing agreement between Bay Area Rapid Transit District and ATU).

The Department also relied on facile assumptions about contrasts between PEPRA and federal labor policy on pensions. As California points out, again without contradiction, federal pension law has undergone reforms similar to those California imposed through PEPRA since the time the UMTA was passed. *See* Cal. Mot. Summ. J. at 5–6 (citing Federal Employees' Retirement System Act of 1986, Pub. L. No. 99-335, 100 Stat. 514). In addition, the National Labor Relations Act "does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment." *S. Nuclear Operating Co. v. N.L.R.B.*, 524 F.3d 1350, 1358 (D.C. Cir. 2008) (quoting *N.L.R.B. v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993)). Relying on this principle, the D.C. Circuit held in *Southern Nuclear* that an employer can unilaterally change the healthcare plans it offers to employees if the company has reserved its right to make those changes. *See id.* at 1358–60. But California has presented unrebutted evidence that some transit agency collective bargaining agreements are expressly conditioned on state pension law. *See* Cal. Mot. at 15 n.7; Cal. Opp'n at 16 (citing Cal. Gov't Code § 20506; Cal. Mot. Expand Exs. 2, 9). If a private employer can expressly reserve the right to make a unilateral change under federal law, it stands to reason a public transit agency could ask employee representatives to recognize that governing state laws could change, as some have done. The Department did not consider this evidence, so the assumptions underlying its 2021 Determination were arbitrary, and that decision must be set aside.

1  **VI.   THE ATU'S ARGUMENTS**

2        The ATU advances two primary arguments in support of the Department's 2021 decision

3  that section 13(c)(2) bars the Department from certifying any funding applications by agencies

4  subject to PEPRA.  Neither is persuasive.

5        **A.   Plural "Rights"**

6        The ATU argues first that the phrase "collective bargaining rights" in section 13(c)(2)

7  shows Congress unambiguously enshrined a separate collective bargaining right for each term

8  and condition of employment.  *See, e.g.*, Prev. ATU Mem. Summ. J. at 6, 9–12, ECF No. 33-1.

9  In other words, the ATU argues there is a collective bargaining right related to pensions, another

10  right related to wages, another right related to hours, and so on.  That reading does not appear to

11  be what Congress intended.

12        To begin, the ATU does not confront the ambiguity of the word "rights" itself.  "Rights"

13  might be plural because there are multiple protective arrangements, multiple employers and

14  multiple employees for the Secretary to consider.  Congress might also have used the plural

15  "rights" to refer to the many actions employees can undertake to assert and protect their interests.

16  It might have been referring to the rights to an employer's recognition, to collective negotiation,

17  to advocate and to seek new members, among other things.

18        The ATU's interpretation suffers from a second basic flaw.  Under its interpretation,

19  "rights" can be defined with arbitrary granularity.  It could encompass any part of the relationship

20  between an employer and employee.  Under the ATU's interpretation of the word "rights,"

21  section 13(c)(2) would permit the Secretary of Labor to indefinitely freeze any condition at will.

22  Consider, for example, a defined benefit pension plan like the plans previously offered by many

23  public employers in California.  Under these plans, retirement benefits were determined by the

24  number of years an employee was in service, the salary at retirement and a multiplier.  An

25  employee could increase the defined benefit by artificially increasing either their years in service

26  or their salary at retirement.  If "rights" corresponded to any term or condition of employment,

27  the Secretary of Labor could freeze every aspect of the former retirement plan by defining the

28  "right" to bargain very specifically—beyond retirement, beyond pensions, beyond defined benefit

1    pension plans and how those benefits accrue, beyond even the calculation of service credits all the

2    way down to an employee's ability to purchase additional service credits and the terms of that

3    purchase.  If the "bargaining right" associated with any isolated "term" of employment did not

4    "continue," then the Secretary could deny certification.

5           Nothing in section 13(c)(2) suggests Congress intended to give the Secretary this power.

6    If anything, the language of section 13(c) suggests it did not.  Rather, Congress used different

7    parts of that section and different language to protect the "rights, privileges, and benefits . . .

8    under existing collective bargaining agreements" and to protect "individual employees against a

9    worsening of their positions related to employment."  49 U.S.C. § 5333(b)(2)(A), (C).  Reading

10   "bargaining rights" as the ATU proposes would therefore expand "collective bargaining rights" to

11   conflict with the rest of section 13(c)(2).

12          **B.      Legislative History**

13          Second, the ATU argues the legislative history of section 13(c)(2) resolves any

14   ambiguities in its language and shows Congress would have expected the Secretary of Labor not

15   to certify funding applications from agencies subject to PEPRA.  *See* ATU Mot. Summ. J. at 6–9;

16   Prev. ATU Mot. Summ. J. at 12–14.  This court concluded otherwise in the *California* litigation,

17   *see California III*, 2016 WL 4441221, at *15–17, and after reviewing that history again, reaches

18   the same conclusion now.

19          The Senate originally began considering mass transit funding bills in 1960.  Senate Rep.

20   No. 88-82, 88th Cong., 1st Sess. at 1 (Mar. 28, 1963).[6]  A bill was reported out of a Senate

21   committee that year, but the House did not act on it.  *Id.*  The next year, Congress enacted a

22   stopgap program that would offer temporary relief while the administration completed a study.

---

[6] For ease of reference, this order cites the Committee report as "S. Rep. No. 88-82."  The related house report is cited as "H.R. Rep. No. 88-244."  *See* H.R. Rep. No. 88-244, 88th Cong., 1st Sess. at 2 (Apr. 9, 1963).  The related House and Senate committee hearing records are cited as "H.R. Comm. Hr'g" and "S. Comm. Hr'g," respectively.  *See* Hearings Before a Subcommittee of the Committee on Banking and Currency of the United States Senate, 88th Cong., 1st Sess., on S. 6 and S. 917 (Feb. 28, Mar. 1, 4, 5, 8, 11, 1963); Hearings Before the Committee on Banking and Currency of the U.S. House of Representatives, 88th Cong., 1st Sess., on H.R. 3881 (Feb. 27, 28, Mar. 1, 4, 5, 6, 8, 1963).

48

*See id.*; H.R. Rep. No. 88-204 at 2.  After this study was complete, and after extensive hearings before both House and Senate committees in 1962, a bill was reported out of committee.  *See* S. Rep. No. 88-82 at 1–2; H.R. Rep. No. 88-204 at 2.  That bill failed as well; no action was taken.  S. Rep. at 2; H.R. Rep. No. 88-204 at 2–3.

The administration proposed new mass transit legislation early the next year.  S. Rep. No. 88-82 at 2; H.R. Rep. No. 88-204 at 3.  Senate and House Committees held many more days of hearings in early 1963.  S. Rep. No. 88-82 at 2; H.R. Rep. No. 88-204 at 3; *see also* S. Comm. Hr'g; H.R. Comm. Hr'g.  In addition to testimony from subject-matter experts and the administration, lawmakers heard from witnesses representing local governments, labor organizations, manufacturers, transportation companies and others.  A majority emerged in support of the proposed legislation, but a minority view solidified as well.  *See* S. Rep. No. 88-82 at 39–55; H.R. Rep. No. 88-204 at 22–30.

According to the 1963 committee reports, the majority view started with the basic premise that an ever-greater share of the country's population had moved into cities and suburbs.  *See, e.g.*, S. Rep. No. 88-82 at 4.  To this majority, it was clear the United States could not solve its transportation problems with ever-wider highways and ever-larger parking lots.  *See, e.g.*, *id.* at 5–6.  "Would it not be better in downtown sections of cities to have productive people," one proponent later asked, "rather than idle automobiles, stacked in those skyscrapers?" 109 Cong. Rec. 5324 (Apr. 1, 1963) (Statement of Sen. Williams).  "[B]alanced transportation systems, utilizing both highways and transit, are essential for urban areas if they are effectively to meet their present transportation needs and to provide for their future growth."  S. Rep. No. 88-82 at 6.  In addition, "[m]ass transportation can be maintained profitably only when it is operating at relatively high capacity."  H.R. Rep. No. 88-204 at 3.  So as more people began driving, private transportation companies found themselves in a "vicious circle" of declining patronage, rising costs and poorer service.  *Id.*  If these private systems failed, mass transit might be impracticable to replace.  *See* S. Rep. No. 88-82 at 5.  If cities and states could not support mass transit on their own, *see id.* at 12–13, federal support was necessary, *see id.* at 13–14.

/////

1      Many of those who opposed the bill saw it as an irresponsible and wasteful spending

2  spree. *See, e.g.*, S. Rep. No. 88-82 at 39, 42, 45; H.R. Rep. No. 88-204 at 22. One opponent

3  asked, "Why should the taxpayers of the Nation furnish billions of dollars to provide

4  transportation to people who want to live in the country and work in the city?" S. Rep. No. 88-82

5  at 39 (individual views of Sen. Robertson). Others protested the "czaristic powers" the proposed

6  legislation would bestow on federal regulators. *See, e.g., id.* at 45; H.R. Rep. No. 88-204 at 25–

7  26. Freely available federal money might also dissuade cities and states from funding their own

8  mass transit projects. *See* S. Rep. No. 88-82 at 46.

9      When federal mass transit bills were originally introduced, they did not include the labor

10 protections that eventually became section 13(c). *See, e.g.*, S. 6, 88th Cong. 1st Sess. (Jan. 14,

11 1963), as reprinted in Hearings Before a Subcommittee of the Senate Committee on Banking and

12 Currency on S. 9 and S. 917, 88th Cong., 1st Sess. (Feb. 1, Mar. 1, 4, 5, 6, 11, 1963); S. 345, 88th

13 Cong., 1st Sess., at 3–17 (Jan. 11, 1961), as reprinted in Hearings Before a Subcommittee of the

14 Senate Committee on Banking and Currency on S. 345, 87th Cong., 1st Sess., at 3–17 (Mar. 20,

15 21, and 22, 1961). The prospect of a mass distribution of federal funding raised concerns among

16 labor organizations who represented transit workers. Labor representatives foresaw two

17 problems. First, people could lose their jobs if federal spending led to greater automation or

18 consolidation. *See* S. Comm. Hr'g at 320. Second, if a local government used federal dollars to

19 acquire, rescue, and operate essential transit agencies, private transit employees might find

20 themselves suddenly working for the government. *See id.* The employees of many private transit

21 companies had fought hard for the right to organize and bargain collectively with their private

22 employers. *See id.* If state law barred the new public employer from bargaining collectively with

23 its employees, then "collective bargaining [would] be lost." *Id.* Pension rights and other rights

24 "could be wiped out." *Id.*

25     Legislators and witnesses often retold a story about one transit agency in Florida to

26 illustrate this second concern. This story appears to have first been brought to Congress's

27 attention by an AFL-CIO representative, Andrew Biemiller, when Congress was considering a

28 predecessor to the UMTA in 1962. According to Mr. Biemiller, a local transit system in the

1    Miami area had wrongly refused to negotiate with the transit workers' union.  *See, e.g.*, Statement

2    of Andrew J. Biemiller, Director of Legislation, AFL–CIO, in Hearings Before Subcommittee

3    No. 3 of the Committee on Banking and Currency of the U.S. House of Representatives on H.R.

4    11158, 87th Cong., 2nd Sess., at 423 (1962).  Through what Mr. Biemiller portrayed as a corrupt

5    back-room deal, the municipal government then took over the transit company, which made the

6    transit workers into civil servants and stripped them of their right to bargain collectively under

7    state law.  *Id.*

8         Others recognized this potential problem as well.  According to a representative of the

9    American Transit Association, whose members included several hundred transit companies, the

10   danger went beyond public acquisitions:

11            In some instances where transit service has been abandoned, it has
12            been taken over by the city or by another transit operator. In most
13            such cases the successor operation is conducted on a very much
14            curtailed basis, with the employees often working under a much less
15            desirable labor agreement and the community generally suffering
16            because of the less frequent and convenient service.

17   S. Comm. Hr'g at 263 (Prepared Statement of George W. Anderson, Executive Vice President,

18   American Transit Association).

19        Some of the transit bill's proponents foresaw a different danger.  If the federal government

20   did not intervene, then transit jobs might disappear as companies folded.  *See* S. Comm. Hr'g at

21   243 (Statement of Sen. Abraham Ribicoff).  Criticizing the bill for its labor implications was, in a

22   sense, looking a gift horse in the mouth.  *See id.*  The bill would "mean the salvation of many of

23   these jobs."  *Id.*

24        Whether well-founded or shortsighted, these fears prompted discussions between the

25   administration and labor representatives while Senate and House committees were conducting

26   hearings on the bill's broader provisions.  Following these discussions, the administration

27   proposed an amendment "dealing with the subject of protecting the rights and interests of

28   employees who might be adversely affected by projects undertaken or assisted by the mass

29   transportation program."  Letter from Pres. John F. Kennedy to Lyndon Johnson, President of the

30   Senate (Feb. 18, 1963), reprinted in S. Comm. Hr'g at 20–21.  *See also* Letter from Robert C.

1    Weaver, Administrator, House and Home Finance Agency, to Pres. John F. Kennedy (Feb. 18,

2    1963), reprinted in H.R. Comm. Hr'g at 13–14.  Secretary of Labor Wirtz presented the

3    administration's proposal to the Senate and House committees.  *See* S. Comm. Hr'g at 311–12.

4    This proposal was the original basis of section 13(c): no financial assistance would be distributed

5    unless "fair and equitable arrangements are made, as determined by the Administrator after

6    consultation with and the concurrence of the Secretary of Labor, to protect the interests of

7    employees affected by such assistance or financing."  S. Comm. Hr'g at 308.  Wirtz's proposal

8    listed several examples of "provisions" that these "fair and equitable arrangements" would need

9    to include.  The second is what eventually became section 13(c)(2).  It would require provisions

10   necessary for "(b) the prevention of curtailment of collective bargaining rights."  *Id.*

11         Perhaps wary of derailing a popular transit bill just as it was gaining steam, Secretary

12   Wirtz testified cautiously and in conciliatory terms before the Senate and House committees.

13   "We think it quite important," he said, for example, "the program will not be administered in a

14   way which will result in the destruction of established collective bargaining rights."  *Id.* at 309.

15   But he reassured senators that he saw it "not as a problem of in any sense extreme proportions."

16   *Id.*  He was "concerned particularly about only the transitional effects upon particular employee

17   groups."  *Id.* at 308.  "[I]t is advisable to protect against the possibility of the worsening of a few

18   individuals' positions."  *Id.* at 309.  The proposal was to "cover those employees, present

19   employees, whose interests would be adversely affected by a change, and it would not be

20   intended to establish protections for the future as far as new employees are concerned."  *Id.* at

21   317.  Secretary Wirtz disagreed that the labor protections would "supersede" state laws, but he

22   conceded it was a "somewhat different question" whether "there would be an effect" on state law.

23   *Id.* at 312.  On the one hand, state laws would not necessarily "change," but "this kind of

24   provision would require the facing up to some problems."  *Id.* at 313.

25         What "problems" he had in mind, and what "facing up" might be necessary, went

26   unspoken.  If anything, Secretary Wirtz's ambiguous testimony suggests the administration

27   intended its bill to be open-ended; loose language left room for discretion and discretion

28   permitted flexibility; "different answers may be appropriate in different cases."  H.R. Comm.

Hr'g at 482.  "[T]he proposal does contemplate the exercise of judgment," Secretary Wirtz testified, "on the basis of a fair and equitable basis, and on the further basis that we shall do what is appropriate in the circumstances."  *Id.; see also id.* at 484–85.

Others wanted more.  For example, Bernard Cushman, General Counsel for the Amalgamated Association of Street, Electric Railway, and Motor Coach Employees of America, AFL-CIO, one of the largest organizations of American transit workers, acknowledged the transit bills had "some beneficial aspects," but he voiced "substantial and serious objections."  S. Comm. Hr'g at 324–35.  "We cannot take the bills in their present form," he testified.  *Id.* at 376.  "If so enacted, we will oppose them; we will have to."  *Id.*  When governments had recently acquired local transit companies, he explained, they had sometimes taken the position they were "legally disqualified from entering into collective bargaining with the collective bargaining agent of the employees and also from entering into arbitration agreements with such a collective bargaining agent."  *Id.* at 325.  This was so even if "the employees [had] been for many years represented by the union under a system of collective bargaining and with provision in the collective bargaining agreement for arbitration of unsettled disputes."  *Id.*  He repeated concerns about the transit acquisition in Miami, Florida and a similar proposal in Portland, Oregon.  *See id.*  In Portland, "officials took the position that they would not assume and could not assume the obligations to present pensioners."  *Id.* at 327.  "If the transaction had been consummated, therefore some 300 old men on the pension rolls would have lost their pension, according to the position taken by the city officials."  *Id.*

To Cushman and the labor representatives who testified before the Senate and House Committees, the administration's proposed amendment did not go far enough.  They thought it was overgeneralized and weak.  *See, e.g.*, S. Rep. No. 88-82 at 50 (Individual views of Senators Bennett, Tower, Simpson and Dominick stating Biemiller believed bill did not afford adequate protections); *see also* S. Comm. Hr'g at 322–23.  They proposed more specific language and several mandatory protections, both for "employees of existing mass transportation systems" and those "employed on any new project, system, line operation, or facility."  S. Comm. Hr'g at 322–23.  Their proposal included, for example, specific requirements for the preservation of "all

1   employee rights, privileges, and benefits; the continuation for members and beneficiaries of any

2   retirement or pension system of rights, privileges, benefits, obligations, and status with respect to

3   such pension system and payment of such benefits to those on pension; and assumption of any

4   existing collective bargaining agreements." *Id.*  Under their proposal, the Labor Secretary would

5   also decide whether arrangements were in place to ensure "[t]he right of employees to bargain

6   collectively through representatives of their own choosing concerning wages, hours, and

7   conditions of employment." *Id.*

8       Cushman also urged lawmakers to consider "a strong congressional legislative precedent

9   in one of the industries which is affected by the legislative proposals you are considering; namely,

10  the railroad industry, which affirmatively requires collective bargaining and provides for

11  arbitration of disputes." *Id.* at 326 (citing the Railway Labor Act, 45 U.S.C. § 151 *et seq.*).  To

12  illustrate his point, he mentioned *California v. Taylor*, a Supreme Court decision from about six

13  years before, in which the Court held federal labor law preempted state civil service laws and

14  required a California-owned railroad to submit to the jurisdiction of a federal regulator.  *See*

15  *generally* 353 U.S. 553 (1957).  He also cited state laws protecting employees from being "placed

16  in any worse position with respect to workmen's compensation, pension, seniority, wages, sick

17  leave, vacation, health and welfare, insurance, or any other benefits that he enjoyed as an

18  employee of such acquired transportation system." *Id.* at 327.  Cushman was proposing, in other

19  words, that the transit bill impose on states preemptive federal regulation if they assumed control

20  of private transit companies.  In his eyes, strong federal law would protect workers for many

21  years to come: "I am sure that you are aware that you are not just legislating for the fleeting

22  present," he told the Senate Committee.  *Id.* at 375.  "You are legislating for the long tomorrow."

23  *Id.*

24      Lawmakers were skeptical.  "I have had a lot of dealing with writing this type of

25  legislation," one proponent told Mr. Cushman.  H.R. Comm. Hr'g at 632 (Statement of Rep.

26  Rains).  "We cannot write into this bill the abolition and the changing of State laws, because that

27  will defeat the bill.  There is no vote for that kind of thing in Congress." *Id.*  Nor did this

28  Congressman think Congress could be as specific as the labor organizations wanted.  "What we

1    must do is to give to the Administrator and to the Secretary of Labor the authority to do what we

2    believe will be right and just by all of these people, and we have to hold him accountable for

3    doing it.  Somebody has to do the administration.  We can never spell out the exact thing . . . ."

4    *Id.* at 634.

5          A revised transit bill emerged from the committee hearings.  It included labor protections

6    along the lines of those the administration had proposed.  The protections required "fair and

7    equitable arrangements . . . to protect the interests of employees," including provisions for "the

8    encouragement of the continuation of collective bargaining rights."  S. Rep. No. 88-82 at 34.  The

9    Senate Committee explained it "added this amendment to the bill in order to help safeguard the

10   rights and privileges of those now employed by transit companies in communities where such

11   projects are assisted or financed under the bill."  *Id.*  The bill's labor protections were expressed

12   generally because lawmakers expected "specific conditions normally will be the product of local

13   bargaining and negotiation, subject to the basic standard of fair and equitable treatment."  *Id.* at

14   28.  They did not believe it was "feasible" to include more detailed protections.  *Id.*

15         The bill's proponents downplayed the likely effects of these labor protections.  The House

16   committee's report, for example, emphasized its belief "existing private companies will be

17   acquired in only a few cases."  H.R. Rep. No. 88-204 at 15; *see also* S. Rep. No. 88-82 at 34–35.

18   "It is not the intent of this legislation to promote public ownership of urban transportation

19   systems, or to eliminate or curtail collective bargaining rights."  H.R. Rep. No. 88-204 at 15.  The

20   committee conceded "the problem of worker protection may arise," but "in only a limited number

21   of cases."  *Id.*  In these cases, the committee believed "workers for whom a standard of benefits

22   has already been established under other laws should receive equally favorable treatment under

23   the proposed new program."  *Id.* at 16.  "[A]ll workers adversely affected by adjustments effected

24   under the bill should be fully protected in a fair and equitable manner."  *Id.*  "Federal funds

25   should not be used in a manner that is directly or indirectly detrimental to legitimate interests and

26   rights of such workers."  *Id.* at 16.

27         As for the possibility of preempting state law, the committees agreed with the Secretary of

28   Labor "there could be no superseding of State laws."  S. Rep. No. 88-82 at 29.  But the committee

55

stopped short of expressing that point clearly in the text.  At the urging of Senator Tower, one of the transit bill's opponents, a draft clarified the bill encouraged a continuation of collective bargaining only "to the extent not inconsistent with State or local law."  109 Cong. Rec. 5322 (Apr. 1, 1963).  The full committee "deleted" this proviso.  *Id.*  "From this," Senator Tower later argued, "one can only assume that this measure could be enforced in a manner not consistent with State or local law."  *Id.*

The dispute over the labor protections continued in vigorous debates on the Senate and House floors.  Opponents of the transit bill portrayed its labor protections as federal overreaching.  Senator Goldwater, for example, saw "no better example" of the consequences of federal meddling than the transit bill's labor protections.  1090 Cong. Rec. 5414–15 (Apr. 2, 1963).  In his view, section 13(c) "would represent a complete reversal of the public policy of the United States," which "specifically excluded . . . any State or political subdivision thereof from all obligations imposed by the Federal Labor-Management Relations Act, including the requirement to bargain collectively with representatives of its employees."  *Id.* at 5415.  Despite the committees' reassurances to the contrary, he believed state laws and local ordinances would be preempted.  *Id.*  He thought section 13(c) was "a back-door way of destroying certain parts of our labor laws and destroying State and local autonomy."  *Id.* at 5417.

Senator Tower made the same point.  He argued the bill's labor protections might allow regulators to "lay down, as a condition for giving aid, the condition that a State should have to revise its laws or make an exception to its laws to accommodate this program."  *Id.* at 5416 (Apr. 2, 1963).  "In practical effect, so far as the implementation of the law is concerned, it will not be Congress, but one man," the Labor Secretary, "who will have in his hands the power to abrogate, supersede, or nullify existing laws of State and local governments."  *Id.*  Even if state laws were not formally superseded, Senator Tower argued the bill would give the administration that power in practice.  *See id.* at 5323.

The bill's proponents attempted to eliminate any doubts that they did not intend to preempt state law.  Senator Williams, for example, sought to correct the "legislative history" expressly in real time.  *Id.* at .  "[W]e must have a record that will show that the bill does not

preempt State law; it does not control or dominate with irrevocable authority local situations.  The bill provides for the encouragement of collective bargaining."  *Id.*  "I do not believe we can pass a law which would change State law; and we do not attempt to do so.  The bill encourages collective bargaining."  *Id.*  Or in the words of Senator Sparkman, "It was not our intention to supersede State laws, and we do not intend, I am sure, to do so.  We do not believe that the language has that effect."  *Id.* at 5418.  Senator Williams also emphasized, as the Senate Committee had in its report, that the labor provisions were "truly ancillary to the thrust of the transportation program."  *Id.* at 5417.  He later added, "very few, although some, systems might be changed in a way that a few employees might be adversely affected."  109 Cong. Rec. 5678 (Apr. 4, 1963).  And the proposal merely protected "those rights which have been hard earned and enables them to continue."  109 Cong. Rec. 5417 (Apr. 2, 1963).

This debate culminated with a proposed floor amendment by Senator Morse.  This amendment and Senator Morse's description of it on the Senate floor are crucial to the ATU's arguments, so it is worth reproducing significant portions of his comments verbatim.  The amendment had three parts.  Senator Morse summarized:

> First. No financial assistance under the bill shall be made available to any State or local public body for the purpose of purchasing any facility or property of a private mass transportation company unless (a) such company has, prior to such acquisition, been declared bankrupt or placed into receivership by a court of competent jurisdiction, or (b) the Administrator finds that such assistance is essential to a program, for the acquisition of mass transportation facilities or property, supplementary to the service provided by an existing publicly owned or operated mass transportation system, and (c) in either situation under (a) or (b), the Administrator and the Secretary of Labor, acting jointly under section 19(c) of the bill, find that the project to be assisted complies with the section 19(c) requirements.

> This limitation on the use of Federal funds under the bill extends to the improvement or reconstruction of facilities acquired after the effective date of the act as well.

109 Cong. Rec. 5671 (Apr. 4, 1963).

/////

1        The amendment's second part is similar:

2                Financial assistance under the bill will be available to any State or
3                local public body for the purpose of developing mass transportation
4                facilities which will compete with or supplement existing mass
5                transportation service only if the following conditions are met:

6                (a) The Administrator must find that such assistance is essential to
7                the development of a unified urban transportation system which is a
8                part of a comprehensively planned development of the urban areas;

9                (b) The Administrator finds that the program provides for the
10               participation of private mass transportation companies to the
11               maximum extent feasible; and

12               (c) The Administrator acting jointly with the Secretary of Labor is
13               satisfied that the protective arrangements required by section 19(c)
14               have been provided by the project.

15   *Id.* The Morse amendment thus attempted to limit the use of federal funds primarily to the

16   acquisition of bankrupt transit agencies and to prevent federal funds from being used to drive

17   private companies from the market.

18        Third, the amendment modified the bill's labor protections:

19               The amendment clarifies and improves the protective arrangements
20               in section 19(c) of the bill in the following manner: (a) It makes it
21               clear that the rights of beneficiaries will be preserved along with the
22               rights of employees under existing collective bargaining agreements
23               in effect in any mass transportation which is involved in any project
24               assisted under the bill; (b) it makes it clear that collective bargaining
25               in any situation where it now exists will be continued; (c) it assures
26               employees that in the event of any layoff or downgrading of their
27               employee classification in consequence of the development of any
28               project under the bill, they will receive basic job protection benefits
29               at least equivalent to those which have prevailed in the transportation
30               industries subject to Federal regulation; and (d) it provides for the
31               continuation of employment of any employees of any mass
32               transportation system which has been transferred in consequence of
33               any project which has been assisted under the bill.

34   *Id.* More specifically, section 13(c)(2) would no longer require only that protective arrangements

35   include provisions for "the encouragement of the continuation of collective bargaining rights."

36   Senator Morse's amendment used categorical language: "protective arrangements shall

37   /////

58

1   include . . . such provisions as may be necessary for . . . the continuation of collective bargaining

2   in any situation where it now exists . . . ." *Id.* at 5692.

3        Senator Morse explained his proposed amendment's "philosophy" by posing a question of

4   "policy." *Id.* at 5671.  "Should the Federal Government make available to cities, States, and local

5   governmental units Federal money to be used to strengthen their mass transit system in those

6   communities when the use of that money would result in lessening the collective bargaining

7   rights of existing unions?" *Id.*  Senator Morse thought not: "we cannot justify, as a matter of

8   public policy, the use of Federal dollars by a local community or a governmental unit thereof to

9   be spent for development of a transit system, the expenditure of which would result in worsening

10  the present collective bargaining rights of free labor which operates that transit system." *Id.*

11       On the other hand, however, Senator Morse did not believe "the transit bill should be used

12  in order to strengthen labor by imposing a union on a nonunion transit system." *Id.*  Nor did he

13  think "the bill should be used, in a new community where a transit system has to be built to

14  require that a union be established in that transit system." *Id.*  "[T]hat ought to depend on the

15  employees' free choice in the matter and on the processes of an orderly free collective bargaining

16  system between free labor and free employers." *Id.*  In short, he explained, "we ought to maintain

17  the status quo." *Id.*  "[W]hatever the arrangement is now—in comparable situations which might

18  not have occurred without the bill, whether in terms of displacement allowances, or of moving

19  allowances—such a severance arrangement is continued and collective bargaining rights are

20  continued." *Id.* at 5677.  He offered an example:

21         Suppose we consider company X and union A. Company X is going
22         into bankruptcy. It has been decided that city M will take over the
23         company. In my judgment, the city should be allowed to take over
24         the company, and my amendment would permit it, but it should be
25         allowed to do so only if the city is willing also to take over the labor-
26         management relations, if any, that have prevailed in the company. In
27         other words, if there is a collective bargaining agreement, it should
28         be understood that the city shall take them over [sic]. But I am told
29         that such an arrangement cannot be accepted by many Senators
30         because in some States there is a policy, by way of law, against
31         recognizing unions.

32         . . .

1      What we have in that situation under the substitute bill, as I see it, is
2      a conflict between a sound Federal public policy and a policy of a
3      State. The State can continue its State policy if it wishes to; but in the
4      judgment of the senior Senator from Oregon [Senator Morse], the
5      State should not be allowed to receive Federal money with which to
6      continue a policy that is in conflict with sound Federal policy.

7  *Id.* at 5671–72.

8      Senator Morse repeated that he expected only in "rare cases" would federal money not be

9  available because "local law prohibits collective bargaining." *Id.* at 5684. And even in that

10  situation, as noted above, *see supra* section III at 26, "all a city needs is a good lawyer, such as

11  the city of Memphis had. It established a private commission, under a contract by which the

12  private commission operates the line and has an agreement with the employees." *Id.*

13      Senator Morse made his case forcefully, but he left no doubt he was offering his own

14  opinion only. He peppered his remarks with parenthetical caveats: "I think," "as I see it," "that is

15  my position," and "in my judgment." *See id.* at 5670–84. He described his colleagues as

16  anything but unanimous. "[R]easonable men," he acknowledged, might "disagree" with his

17  position, even adamantly. *Id.* at 5671. The Senate "already had disagreement on the bill with

18  respect to that question." *Id.* He acknowledged that disagreements divided even the bill's

19  supporters. "I have worked on many complicated issues in the Senate," Senator Morse said. *Id.*

20  "However, I do not know that I have ever worked on one with more tug and pull, more conflict of

21  interests of various types, more complexities, than this issue." *Id.* He described his amendment

22  as "the composite result of many minds here in the Senate being brought to bear on a problem,

23  with individual Senators pressing for consideration of individual problems relative to their

24  States." *Id.* It took "some 800 man-hours . . . by experienced and skilled experts" to develop the

25  amendment. *Id.* at 5675. And it was hammered out not just on the Senate floor, but also in

26  private offices and the "cloakroom."[7] *Id.* at 5671.

---

[7] "The cloakrooms are off the floor of the House and Senate chambers, and they are similar to what other offices call break rooms." Kristi Keck, "Capitol Jobs You've Never Heard Of," CNN (Mar. 16, 2010). They "were originally designed, obviously, as places for members to leave their cloaks and other personal belongings, and they have historically been used for

1   Notwithstanding all the Senators' disputes, Morse's amendment was adopted by a vote of

2   52 to 41.  *Id.* at 5684–85.  The full Senate bill passed by the same vote.  *Id.* at 5688.

3   Debates in the House followed a similar pattern.  The bill's opponents decried the control

4   and influence it granted the federal government.  *See, e.g.*, 110 Cong. Rec. 14916 (June 24, 1964)

5   (Statement of Rep. Bolton).  They warned the bill would "increase the trend in public ownership

6   of mass transit systems."  110 Cong. Rec. 14902 (June 24, 1964) (Statement of Rep. Harvey).

7   Others criticized the labor protections as indefinite, slippery and half-baked.  Take representative

8   Taft's arguments, for example:

> The labor provisions of the mass transit bill have been subject to change at every stage in the consideration of this legislation. On the Senate side, the labor provisions in the administration bill as introduced were scrapped in the recommendation made by the subcommittee to the full committee. The full committee in reporting the bill, scrapped the recommendation from its subcommittee. When the bill was considered on the floor of the Senate, the committee reported provisions were scrapped by the Senate and a substitute floor amendment was adopted.
>
> On the House side, the history is similar. The labor provisions of the administration bill as introduced were disowned and a substitute proposed by the Secretary of Labor at the time when he appeared as a witness on the bill. His proposed substitute was junked by the committee and a different version appears in the bill as reported by the committee. On this bill we will be confronted with still another set of changes in the proposed amendment to this section (10(c))[8] of the bill. And I might add, this amendment if adopted would not conform the labor provisions to those of the Senate-passed bill in at least four important respects.
>
> There has not been any committee hearing on these changes. There has been no executive session of the committee to consider them. Indeed most members of this House only today have had an opportunity to even see or hear what these changes are.

32   *Id.* at 14903.  The bill's defenders downplayed the likelihood of public takeovers and portrayed

---

whispered conversations off the floor of the chamber."  Congress; Of Life in the Cloakroom, *New York Times* A22 (Jan. 21, 1986).

[8] The provisions that became section 13(c) were originally in the bill's tenth section.  *See supra* note 1.

the labor protections as necessary for "equity, justice and right to all the people who would be involved, who are now workers." 110 Cong. Rec. 14977 (June 25, 1964) (Statement of Rep. Rains). Eventually, with a few minor changes, including tweaks to section 13(c)(2), the House passed the transit bill. *See* Pub. L. No. 88-365, 78 Stat. 302 (July 9, 1964).

At least five broad conclusions can be drawn for this case from this history. First, the transit legislation was contentious and hard-fought. It was contested over a period of almost four years in weeks of testimony that fills thousands of pages. *See* 109 Cong. Rec. 5316 (Apr. 1, 1963) (Statement of Sen. Sparkman) (summarizing this history). It required sixteen days of committee deliberations alone for the bill to be reported out of the Senate committee. *Id.* The debate over labor protections ignited at the very end of the committee hearings. Senators labored to revise the labor protections several times in quick succession in a series of compromises that left many lawmakers skeptical and dissatisfied, even those who supported the transportation bill in general. With that long history behind them, and with an enacted law so close at hand, supporters expressed a preference for a flawed and ambiguous bill to no bill at all. *See, e.g.*, *id.* at 5317 (statement of Senator Sparkman) ("Quite frankly, I have reservations about some of the provisions of the bill. However, I believe that [the bill], in general, is a sound bill and that it will go a long way toward serving the mass transportation needs of this Nation and our people.").

Second, all who advocated in favor of the labor protections—labor representatives, the administration, and lawmakers alike—focused on a narrow set of relatively extreme circumstances: public acquisitions of private transit companies and the potential resulting losses of collective bargaining and contractual rights, such as those in Miami and Portland, and those avoided in Memphis. The administration that proposed the labor protections and the lawmakers who adopted them, including Senator Morse, did not expect the labor protections to be necessary in most cases. Senator Morse's amendment, for example, modified not only the language that eventually became section 13(c)(2), but also provisions limiting the circumstances in which federal funds could be used to fund transit company acquisitions or to subsidize government transit competitors. The goal of these protections, which witnesses and lawmakers mentioned repeatedly, was to prevent the federal government from sponsoring or subsidizing union-busting

62

1   transit company takeovers.  As Secretary Wirtz put it, the administration was "concerned

2   particularly about only the transitional effects upon particular employee groups."  S. Comm. Hr'g

3   at 308.

4          Third, in none of the recorded debates and testimony did any witness, Senator or

5   Representative voice concerns about a situation akin to what has spurred this litigation: a state

6   law, passed long after the transit bill was adopted, which does not prohibit collective bargaining

7   by longstanding public transit agencies, but which limits the types of benefits those agencies can

8   offer to the employee organizations with which they continue to negotiate.  Nothing in the

9   legislative history signals section 13(c)'s supporters thought the Labor Secretary would be

10  required to block federal funding if a state's pension laws permitted collective bargaining about

11  some types of pensions, but not others.  No testimony or speeches suggest lawmakers thought

12  they were commanding the Secretary to block funding proposals even when workers could

13  negotiate for equivalent, alternative pension benefits.  To the contrary, the legislative history

14  suggests section 13(c)'s supporters would have approved of such a state law.  As the First Circuit

15  explained, after reviewing the legislative history extensively in *Local Division 589*, lawmakers

16  stressed "the need for flexibility and discretion." 666 F.2d at 634.  As Senator Morse observed, all

17  it would take is a "good lawyer" to find a creative solution when state laws created obstacles.

18  109 Cong. Rec. 5684 (Apr. 4, 1963).

19         Fourth, Senator Morse's comments on the Senate floor do not bear the weight the ATU

20  places upon them.  For one, he expressed only his own views and arguments, not those of the

21  many other Senators and Representative who ultimately voted in favor of the transit bill.  Nor do

22  his comments show he himself would agree with the ATU's interpretation of his amendment.  He

23  intended to preserve the "status quo."  "[I]f there is a collective bargaining agreement, it should

24  be understood that the city shall take them over [sic]."  Id. at 5672.  The government would not

25  force any agency's employees to organize; nor would it place a finger on the scale.  Senator

26  Morse rejected the suggestion by labor advocates "that if a new transit company were to be

27  established with Federal funds contributed to it, there would have to be collective bargaining."

28  *Id.*

Fifth and finally, when the many proposed versions of section 13(c)(2) are laid side by side, its evolution offers no conclusive evidence of what lawmakers would have intended for a case like this one.  The administration originally proposed the following protection:

> It shall be a condition of the granting of any assistance or the financing of any project under this act that fair and equitable arrangements are made, as determined by the Administrator after consultation with and the concurrence of the Secretary of Labor, to protect the interests of employees affected by such assistance or financing.  Such protective arrangements shall include, without being limited to, such provisions as are found to be appropriate for . . . the prevention of curtailment of collective bargaining rights . . . .

S. Comm. Hr'g at 308.

The bill reported out of the committee rephrased this protection in positive terms.  Rather than "prevention of curtailment," it was "encouragement of the continuation":

> It shall be a condition of the granting of any assistance or the financing of any project under this Act that fair and equitable arrangements are made, as determined by the Administrator after consultation with and the concurrence of the Secretary of Labor, to protect the interests of employees affected by such assistance or financing.  Such protective arrangements shall include, without being limited to, such provisions as may be necessary for . . . the encouragement of the continuation of collective bargaining rights . . . .

S. Rep. No. 88-82 at 34.

After the Morse amendment, the section required a joint decision by the Secretary of Labor and the Housing and Urban Development Administrator, dropped "encouragement" and limited its protections to situations in which collective bargaining "now exists":

> It shall be a condition of the granting of any assistance or the financing of any project under this Act that fair and equitable arrangements are made, as determined jointly by the Administrator and the Secretary of Labor, to protect the interests of employees affected by such assistance or financing.  Such protective arrangements shall include, without being limited to, such provisions as may be necessary for . . . the continuation of collective bargaining in any situation where it now exists.

109 Cong. Rec. at  5692 (Apr. 4, 1963).  The mandatory phrasing and reference to "any situation

64

where it now exists" echoes Senator Morse's comments on the Senate floor that his amendment protected the "status quo."  As he argued, the transit bill should neither "break the back of collective bargaining in any transit system now in operation" nor "require that a union be established in that transit system."  *Id.* at 5670–72.

Finally, after House amendments and conferences between the House and Senate, the final version of section 13(c)(2) read as follows:

> It shall be a condition of any assistance under this Act that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for . . . the continuation of collective bargaining rights . . . .

Pub. L. No. 88-365, 78 Stat. 302 (July 9, 1964).  The House thus dropped the requirement for a joint decision by the Housing Administrator and the Secretary of Labor and referred to "collective bargaining rights" rather than "collective bargaining."  Senator Morse believed these changes were, "for the most part, technical and grammatical."  110 Cong. Rec. 15453 (June 30, 1964).  He thought the "substance" of the labor protections was "untouched."  *Id.*  Whether the meaning of section 13(c)(2) was the same, however, is unclear.  Senator Morse and others may very well have thought the changes were not worth any further negotiation or debate, lest no bill be passed at all.  *See, e.g.*, *id.* at 15454 (Statement of Sen. Morse) ("[U]nless we accept the bill in its present form, the probabilities are that we will have no bill at all.").

The modern version of section 13(c)(2) differs from the version adopted in 1964, but these differences are not meaningful for this case:

> (1) As a condition of financial assistance [under several sections of Title 49], the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance . . . shall specify the arrangements. . . . (2) Arrangements under this subsection shall include provisions that may be necessary for . . . the continuation of collective bargaining rights . . . .

49 U.S.C. § 5333(b)(1)–(2).

/////

1    As this court observed in the *California* litigation, these changes in the proposed statutory

2    text do not shed much light on how to interpret section 13(c)(2).  *See* 2016 WL 4441221, at \*15–

3    17.  On the one hand, Congress opted for the mandatory prescription rather than the

4    "encouragement of the continuation of collective bargaining rights," which suggests a strict,

5    unbending line.  *See id.* at \*16.  On the other hand, Congress decided not to adopt the

6    administration's proposal to prevent the "curtailment of collective bargaining rights," and "[t]he

7    word 'curtailment' communicates an intent to avoid diminutions more obviously than the phrase

8    'necessary for . . . the continuation.'"  *Id.*  If Senator Morse was correct that the final version of

9    section 13(c)(2) imposed the same limit as the language he proposed, then his proposal's

10   reference to "collective bargaining in any situation where it now exists" suggests Congress was

11   unconcerned with the distant future.  But Senator Morse might have been wrong, and the final

12   version of section 13(c)(2) might actually impose a stricter protection than he envisioned.  Or it

13   might have been intentionally ambiguous to maximize its flexibility.

14   In sum, the legislative history does not resolve the ambiguity in section 13(c)(2): it is

15   unclear whether Congress intended for the Secretary of Labor to deny funding applications

16   whenever collective bargaining rights were altered or diminished, no matter how slightly; whether

17   the protection in section 13(c)(2) applies to a smaller set of more consequential or serious

18   deprivations; or whether it is intentionally vague.  In any event, the legislative history does not

19   support the ATU's interpretation or resolve the ambiguity in the text of section 13(c)(2).

20   **VII.   CONCLUSION**

21   The Department of Labor issued its 2021 Determination without authority and truncated

22   its ordinary decision-making process arbitrarily.  As a result, it overlooked important parts of the

23   problem it purported to address.  In the end, the Department's reasoning, which rests primarily on

24   legal extrapolation, not subject-matter expertise, is unconvincing and arbitrary.  Its positions have

25   changed abruptly, for a second time and without regard for this court's prior orders.  It has

26   /////

27   /////

28   /////

1   rejected directly relevant evidence, overlooked important nuances and made assumptions that

2   lack support in the record.  Its 2021 Determination cannot stand.  The court orders as follows:

3       1.  California's motion to expand the administrative record (ECF No. 88) is **granted**.

4       2.  California's motion for leave to file a supplemental brief (ECF No. 104) is **denied**.

5       3.  The Department's and the ATU's motions are **granted in part** as to California's

6           second cross-claim, which is moot.  California's motion is accordingly **denied in**

7           **part** to the same extent.  In all other respects, California's cross-motion is

8           **granted**, and the Department's and ATU's motions are **denied**.

9       4.  At the hearing on the parties' cross-motions, the parties disagreed how the court

10          should determine what remedy or remedies are appropriate.  **Within thirty days**,

11          the parties shall meet and confer and file a joint status report proposing a schedule

12          to bring this matter to judgment justly and efficiently.  In their report, the parties

13          shall advise the court whether they would stipulate to converting the preliminary

14          injunction to a permanent injunction to avoid further delays and permit the

15          Department or the ATU to seek prompt appellate review, if they so choose.

16      5.  The preliminary injunction (ECF No. 83) **remains in place**.

17  This order resolves ECF Nos. 33, 39, 87, 88, 90, 92 and 104.

18  IT IS SO ORDERED.

19  DATED:  December 27, 2022.

20

21                                          CHIEF UNITED STATES DISTRICT JUDGE